No. 24-4114

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

BRIANNE DRESSEN,
*Plaintiff-Appellee*,

v.

ASTRAZENECA AB, a Sweden corporation, *et al.*,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Utah
No. 2:24-cv-00337-RJS-CMR (Chief Judge Robert J. Shelby)

## APPELLANTS' APPENDIX—VOLUME I OF II
## (AA1–AA214)

Arthur E. Brown
Alexander Cousins
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019

Matthew M. Cannon
Kamie F. Brown
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P. O. Box 45385
Salt Lake City, UT 84145

Robert Reeves Anderson
ARNOLD & PORTER
  KAYE SCHOLER LLP
1144 Fifteenth Street
Suite 3100
Denver, CO 80202
(303) 863-1000
reeves.anderson@arnoldporter.com

Samuel I. Ferenc
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001

*Counsel for Defendants-Appellants*

**Oral Argument Requested**

April 4, 2025

# INDEX

**Volume I of II**

District Court Docket Sheet ..................................................................................AA1

Complaint With Jury Demand,
    Dkt. 1 (May 13, 2024) ...............................................................AA11

    Ex. A: AZD1222 COVID Vaccine Participant Information Sheet and Consent
    Form and HIPAA Authorization (Nov. 4, 2020) (Dkt. 1-1) .....................AA49

    Ex. B: Participant Information Sheet and Consent Form and HIPAA
    Authorization (Nov. 6, 2020) (Dkt. 1-1)...................................................AA76

AstraZeneca Defendants' Motion to Dismiss Plaintiff's Complaint,
    Dkt. 24 (June 28, 2024) ...........................................................AA103

Plaintiff's Opposition to AstraZeneca's Motion to Dismiss,
    Dkt. 26 (July 26, 2024)............................................................AA128

AstraZeneca Defendants' Reply in Support of Motion to Dismiss,
    Dkt. 38 (Aug. 16, 2024) ..........................................................AA163

Plaintiff's Sur-Reply to AstraZeneca's Motion to Dismiss,
    Dkt. 45 (Sept. 6, 2024) ...........................................................AA187

AstraZeneca Defendants' Notice of Supplemental Authority,
    Dkt. 46 (Oct. 10, 2024) ...........................................................AA201

    Ex. A: *Redd v. Amazon.com, Inc.*, No. 20 C 6485, 2024 WL 2831463
    (N.D. Ill. June 4, 2024) (Dkt. 46-1) ........................................................AA204

Plaintiff's Response to AstraZeneca Defendants' Notice of
    Supplemental Authority,
    Dkt. 47 (Oct. 17, 2024) ...........................................................AA212

**Volume II of II**

Transcript of Motion Hearing Before the Honorable Judge Robert J. Shelby,
    Dkt. 50 (Oct. 29, 2024) ...........................................................AA215

Memorandum Decision and Order Denying AstraZeneca's Motion to Dismiss,
    Dkt. 49 (Nov. 4, 2024) ............................................................AA308

Defendants' Notice of Appeal,
Dkt. 53 (Nov. 12, 2024) ........................................................................... AA336

AstraZeneca Defendants' Motion to Stay Pending Appeal,
Dkt. 56 (Nov. 15, 2024) ........................................................................... AA338

Plaintiff's Opposition to AstraZeneca Defendants' Motion to Stay Pending Appeal,
Dkt. 60 (Nov. 22, 2024) ........................................................................... AA347

AstraZeneca Defendants' Reply in Support of Motion to Stay Pending Appeal,
Dkt. 61 (Nov. 27, 2024) ........................................................................... AA356

AstraZeneca Defendants' Answer and Affirmative Defenses to
Plaintiff's Complaint,
Dkt. 65 (Dec. 13, 2024) ........................................................................... AA367

Memorandum Decision and Order Granting AstraZeneca's Motion to Stay,
Dkt. 69 (Jan. 21, 2025) ........................................................................... AA403

STAYED,(b)(1)(A),MAG,ACCO,APPEAL,JURY

## US District Court Electronic Case Filing System
### District of Utah (Central)
### CIVIL DOCKET FOR CASE #: 2:24−cv−00337−RJS−CMR

Dressen v. AstraZeneca AB et al
Assigned to: Judge Robert J. Shelby
Referred to: Magistrate Judge Cecilia M. Romero
Case in other court:  Tenth Circuit, 24−04114
Cause: 28:1332 Diversity−Breach of Contract

Date Filed: 05/13/2024
Jury Demand: Plaintiff
Nature of Suit: 110 Insurance
Jurisdiction: Diversity

**Plaintiff**

**Brianne Dressen**                    represented by  **Jason R. Hull**
MARSHALL OLSON & HULL PC
10 EXCHANGE PL STE 350
SALT LAKE CITY, UT 84111
(801)456−7655
Email: jhull@mohtrial.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aaron Siri**
SIRI & GLIMSTAD LLP
745 FIFTH AVE STE 500
NEW YORK, NY 10151
888−747−4529
Email: aaron@sirillp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anikka Hoidal**
MARSHALL OLSON & HULL PC
10 EXCHANGE PL STE 350
SALT LAKE CITY, UT 84111
801−244−6307
Email: ahoidal@mohtrial.com
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Brehm**
745 FIFTH AVE STE 500
745 FIFTH AVE STE 500
NEW YORK, NY 10151
888−747−4529
Fax: 646−417−5967
Email: ebrehm@sirillp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Connett**
SIRI & GLIMSTAD LLP
700 S FLOWER ST STE 1000
LOS ANGELES, CA 90017
213−974−1740
Email: mconnett@sirillp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**AstraZeneca AB**                    represented by  **Aaron C. Hinton**
RAY QUINNEY & NEBEKER PC

36 S STATE ST STE 1400
PO BOX 45385
SALT LAKE CITY, UT 84145–0385
(801)532–1500
Email: ahinton@rqn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kamie F. Brown**
RAY QUINNEY & NEBEKER PC
36 S STATE ST STE 1400
PO BOX 45385
SALT LAKE CITY, UT 84145–0385
(801)532–1500
Email: kbrown@rqn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew M. Cannon**
RAY QUINNEY & NEBEKER PC
36 S STATE ST STE 1400
PO BOX 45385
SALT LAKE CITY, UT 84145–0385
(801)323–3364
Email: mcannon@rqn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Cousins**
ARNOLD & PORTER KAYE SCHOLER
LLP
250 W 55TH ST
NEW YORK, NY 10019–9710
212–836–8000
Email: alexander.cousins@arnoldporter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Arthur E. Brown**
ARNOLD & PORTER KAYE SCHOLER
LLP
250 W 55TH ST
NEW YORK, NY 10019–9710
212–836–8592
Email: arthur.brown@arnoldporter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel I. Ferenc**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 MASSACHUSETTS AVE NW
WASHINGTON, DC 20001–3743
202–942–5729
Email: sam.ferenc@arnoldporter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Velocity Clinical Research, Inc.**
*TERMINATED: 08/07/2024*

represented by **Mark A. Nickel**
GORDON REES SCULLY
MANSUKHANI
15 W SOUTH TEMPLE STE 1600
SALT LAKE CITY, UT 84101

801−204−9990
Email: mnickel@grsm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Zachary A. Bloomer**
GORDON REES SCULLY
MANSUKHANI
15 W SOUTH TEMPLE STE 1600
SALT LAKE CITY, UT 84101
480−313−9740
Email: zbloomer@grsm.com
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **AstraZeneca Pharmaceuticals LP** | represented by | **Aaron C. Hinton** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kamie F. Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew M. Cannon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Cousins**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Arthur E. Brown**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel I. Ferenc**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/13/2024 | 1 | COMPLAINT against AstraZeneca AB, AstraZeneca Pharmaceuticals LP, Velocity Clinical Research, Inc. (Filing fee $ 405, receipt number AUTDC−5059787) filed by Brianne Dressen. (Attachments: # 1 Exhibit (Consent Form), # 2 Exhibit Civil Cover Sheet) (Hull, Jason) (Entered: 05/13/2024) |
| 05/13/2024 | 2 | NOTICE of Appearance by Anikka Hoidal on behalf of Brianne Dressen (Hoidal, Anikka) (Entered: 05/13/2024) |
| 05/13/2024 | 3 | NOTICE OF REQUIREMENTS for appearance Pro Hac Vice mailed to attorney Aaron Siri, Elizabeth Brehm and Michael Connett for Brianne Dressen (Attachments: # 1 Supplement PHV Notice) (kec) (Entered: 05/13/2024) |
| 05/13/2024 | | Judge Robert J. Shelby added.<br><br>Case number will now read **2:24−cv−00337−RJS.** Please make changes to document captions accordingly. (kec) (Entered: 05/13/2024) |

| | | |
|---|---|---|
| 05/13/2024 | 4 | NOTICE OF MAGISTRATE JUDGE AVAILABILITY TO PRESIDE OVER CASE– Under 28 U.S.C. 636(c), Fed. R. Civ. P. 73, and DUCivR 72–4, you are hereby notified that a magistrate judge for the District of Utah may conduct any or all proceedings in this case, including a jury or bench trial and entry of a final judgment. Exercise of this jurisdiction by the magistrate judge is permitted only if all parties voluntarily sign and return the form. To consent, return the Consent Form to the clerk's office within 21 days via efile at consents@utd.uscourts.gov or mail at the address on the form. **Please do not efile the Consent Form in the case.** Notice emailed or mailed to Plaintiff Brianne Dressen. (Notice generated by Clerk's office) Form due by 6/3/2024. (kec) (Entered: 05/13/2024) |
| 05/13/2024 | 5 | Summons Issued Electronically as to AstraZeneca AB. Instructions to Counsel: 1. Click on the document number. 2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF. 3. Print the issued summons for service. (kec) (Entered: 05/13/2024) |
| 05/13/2024 | 6 | Summons Issued Electronically as to AstraZeneca Pharmaceuticals LP. Instructions to Counsel: 1. Click on the document number. 2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF. 3. Print the issued summons for service. (kec) (Entered: 05/13/2024) |
| 05/13/2024 | 7 | Summons Issued Electronically as to Velocity Clinical Research, Inc.. Instructions to Counsel: 1. Click on the document number. 2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF. 3. Print the issued summons for service. (kec) (Entered: 05/13/2024) |
| 05/13/2024 | 8 | MOTION for Admission Pro Hac Vice of Aaron Siri , Registration fee $ 50, receipt number AUTDC–5060048, <br><br> Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf–electronic–case–filing. <br><br> filed by Plaintiff Brianne Dressen. (Attachments: # 1 Exhibit Pro Hac Vice Application, # 2 Text of Proposed Order)(Hull, Jason) (Entered: 05/13/2024) |
| 05/13/2024 | 9 | MOTION for Admission Pro Hac Vice of Elizabeth A. Brehm , Registration fee $ 50, receipt number AUTDC–5060055, <br><br> Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf–electronic–case–filing. <br><br> filed by Plaintiff Brianne Dressen. (Attachments: # 1 Exhibit Pro Hac Vice Application, # 2 Text of Proposed Order)(Hull, Jason) (Entered: 05/13/2024) |
| 05/13/2024 | 10 | MOTION for Admission Pro Hac Vice of Michael Connett , Registration fee $ 50, receipt number AUTDC–5060058, <br><br> Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf–electronic–case–filing. <br><br> filed by Plaintiff Brianne Dressen. (Attachments: # 1 Exhibit Pro Hac Vice |

| | | |
|---|---|---|
| | | Application, # 2 Text of Proposed Order)(Hull, Jason) (Entered: 05/13/2024) |
| 05/14/2024 | 11 | ORDER granting 8 , 9 and 10 Motion for Admission Pro Hac Vice of Attorney Aaron Siri, Elizabeth A. Brehm, Michael Connett for Brianne Dressen.<br><br>*Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf−electronic−case−filing.***A Pro Hac Vice Attorney who fails to register for CM/ECF access will not receive notifications of electronic filings.***<br><br>*Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules−practice.*<br><br>Signed by Judge Robert J. Shelby on 5/13/2024. (mh) (Entered: 05/14/2024) |
| 05/14/2024 | 12 | SUMMONS Returned Executed by Brianne Dressen. Summons served on AstraZeneca Pharmaceuticals LP, on 5/14/2024. (Hoidal, Anikka) (Entered: 05/14/2024) |
| 05/14/2024 | 13 | SUMMONS Returned Executed by Brianne Dressen. Summons served on AstraZeneca AB, on 5/14/2024. (Hoidal, Anikka) (Entered: 05/14/2024) |
| 05/14/2024 | 14 | SUMMONS Returned Executed by Brianne Dressen. Summons served on Velocity Clinical Research, Inc., on 5/14/2024. (Hoidal, Anikka) (Entered: 05/14/2024) |
| 05/28/2024 | 15 | NOTICE of Appearance by Kamie F. Brown on behalf of AstraZeneca AB, AstraZeneca Pharmaceuticals LP (Brown, Kamie) (Entered: 05/28/2024) |
| 05/28/2024 | 16 | Stipulated MOTION for Extension of Time to File Answer ~~Response/Reply~~ as to 1 Complaint, filed by Defendants AstraZeneca AB, AstraZeneca Pharmaceuticals LP. (Attachments: # 1 Text of Proposed Order Exhibit A)(Brown, Kamie) Modified by correcting motion event and text on 5/28/2024 (mh). (Entered: 05/28/2024) |
| 05/28/2024 | 17 | Modification of Docket re 16 MOTION: Error: Pleading filed under Motion event, Motion for Extension of Time to File Response/Reply. Pleading seeks additional time to file an answer. Correction: Pleading event corrected to, Motion for Extension of Time to File Answer. No further action needed. (mh) (Entered: 05/28/2024) |
| 05/28/2024 | 18 | ORDER granting 16 Motion for Extension of Time to Answer. DEFENDANTS AstraZeneca AB and AstraZeneca Pharmaceuticals LP shall have up to and including Friday, June 28, 2024 to respond to Plaintiff's 1 Complaint. Signed by Judge Robert J. Shelby on 5/28/2024. (mh) (Entered: 05/28/2024) |
| 05/28/2024 | 19 | ORDER REFERRING CASE to Magistrate Judge Jared C. Bennett under 28:636 (b)(1)(A), Magistrate Judge to hear and determine all nondispositive pretrial matters. No attached document. Signed by Judge Robert J. Shelby on 5/28/2024. (mjm) (Entered: 05/28/2024) |
| 05/28/2024 | 20 | ORDER TO PROPOSE SCHEDULE – See order for details. Signed by Magistrate Judge Jared C. Bennett on 5/28/2024. (haa) (Entered: 05/28/2024) |
| 06/03/2024 | 21 | ORDER OF RECUSAL Magistrate Judge Jared C. Bennett recused. Case reassigned to Magistrate Judge Cecilia M. Romero for all further proceedings. Signed by Magistrate Judge Jared C. Bennett on 6/3/2024. (mh) (Entered: 06/03/2024) |
| 06/04/2024 | 22 | Stipulated MOTION for Extension of Time to File Answer re 1 Complaint, and Memorandum in Support filed by Defendant Velocity Clinical Research, Inc.. (Attachments: # 1 Text of Proposed Order Granting Stipulated Motion to Extend Time for Defendant Velocity to Respond to the Complaint) Motions referred to Cecilia M. Romero. Attorney Mark A. Nickel added to party Velocity Clinical Research, Inc.(pty:dft)(Nickel, Mark) (Entered: 06/04/2024) |
| 06/05/2024 | 23 | ORDER granting 22 Motion for Extension of Time to Answer. Defendant Velocity Clinical Research, Inc. to file a response to the 1 Complaint on or before June 28, 2024. Signed by Magistrate Judge Cecilia M. Romero on 6/5/2024. (mh) (Entered: 06/05/2024) |

| | | |
|---|---|---|
| 06/28/2024 | 24 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Defendants AstraZeneca AB, AstraZeneca Pharmaceuticals LP. (Brown, Kamie) (Entered: 06/28/2024) |
| 07/12/2024 | 25 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Defendant Velocity Clinical Research, Inc.. Attorney Zachary A. Bloomer added to party Velocity Clinical Research, Inc.(pty:dft)(Bloomer, Zachary) (Entered: 07/12/2024) |
| 07/26/2024 | 26 | RESPONSE to Motion re 24 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Plaintiff Brianne Dressen. (Attachments: # 1 Text of Proposed Order)(Connett, Michael) (Entered: 07/26/2024) |
| 08/07/2024 | 27 | NOTICE of Voluntary Dismissal of Velocity Clinical Research, Inc. filed by Plaintiff Brianne Dressen (Hoidal, Anikka) (Entered: 08/07/2024) |
| 08/07/2024 | 28 | Stipulated MOTION for Extension of Time to File Response/Reply as to 24 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Defendants AstraZeneca AB, AstraZeneca Pharmaceuticals LP. (Attachments: # 1 Text of Proposed Order Exhibit A) Motions referred to Cecilia M. Romero.(Brown, Kamie) (Entered: 08/07/2024) |
| 08/07/2024 | 29 | DOCKET TEXT ORDER: On August 7, 2024, Plaintiff filed 27 NOTICE of Voluntary Dismissal of Defendant Velocity Clinical Research, Inc. Under Fed. R. Civ. P. 41(a)(1)(A)(i), the dismissal of Velocity is self– effectuating. Pursuant to the terms of the notice of voluntary dismissal, this case is dismissed without prejudice against Defendant Velocity only. As a result of the voluntary dismissal, 25 Defendant Velocitys Motion to Dismiss is DENIED without prejudice as moot. Signed by Judge Robert J. Shelby on 8/7/2024. No attached document. (mh) Modified by updating text per chambers and correcting typo on 8/7/2024 (mh). (Entered: 08/07/2024) |
| 08/07/2024 | 30 | Modification of Docket re 29 Docket Text Order on Motion to Dismiss for Failure to State a Claim: Docket text has been updated per chambers and typo corrected. (mh) (Entered: 08/07/2024) |
| 08/08/2024 | 31 | ORDER granting 28 Motion for Extension of Time to File Response/Reply. AstraZeneca Defendants shall have up to and including Friday, August 16, 2024, to file a reply in support of their 24 Motion to Dismiss Plaintiff's Complaint in the above–referenced matter. Signed by Magistrate Judge Cecilia M. Romero on 8/8/2024. (mh) (Entered: 08/08/2024) |
| 08/15/2024 | 32 | MOTION for Leave to File Excess Pages *Re Reply Memorandum in Support of Motion to Dismiss Plaintiff's Complaint* filed by Defendants AstraZeneca AB, AstraZeneca Pharmaceuticals LP. (Attachments: # 1 Text of Proposed Order Exhibit A) Motions referred to Cecilia M. Romero.(Brown, Kamie) (Entered: 08/15/2024) |
| 08/15/2024 | 33 | NOTICE of Appearance by Aaron C. Hinton on behalf of AstraZeneca AB, AstraZeneca Pharmaceuticals LP (Hinton, Aaron) (Entered: 08/15/2024) |
| 08/16/2024 | 34 | ORDER granting 32 Motion for Leave to File Excess Pages. AstraZeneca Defendants may file an overlength Reply Memorandum in Support of 24 Motion to Dismiss Plaintiff's Complaint consisting of a total of 19 pages. Signed by Magistrate Judge Cecilia M. Romero on 8/16/2024. (mh) Modified by correcting typo on 8/16/2024 (mh). (Entered: 08/16/2024) |
| 08/16/2024 | 35 | MOTION for Admission Pro Hac Vice of Arthur E. Brown , Registration fee $ 50, receipt number AUTDC–5156469,<br><br>Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html.<br>Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf–electronic–case–filing.<br><br>filed by Defendants AstraZeneca AB, AstraZeneca Pharmaceuticals LP. (Attachments: # 1 Exhibit A Application for Admission, # 2 Text of Proposed Order Exhibit B)(Brown, Kamie) (Entered: 08/16/2024) |

| 08/16/2024 | 36 | MOTION for Admission Pro Hac Vice of Alexander Cousins , Registration fee $ 50, receipt number AUTDC−5156481,<br><br>Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html.<br>Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf−electronic−case−filing.<br><br>filed by Defendants AstraZeneca AB, AstraZeneca Pharmaceuticals LP. (Attachments: # 1 Exhibit A − Application for Admission, # 2 Text of Proposed Order Exhibit B)(Brown, Kamie) (Entered: 08/16/2024) |
| 08/16/2024 | 37 | MOTION for Admission Pro Hac Vice of Samuel I. Ferenc , Registration fee $ 50, receipt number AUTDC−5156489,<br><br>Attorneys awaiting Pro Hac Vice admission should immediately register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html.<br>Registration requests will not be approved until the court has granted the pro hac vice motion. Instructions are available on the court's website at https://www.utd.uscourts.gov/cmecf−electronic−case−filing.<br><br>filed by Defendants AstraZeneca AB, AstraZeneca Pharmaceuticals LP. (Attachments: # 1 Exhibit A − Application for Admission, # 2 Text of Proposed Order Exhibit B)(Brown, Kamie) (Entered: 08/16/2024) |
| 08/16/2024 | 38 | REPLY to Response to Motion re 24 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Defendants AstraZeneca AB, AstraZeneca Pharmaceuticals LP. (Brown, Kamie) (Entered: 08/16/2024) |
| 08/19/2024 | 39 | ORDER granting 35 Motion for Admission Pro Hac Vice of Attorney Arthur E. Brown for AstraZeneca AB,Arthur E. Brown for AstraZeneca Pharmaceuticals LP.<br><br>*Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf−electronic−case−filing.***A Pro Hac Vice Attorney who fails to register for CM/ECF access will not receive notifications of electronic filings.***<br><br>*Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules−practice.*<br><br>Signed by Magistrate Judge Cecilia M. Romero on 8/19/2024. (mh) (Entered: 08/19/2024) |
| 08/19/2024 | 40 | ORDER granting 36 Motion for Admission Pro Hac Vice of Attorney Alexander Cousins for AstraZeneca AB,Alexander Cousins for AstraZeneca Pharmaceuticals LP.<br><br>*Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf−electronic−case−filing.***A Pro Hac Vice Attorney who fails to register for CM/ECF access will not receive notifications of electronic filings.***<br><br>*Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules−practice.*<br><br>Signed by Magistrate Judge Cecilia M. Romero on 8/19/2024. (mh) (Entered: 08/19/2024) |
| 08/19/2024 | 41 | ORDER granting 37 Motion for Admission Pro Hac Vice of Attorney Samuel I. Ferenc for AstraZeneca AB,Samuel I. Ferenc for AstraZeneca Pharmaceuticals LP. |

*Attorneys admitted Pro Hac Vice must register to efile and receive electronic notification of case activity in the District of Utah at https://www.pacer.uscourts.gov/cmecf/dcbk.html. Instructions are available at https://www.utd.uscourts.gov/cmecf−electronic−case−filing.* **A Pro Hac Vice Attorney who fails to register for CM/ECF access will not receive notifications of electronic filings.**

*Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at https://www.utd.uscourts.gov/rules−practice.*

Signed by Magistrate Judge Cecilia M. Romero on 8/19/2024. (mh) (Entered: 08/19/2024)

| | | |
|---|---|---|
| 08/21/2024 | 42 | **NOTICE OF HEARING ON MOTION** re: 24 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support : (Notice generated by Mary Jane McNamee) Motion Hearing set for 10/29/2024 at 01:30 PM in Rm 3.100 before Judge Robert J. Shelby. (mjm) (Entered: 08/21/2024) |
| 08/26/2024 | 43 | Stipulated MOTION to Permit Plaintiff to File a Sur–Reply to AstraZeneca Defendants' Motion to Dismiss re 24 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support and Memorandum in Support filed by Plaintiff Brianne Dressen. (Attachments: # 1 Exhibit 1 Proposed Order) Motions referred to Cecilia M. Romero.(Hoidal, Anikka) (Entered: 08/26/2024) |
| 08/26/2024 | 44 | ORDER granting 43 Motion for Plaintiff to File a Sur–Reply. Plaintiff Brianne Dressen has up to and including September 6, 2024 to file a ten–page sur–reply to Defendants AstraZeneca AB and AstraZeneca Pharmaceuticals LP's 24 Motion to Dismiss. Signed by Magistrate Judge Cecilia M. Romero on 8/26/2024. (mh) (Entered: 08/26/2024) |
| 09/06/2024 | 45 | Sur–reply REPLY to Response to Motion re 24 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Plaintiff Brianne Dressen. (Connett, Michael) (Entered: 09/06/2024) |
| 10/10/2024 | 46 | NOTICE of SUPPLEMENTAL AUTHORITY by AstraZeneca AB, AstraZeneca Pharmaceuticals LP re 24 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support (Attachments: # 1 Exhibit A – Redd v. Amazon.com Inc.) (Brown, Kamie) (Entered: 10/10/2024) |
| 10/17/2024 | 47 | RESPONSE re 46 Notice of Supplemental Authority,, filed by Brianne Dressen. (Connett, Michael) (Entered: 10/17/2024) |
| 10/29/2024 | 48 | Minute Entry for proceedings held before Judge Robert J. Shelby: Motion Hearing held on 10/29/2024, re: 24 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by AstraZeneca Pharmaceuticals LP, AstraZeneca AB. Counsel appeared in person. Oral argument heard. The matter is taken under advisement. Attorney for Plaintiff: Michael Connett, Jason Hull, Anikka Hoidal; Attorney for Defendant: Kamie Brown, Arthur Brown, Alexander Cousins. Court Reporter: Tina Greene. Recording: Electronic.(mjm) (Entered: 10/29/2024) |
| 11/04/2024 | 49 | MEMORANDUM DECISION AND ORDER denying AstraZeneca's 24 Motion to Dismiss for Failure to State a Claim. Signed by Judge Robert J. Shelby on 11/4/2024. (mh) (Entered: 11/04/2024) |
| 11/06/2024 | 50 | **\*\*RESTRICTED DOCUMENT\*\*** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on October 29, 2024 before Judge Robert J. Shelby. Court Reporter/Transcriber Teena Green, RPR, CRR, CBC, Telephone number 801–910–4092.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Please review the transcript within 14 days after receiving this notice to determine if personal data identifiers need to be redacted. If redaction is not required, the transcript will be made electronically available 90 days after this notice. If redaction of personal identifies is needed, a party must file a Notice of Intent to Request Redaction within 21 days after receiving this notice. Within 42 days after receiving this notice, a party must file a Redaction Request identifying the information that must be redacted. Please** |

| | | |
|---|---|---|
| | | review DUCivR 5.2–1 for additional information about redacting personal identifiers or protected information. The Attorney Filing the Notice of Intent To Request Redaction and Redaction request must send a copy to the court reporter. The court will not send a copy to the court reporter.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Request Redaction due 11/27/2024. Redaction Request due 12/18/2024. Redacted Transcript Deadline set for 1/8/2025. Release of Transcript Restriction set for 2/4/2025. (mh) Modified by removing restricted text on 2/4/2025 (kec). (Entered: 11/06/2024) |
| 11/06/2024 | 51 | Transcript Purchased by: Michael Connett re 50 transcript(s) of 10/29/2024. (mh) (Entered: 11/06/2024) |
| 11/12/2024 | 52 | NOTICE of Appearance by Matthew M. Cannon on behalf of AstraZeneca AB, AstraZeneca Pharmaceuticals LP (Cannon, Matthew) (Entered: 11/12/2024) |
| 11/12/2024 | 53 | NOTICE OF APPEAL as to 49 Order on Motion to Dismiss for Failure to State a Claim, Memorandum Decision filed by AstraZeneca AB, AstraZeneca Pharmaceuticals LP. Appeals to the USCA for the 10th Circuit. Filing fee $ 605, receipt number AUTDC–5241437. (Brown, Kamie) (Entered: 11/12/2024) |
| 11/14/2024 | 54 | Transmission of Preliminary Record to USCA 10th Circuit re 53 Notice of Appeal. (Attachments: # 1 Appendix)(mh) (Entered: 11/14/2024) |
| 11/15/2024 | 55 | USCA Case Number Case Appealed to Tenth Circuit Case Number 24–4114 for 53 Notice of Appeal, filed by AstraZeneca Pharmaceuticals LP, AstraZeneca AB. A transcript order form or notice that no transcript is necessary per 10th Cir. R. 10.2. This form must be filed in both the district court and this court. See letter for additional information. (jrj) (Entered: 11/15/2024) |
| 11/15/2024 | 56 | MOTION to Stay re 53 Notice of Appeal, and Memorandum in Support filed by Defendants AstraZeneca AB, AstraZeneca Pharmaceuticals LP. Motions referred to Cecilia M. Romero.(Cannon, Matthew) (Entered: 11/15/2024) |
| 11/15/2024 | 57 | MOTION for Extension of Time to File Answer re 1 Complaint, and Memorandum in Support filed by Defendants AstraZeneca AB, AstraZeneca Pharmaceuticals LP. (Attachments: # 1 Text of Proposed Order Exhibit A) Motions referred to Cecilia M. Romero.(Cannon, Matthew) (Entered: 11/15/2024) |
| 11/18/2024 | 58 | DOCKET TEXT ORDER granting 57 Motion for Extension of Time to Answer re 1 Complaint. For good cause appearing, the court hereby extends the Answer deadline for AstraZeneca AB and AstraZeneca Pharmaceuticals LP to 12/13/2024. Signed by Magistrate Judge Cecilia M. Romero on 11/18/2024. No attached document. (jfm) (Entered: 11/18/2024) |
| 11/18/2024 | 59 | DOCKET TEXT ORDER TO EXPEDITE BRIEFING. The court directs Plaintiff to submit a response or notice of non–opposition to AstraZeneca Defendants' 56 Motion to Stay no later than November 22, 2024. No attached document. Signed by Magistrate Judge Cecilia M. Romero on 11/18/2024. (jfm) (Entered: 11/18/2024) |
| 11/22/2024 | 60 | Plaintiff's MEMORANDUM in Opposition re 56 MOTION to Stay re 53 Notice of Appeal, and Memorandum in Support filed by Plaintiff Brianne Dressen. (Hoidal, Anikka) (Entered: 11/22/2024) |
| 11/27/2024 | 61 | REPLY to Response to Motion re 56 MOTION to Stay re 53 Notice of Appeal, and Memorandum in Support filed by Defendants AstraZeneca AB, AstraZeneca Pharmaceuticals LP. (Cannon, Matthew) (Entered: 11/27/2024) |
| 11/27/2024 | 62 | TENTH CIRCUIT APPEALS TRANSCRIPT ORDER FORM filed by AstraZeneca AB, AstraZeneca Pharmaceuticals LP for proceedings held on 10/29/2024 before Judge Robert J. Shelby, re 53 Notice of Appeal, (Cannon, Matthew) (Entered: 11/27/2024) |
| 12/02/2024 | 63 | Please be advised the Record is complete for purposes of appeal for USCA 10th Circuit case number 24–4114 re 53 Notice of Appeal. (mh) (Entered: 12/02/2024) |

| | | |
|---|---|---|
| 12/10/2024 | 64 | REQUEST to Submit for Decision re 56 MOTION to Stay re 53 Notice of Appeal, and Memorandum in Support filed by Defendants AstraZeneca AB, AstraZeneca Pharmaceuticals LP. (Cannon, Matthew) (Entered: 12/10/2024) |
| 12/13/2024 | 65 | ANSWER to Complaint filed by AstraZeneca AB, AstraZeneca Pharmaceuticals LP.(Cannon, Matthew) (Entered: 12/13/2024) |
| 12/17/2024 | 66 | Motions No Longer Referred: 56 MOTION to Stay re 53 Notice of Appeal, and Memorandum in Support . District Judge Robert J. Shelby will handle the motion. (mjm) (Entered: 12/17/2024) |
| 01/17/2025 | 67 | NOTICE of AstraZeneca's Position on Jurisdiction and Discovery by AstraZeneca AB, AstraZeneca Pharmaceuticals LP (Attachments: # 1 Exhibit A – 10th Circuit Docket) (Cannon, Matthew) (Entered: 01/17/2025) |
| 01/17/2025 | 68 | Plaintiff's MOTION for Scheduling Order ~~MOTION for Initial Scheduling Conference~~ and Memorandum in Support filed by Plaintiff Brianne Dressen. (Attachments: # 1 Exhibit 1 Attorney Planning Meeting Report, # 2 Exhibit 2 Plaintiff's Proposed Scheduling Order) Motions referred to Cecilia M. Romero.(Hoidal, Anikka) Modified by correcting motion event and text on 1/21/2025 (mh). (Entered: 01/17/2025) |
| 01/21/2025 | 69 | MEMORANDUM DECISION AND ORDER granting AstraZeneca's 56 Motion to Stay. Signed by Judge Robert J. Shelby on 1/21/2025. (mh) (Entered: 01/21/2025) |
| 01/21/2025 | 70 | Modification of Docket re 68 MOTON: Pleading filed under motion event, MOTION for Initial Scheduling Conference. Pleading event corrected to MOTION for Scheduling Order. No further action needed. (mh) (Entered: 01/21/2025) |
| 02/03/2025 | 71 | DOCKET TEXT ORDER denying 68 Motion for Scheduling Order. In light of the court's 69 MEMORANDUM DECISION AND ORDER granting AstraZeneca's 56 Motion to Stay, the court DENIES Plaintiff's 68 Motion for Scheduling Order without prejudice. Signed by Magistrate Judge Cecilia M. Romero on 2/3/2025. No attached document. (jfm) (Entered: 02/03/2025) |

Jason R. Hull [11202]
jhull@mohtrial.com
Anikka T. Hoidal [16489]
ahoidal@mohtrial.com
**MARSHALL OLSON & HULL, PC**
Newhouse Building
Ten Exchange Place, Suite 350
Salt Lake City, Utah 84111
Tel: (801) 456-7655

*Attorneys for Plaintiff*

*\*Pro Hac Vice Forthcoming*

Aaron Siri\*
aaron@sirillp.com
Elizabeth A. Brehm\*
ebrehm@sirillp.com
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Ste 500
New York, NY 10151
Tel: (888) 747-4529

Michael Connett\*
mconnett@sirillp.com
**SIRI & GLIMSTAD LLP**
700 S. Flower St., Suite 1000
Los Angeles, CA 90017
Tel: (888) 747-4529

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **BRIANNE DRESSEN,**<br>**Plaintiff,**<br><br>**v.**<br><br>**ASTRAZENECA AB; ASTRAZENECA**<br>**PHARMACEUTICALS LP; and VELOCITY**<br>**CLINICAL RESEARCH, INC.,**<br><br>**Defendants.** | **COMPLAINT WITH JURY DEMAND**<br><br><br>   **Case Number 2:24-cv-337**<br><br>   **Judge _____** |

Plaintiff Brianne Dressen, by counsel, files this Complaint against the above-named Defendants and alleges as follows:

## **INTRODUCTION**

1.      On the morning of November 4, 2020, Brianne Dressen ("**Bri**") was the picture of good health, enjoying an active and athletic life with her husband and two young children.

2.      At 39 years of age, Bri was an avid rock climber, hiker, snowboarder, wakeboarder, and snowshoer. She and her husband, Brian, met through their mutual love of rock climbing, enjoying their first date on top of Mount Olympus.

3.      Bri had always wanted to be a mother and a teacher, and, by 2020, she had the good fortune of being both: a preschool teacher, and the mother of two young children. Bri was busy, a good kind of busy: teaching her preschoolers every day; taking her children to soccer games, swim lessons, and piano practices; and planning weekend outings for the family.





4.      In 2020, the COVID pandemic was raging, and Bri did her best to make the unknowns of the pandemic a little less scary for her children and preschoolers.

5.      As with many other Americans, Bri and her husband, a chemist for the US Army, were hopeful that the development of COVID vaccines would help stop the spread of the novel virus.

6.      In the fall of 2020, Bri heard there was going to be a clinical trial in nearby Salt Lake County for an experimental COVID vaccine made by the pharmaceutical company AstraZeneca.

7.      Bri wanted to do her part to help with the development of the vaccine. So, on November 4, 2020, she drove to the company's Salt Lake clinic.

8.      When she got to the clinic, Bri was given a consent form that spelled out the procedures she would need to undergo if she participated (e.g., a physical exam, nasal swabs, pregnancy test, blood draws, saliva samples, etc.), the potential side effects that could occur, and what would happen in the event she suffered a serious adverse reaction during the trial.

9.      Importantly, the consent form promised that AstraZeneca would "cover the costs" if a participant suffered a "research injury," including but not limited to medical bills. In a section titled "Compensation for study related injury," the consent form stated:

> If you become ill or are injured while you are in this research study, you must tell your study doctor straight away. The study doctor will **provide medical treatment or refer you for treatment**. . . .
>
> The Sponsor has an insurance policy to **cover the costs of research injuries** as long as you have followed your study doctor's instructions. **Sponsor will pay the costs of medical treatment for research injuries**, provided that the costs are reasonable, and you did not cause the injury yourself.

**AA13**                    **AA13**                    **AA13**

10.     With these reassurances should something go wrong, Bri signed the form, rolled up her sleeve, and let the drug company inject the experimental product into her arm. Her mind was at peace, as Bri believed she was doing the right thing for her country, her students, and her family.

11.     But things quickly took a turn. Bri's right arm began tingling and prickling within an hour of the shot. It was a condition called paresthesia, as Bri would soon learn.

12.     Bri figured the paresthesia was temporary. But it did not go away. Instead, it spread over the next few hours: first to her right shoulder, then to her left arm.

13.     Bri still thought this was just a fleeting effect. But that evening other progressively worrying symptoms emerged: blurred vision, double vision, headache, sound sensitivity, a loud ringing in the ears (tinnitus), nausea, vomiting, fever, and chills.

14.     By morning, the fever and chills had passed, but the other symptoms remained and were getting worse.

15.     Over the next few weeks, the paresthesia spread to Bri's legs, she lost 20 pounds from the persistent vomiting, her eyes became acutely sensitive to light, her ears became acutely sensitive to sound, an electric shock sensation coursed through her body, and her heart would randomly begin sprinting at a rate that made her feel a short breath away from fainting, or worse.

16.     As Bri recalls:

> I walked into the clinic fine, and walked out the beginning of a nightmare I wouldn't wish on my worst enemy. My little girl's voice was too painful for my ears. My little boy's hand was too painful for touch. There was no break, no reprieve, no escape. No answers, no help, only questions, and fear of what was overtaking my body more and more each day as new symptoms piled on. The raging tinnitus came on, freight train in one ear, and a high-pitched sound. I was so nauseous 24/7, like the worst kind of pregnancy nausea that never stops. I couldn't keep food down. I was a completely hollowed out version of who I once was.

17.     Bri's friends, family, and doctors did everything they could to help her manage the terrifying onset of symptoms. As Bri describes:

> My long-time friends would come sit in the darkness with me, unable to touch me, unable to talk because all of my sensory facets were on overdrive, my heart had a mind of its own. They were as helpless as I was, but they didn't want me to suffer alone. I would just sit there with tears rolling down my face, quietly asking if this would stop at some point…would it end?

18.     Fast forward three years and Bri is still disabled. While some of the acute symptomology has improved, she remains a shadow of her former self: unable to work, unable to do any athletic activity, unable to parent the way she had, and unable to drive more than a few blocks at a time.

19.     Throughout it all, Bri has had to navigate this terrifying new world without any assistance or support from AstraZeneca and its research team. As described by Bri: "I did everything they asked of me. I honored my obligations to them. They have not honored any. When they needed me, I was there, I cooperated. When I needed them, they were nowhere to be found."

20.     Despite promising to **"provide medical treatment or refer you for treatment,"** AstraZeneca ignored every one of Bri's repeated pleas for help and guidance. As Bri recounts:

> I called the test clinic early on with tears running down my face, begging them to help me. They said the drug company would call back any day now. Nightmarish days turned into weeks, and those nightmarish weeks turned into months, and now years. That call never came. As time passed by, my doctors kept asking for guidance from the drug company, "what does the drug company say?" I did not have an answer, because AstraZeneca never shared any information or referrals with me, let alone provided care, to help me through this situation.

21.     Despite promising **"to cover the costs of research injuries,"** AstraZeneca ignored numerous requests for support before finally offering the paltry sum of $1,243.30—a minuscule

fraction of the medical bills and lost wages, among other financial costs, that Bri had incurred and will continue to incur.

22.     Worse, AstraZeneca conditioned its offer of $1,243.30 on Bri agreeing to release the company of all further financial responsibility for her care.

23.     Bri was receiving medical treatment when she got AstraZeneca's insulting request: an IV drip infusing her blood with a biweekly medication that had a price tag of $3,500 per session, or nearly three times the total amount AstraZeneca had just offered for *all* of her past and future bills.

24.     Bri's husband, who was by her side, replied to AstraZeneca's request: "The way we have been and continue to be treated is simply appalling."

25.     AstraZeneca's callousness increased the trauma of an already traumatizing situation. As Bri learned, "I was nothing more than a number to AstraZeneca. I was not a mom with kids who desperately needed their momma, or a teacher with dozens of little kids depending on me to make the unknowns of this new Covid world less scary. I was not a wife to a man who wanted nothing more than for the love of his life to be ok. To them I was nothing."

26.     With no guidance or support from the drug company or its test clinic, Bri and her husband went from one doctor to the next to figure out what was going on with her body, racing to the emergency room when the symptoms became too much to bear.

27.     Doctors struggled to determine how to treat Bri's condition, but there was little doubt about what caused it. The diagnosis can be found throughout Bri's medical records: "Vaccine Reaction," "Vaccine side effect," "Immunization reaction," "likely side effect due to an

increased immune response to the vaccine," "post-vaccine polyneuritis," and "covid vaccine injury."

28.     Bri's husband reached out to a neurologist from the National Institute of Health ("NIH"), who expressed an interest in Bri's situation and invited her to come to the NIH's state-of-the-art campus in Bethesda, Maryland for extensive testing and treatment.

29.     In June 2021, seven months after receiving AstraZeneca's experimental vaccine, a team of NIH neurologists diagnosed Bri as having "Post Vaccine Neuropathy."

30.     As a result of this neuropathy, Bri has developed a debilitating disordering of her autonomic nervous system ("dysautonomia"), including "chronic inflammatory demyelinating polyneuropathy" or "CIDP," a condition in which the myelin sheaths that protect the nerve cells are stripped away. The net result is a myriad array of constant, abnormal, and painful sensations, including the feeling of an electric shock coursing in her body.

31.     Since receiving AstraZeneca's experimental vaccine, Bri's need for medical care and medication has skyrocketed, going from one family doctor to a team of specialists, including neurologists, immunologists, allergists, and dieticians. One of Bri's current medications comes with a price tag of $432,000 a year, although her insurance company has been able to negotiate this down (at least for now) to $119,000 per year.

32.     Bri is aware that COVID vaccines, including AstraZeneca's experimental vaccine, are subject to the federal Public Readiness and Emergency Preparedness Act ("**PREP Act**"). *See* 85 Fed. Reg. 52, 15198. Because of this, Bri is aware she cannot bring a product liability action against AstraZeneca like she could if it were a standard pharmaceutical.

33.     But this is not a product liability action.

34.     Plaintiff's cause of action does not sound in tort or strict liability; it sounds in the law of contract, and, specifically, the breach of contractual obligations that Defendants knowingly and voluntarily entered into to induce Bri and others into participating in the clinical trial.

35.     Any immunity that Defendants may have had under the PREP Act was waived, at least for purposes of a contract action, when they voluntarily assumed contractual obligations.

36.     Plaintiff thus brings this breach of contract action to recover all available damages, both economic and non-economic, that resulted from Defendants' breaches of their promises.

## PARTIES

37.     Plaintiff Brianne Dressen ("**Bri**") resides in Saratoga Springs, Utah with her husband, Brian, and two young children.

38.     Defendant AstraZeneca AB is a corporation incorporated in Sweden. Its principal place of business is in London, England.

39.     Defendant AstraZeneca Pharmaceuticals, LP is a limited partnership organized in the State of Delaware. Upon information and belief, its principal place of business is in Wilmington, Delaware and its partners are not citizens of or domiciled in Utah.

40.     In 2020, Defendants AstraZeneca AB and AstraZeneca Pharmaceuticals LP (collectively, "**AstraZeneca**") developed an experimental COVID vaccine.

41.     AstraZeneca's COVID vaccine was ultimately never licensed for public use in the United States. The authorization for using AstraZeneca's COVID vaccine in Europe was withdrawn at the request of AstraZeneca by the European Medicines Agency effective May 7, 2024. In total, AstraZeneca's sales of its COVID vaccine totaled over $5.8 billion.

42.     Defendant Velocity Clinical Research, Inc. (hereafter, "**Velocity**") is a corporation incorporated in the State of Delaware. Its principal place of business is in Durham, North Carolina.

43.     Defendant Velocity carried out the clinical trial of AstraZeneca's COVID vaccine.

44.     Upon information and belief, Velocity was an agent of AstraZeneca at all times material to this case.

## JURISDICTION AND VENUE

45.     This Court has subject matter jurisdiction over this matter because the parties are completely diverse in citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a)(1).

46.     This Court has personal jurisdiction over each Defendant because they purposefully availed themselves of the privilege of conducting activities within Utah by, *inter alia*, contracting with Utah residents to take part in a clinical trial, and conducting the clinical trial in Utah.

47.     Venue is proper in this Court because the contract giving rise to Plaintiff's claims was entered into at Defendant Velocity's office in Salt Lake County and the clinical trial was conducted at said office. 28 U.S.C. § 1391(a)(2).

## STATEMENT OF FACTS

### The Informed Consent Form

48.     Defendants had and continue to have access to information about the AstraZeneca vaccine that was, and is, not available to the public, or medical community, and had, and continue to have, access to extensive resources, medical professionals, and scientists on their staff.

49.     Defendants recognized and understood that AstraZeneca's vaccine could cause side effects in some people, and that some of these side effects could be "severe."

50.    In the consent form that Defendants drafted, which study subjects were required to review and sign before participating in the study, Defendants stated:

     a.  "With any vaccination there is a risk of rare serious side effects, such as an allergic reaction."

     b.  "There is a chance you could have a side effect that is severe or that has not been seen before."

     c.  "If you have severe side effects from the vaccine, the study doctor may ask you not to get a second dose of vaccine or placebo."

     d.  "Getting this vaccine may also involve risks to your health that we don't know about right now."

     e.  "If you suffer any of these side effects (or any others not listed) or you think you are experiencing a side effect, during this study, please tell your study doctor immediately."

     f.  "If you have a reaction after the injection of vaccine, your participation may be stopped by the study doctor or sponsor without your consent."

     g.  "Your study doctor or the sponsor may withdraw you from the study without your consent . . . if you have a serious side effect related to the vaccine."

Exhibit A ("**Consent Form**"), at 3, 9, 10, 12, & 14.

51.    On November 6, 2020, two days after Bri received the vaccine, Defendants amended the consent form to indicate that AstraZeneca's vaccine may cause "neurological disorders," including "demyelinating disease," and that these conditions can "cause substantial disability," including death, "if not treated promptly." To quote:

    a.  "Neurological disorders (demyelinating disease) that affect the peripheral and central nervous system (CNS) may occur. They may cause substantial disability, and some can be fatal if not treated promptly."

    b.  "If you develop neurologic symptoms like abnormal sensations, muscle weakness or blurred vision, you should promptly notify your healthcare provider and the study team."

Exhibit B ("**Amended Consent Form**"), at 12-13.

52.    Although not specifically disclosed in either the Consent Form or the Amended Consent Form, Defendants considered effects on the "brain and nerves, blood and blood vessels, [and] the immune system" to be "adverse events of special interest."

53.    Defendants also recognized that study subjects may suffer emotional distress, including "mental, or emotional injury," as well as "fear of physical, mental, or emotional injury." Exhibit A, at 13.

### Defendants' Offer

54.    Given the time, discomfort, and potential for serious side effects that participation in the trial entailed, Defendants – via the Consent Form and Amended Consent Form – offered certain written promises to those who agreed to participate.[1] These promises included:

    a.  Financial reimbursement for each completed visit to the test clinic for physical exams, blood draws, and vaccine administration;

---

[1] The original Consent Form and Amended Consent Form are word-for-word identical with respect to the terms of compensation for research injuries, as well as all other matters that are quoted in this Complaint, with the exception of the information on neurological disorders. As discussed above, the information on neurological disorders was only provided in the Amended Consent Form.

    b.  Financial reimbursement for each completed phone call related to the study;
        and

    c.  Compensation for study related injury.

Exhibit A, at 12-13.

55.     In the section of the Consent Form titled "Compensation for study related injury," Defendants promised that the study doctor would **"provide medical treatment or refer you for treatment"** in the event that a research injury occurred. *Id.* at 12 (emphasis added).

56.     Defendants also promised that AstraZeneca "has an insurance policy to **cover the costs of research injuries** as long as you have followed your study doctor's instructions." *Id.* at 13 (emphasis added).

57.     Defendants defined "research injuries" as "[i]njuries that have been caused by the vaccine, tests or procedures." *Id.* By contrast, "[i]njuries caused by your usual medical care are not research injuries." *Id.*

58.     With respect to medical costs, Defendants promised that "Sponsor **will** **pay the costs of medical treatment for research injuries**, provided that the costs are reasonable, and you did not cause the injury yourself." *Id.* (emphasis added).

59.     Defendants' promise to pay for medical care in the event of a research injury was expressly *not* conditioned on the study subject remaining in the study. To quote:

    a.  "If you decide not to take part in this study, **it will not affect your ability to
        receive medical care**. Your decision to not participate or to withdraw later
        will not result in any penalty or loss of benefits to which you are otherwise
        **entitled**." *Id.* at 4 (emphases added).

**AA22**                    **AA22**                    **AA22**

b.  "Your decision to withdraw your Authorization or not to participate **will not involve any penalty or loss of access to treatment or other benefits to which you are otherwise <u>entitled</u>**." *Id.* at 19-20 (emphasis added).

60.     In addition to promising to pay for the costs of injury, the consent form provides that "Sponsor may also compensate you in accordance with the law of the United States," and that "[b]y signing this form you do not give up any legal right you may have." *Id*. at 13.

61.     The discussion of compensation in the consent form concludes by noting that an unspecified "order" issued by the federal government "**<u>may</u> limit** your right to sue if you are injured or harmed while participating" in the study. *Id.* at 13 (emphasis added).

62.     Upon information and belief, the order that is referenced in the consent form is the *Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against Covid-19* that the Secretary of the U.S. Department of Health and Human Services published on March 17, 2020, in the Federal Register. *See* 85 Fed. Reg. 52, 15198.

63.     The March 17, 2020 order bars certain personal injury actions against Defendants. It has no bearing, however, on the enforceability of **contractual obligations** that Defendants knowingly and willfully entered into with study subjects, including Bri.

**Plaintiff's Acceptance of Defendants' Offer**

64.     On November 4, 2020, Bri visited Defendants' test clinic in Salt Lake County for the first time.

65.     During her visit, Bri was provided with a copy of the Consent Form that set forth, *inter alia*, the requirements for study participants, information about the potential risks and benefits

of the vaccine, and Defendants' promises about compensation in the event of a research injury, as described above.

66.     The Consent Form that Bri was provided on November 4, 2020, did not contain a warning about neurological disorders, including demyelinating diseases. Defendants added that warning to the Amended Consent Form two days later, on November 6.

67.     Based on the information contained in the Consent Form, including Defendants' promises to take care of things if something went wrong, Bri agreed to participate in the trial.

68.     Bri confirmed her agreement by signing the Consent Form, rolling up her sleeve, and allowing Defendants' agent to inject the experimental substance into her arm.

69.     At the moment the substance entered Bri's blood, a solemn contract had been formed. Her performance was complete and Defendants' promises were irrevocable.

**Plaintiff's Research Injury**

70.     Almost immediately after the test substance was injected into her body, Bri began experiencing a tingling and prickling feeling in her right arm, a condition called paresthesia. By the evening, the paresthesia had spread to Bri's left arm and she began noticing other worrying symptoms, including a headache, blurred vision, double vision, a loud ringing in her ears ("tinnitus"), nausea, fever, and a sensitivity to sound.

71.     By morning, the fever had passed, but the other symptoms remained and continued to intensify.

72.     Bri did not know it at the time, but November 5, 2020, the day after she received AstraZeneca's experimental vaccine, was the last day that she would teach her preschool students.

73.     By November 7, 2020, the paresthesia had spread to Bri's legs and her symptoms were so severe that Bri checked into the emergency room at Utah Valley Hospital: the first of four ER visits she would need to make over the next month. Dr. Craig Patten, the doctor who cared for her during this first visit, listed Bri's diagnosis as a "vaccine reaction."

74.     Bri was back in Utah Valley Hospital's emergency room on November 11, 2020, with progressive worsening of her headache, nausea, tinnitus, and sound sensitivity. Due to the nausea and associated vomiting, Bri had lost 10 pounds in just 7 days.

75.     The next day, November 12, 2020, Bri visited Ryan McQuivey, a nurse practitioner at Utah Valley Neurological. As with the emergency room doctor, McQuivey diagnosed Bri as having an "immunization reaction." Per McQuivey's notes:

> [M]y suspicion is this is actually a reaction to her recently given vaccine given the very acute nature immediately after as well as unremarkable imaging by MRI of her brain, C, and T spines and also normal lumbar puncture results.

76.     Bri's healthcare providers, including McQuivey, were at a loss as to how to treat her condition, and the symptoms continued to worsen.

77.     On November 17, 2020, Bri visited Utah Valley Ear Nose Throat & Allergy to seek help for her acute sensitivities to light and sound. Dr. Thaddeus Abbott noted Bri was "wearing sunglasses and ear plugs" during the visit and that she had recently started to experience tachycardia (a fast heart rate) which might require emergency room care for "acute treatment." As with Dr. Patten and McQuivey, Dr. Abbott agreed Bri was experiencing "a likely side effect due to an increased immune response to the vaccine."

78. Two days later, on November 19, 2020, Bri's husband rushed her to the emergency room once again after she began experiencing pain in the left side of her chest and an acute tachycardic episode.

79. A few days later, Bri visited her primary care clinic to address the continued worsening of her symptoms. The medical record states: "Due to her progression of symptoms, I recommended that they present to the ED at the U of U for further evaluation with possible inpatient admission due to progression of symptoms." The first recommendation listed is: **"Go directly to U of U ED."** Bri's husband acted accordingly and brought Bri back to the emergency room, where she was admitted and stayed for 3 days.

80. On December 11, 2020, Bri visited another neurologist, Dr. Neil Patel. In his notes on the visit, Dr. Patel stated: "given the unusual nature of her symptoms and presentation in association with COVID-19 trial vaccination I think multidisciplinary involvement is vital."

81. And on and on it went for months, with Bri and her husband going from doctor to doctor, desperately looking for a way to get Bri back to her previous good health. All the while mounting a steadily growing pile of medical bills, lost wages, and child-care expenses.

82. The first positive breakthrough came in 2021 when Bri was invited by a team of neurologists at the National Institute of Health ("**NIH**") to visit NIH's Bethesda, Maryland campus to undergo testing for vaccine-related neuropathy.

83. In June 2021, Bri visited NIH's campus for what the NIH described as "persistent neurological symptoms following SARS-CoV2 vaccine."

84.     NIH's testing confirmed that Bri had suffered nerve damage, memory impairment, and postural orthostatic tachycardia syndrome ("**POTS**"). Based on these findings, NIH neurologists diagnosed Bri as having "Post-Vaccine Neuropathy."

85.     NIH's neurologists explained Bri's neuropathy was most likely the result of an immunological reaction to the vaccine (i.e., an "immune-mediated neuropathy"). Because of this, NIH's neurologists gave her an IVIG treatment[2] during her stay.

86.     The IVIG treatment that Bri received at the NIH campus was the first treatment she had received, in the seven months since suffering her vaccine injury, that provided some (but far from complete) reprieve from her torturous symptoms.

87.     When Bri returned home from her NIH visit, she immediately began trying to secure access to additional IVIG treatments, but it was not until October 2021 that her insurance company agreed to cover the costs. She was unable to afford to pay for it out of pocket. Since then, Bri has been receiving biweekly infusions, first through IV injections (IVIG) and more recently through subcutaneous injections (SCIG). These treatments have become a critical part of Bri's medical care, and she will need them forevermore.

88.     Others who have received COVID vaccines, including other study subjects in AstraZeneca's clinical trial, have suffered a similar neurological disorder as Bri. The disorder, which is well described in the medical literature, has been termed Post Acute Covid Vaccine Syndrome ("**PACVS**").

89.     The following are statements from the peer-reviewed medical literature:

---

[2] IVIG stands for intravenous immunoglobin. It is a well-established, FDA-approved treatment for immune mediated neurological disorders.

a. "After the coronavirus vaccine, neurological complications can occur, both in the central and peripheral nervous systems."

b. "COVID-19 vaccine-associated peripheral and central neuroimmunological disorders have been well described."

c. "Our case series highlights that acute small fiber neuropathy can follow COVID-19 vaccination and lead to chronic complications."

d. "Clinicians and patients should be aware of the potential for post-vaccination CNS inflammatory syndromes associated with COVID-19 vaccine administration."

e. "Delayed diagnosis of PACVS may result in a delay in appropriate treatment and the prolongation of disabling symptoms. Patients and physicians should be made aware of PACVS to improve diagnostic and therapeutic management in terms of patient and healthcare system costs."

90.     According to Dr. Janet Woodcock, FDA's Acting Commissioner during the peak of the COVID pandemic, the COVID vaccine caused "serious" and "life changing" reactions in some people.

91.     In AstraZeneca's own clinical trial, the company found "a noticeable imbalance in the frequency of unsolicited [Adverse Events] in the Nervous System Disorder class between the [vaccine group] and the control group," with significantly more in the former. Although most of the trial data will not be released by the FDA because the vaccine was never licensed in the United States, it is known that several of the study participants in the vaccine group of AstraZeneca's trial

developed demyelinating diseases, including transverse myelitis and chronic inflammatory demyelinating polyneuropathy.

92.    As a result of Bri's vaccine-induced demyelinating disease, she now lives every day with constant disabling pain. She is unable to work, unable to drive more than a few blocks, and unable to fully care and provide for her two children. In her own words:

> The internal vibrations are still with me every single waking second of the day. They are sharp tingling sensations that move from my heart through my whole body. Those nice moments sitting with my kids – with them just happy to have some time with mom, – in  my head I have to just remind myself to breathe through the nightmarish sensations and put a smile on my face and pretend everything is fine and that I am actually enjoying just being there with them… but the reality is those moments have been robbed from me for the rest of my life. Those feelings of peace, safety, and love can't happen with that much constant pain and discomfort. I don't want my kids to worry so I just keep it all to myself and bury it as much as I can, but it's obvious my pretending doesn't always work. They know I am not able to do what their friends' moms can do.
>
> My heart doesn't beat right, my chest is sore all the time. My legs and hands are getting weaker every winter. Food sensitivities are still really bad. I am living a completely different life. Without my family, without question, I would be gone…would've been gone a long time ago. They are amazing and deserve so much better than this.

**Defendants' Broken Promises (The Breach)**

93.    The contractual breach in this case is not that Bri suffered a vaccine reaction on November 4, 2020. The breach is that, once this reaction occurred, Defendants refused to honor their contractual obligations to provide medical care/referrals and cover the costs of the injury.

94.    On the morning after she received the vaccine, Bri called and left a voice message with Velocity's test clinic to report the symptoms she was experiencing. The clinic called back and asked Bri to come in for an evaluation, which she did on November 6, 2020.

95.     At the end of the November 6 evaluation, Velocity's lead investigator, Dr. Barabra Rizzardi, told Bri she may have Multiple Sclerosis ("MS"). Dr. Rizzardi told Bri to go to a neurologist and get tested for MS.

96.     At the November 6 evaluation, Dr. Rizzardi did not offer further medical care, but stated she would contact AstraZeneca and ask for their input.

97.     Subsequent testing and consultations with doctors over the next two weeks – none of it paid for by AstraZeneca – ruled out MS as a cause of Bri's condition.

98.     While continuing to suffer severe symptoms, on November 18, 2020, Bri went to the test clinic for a second evaluation. Bri, who was in acute physical distress when she entered the clinic, was told she needed to sign the Amended Consent Form before she could be seen by the clinic staff.

99.     The amended version of the Consent Form contained a disclosure that AstraZeneca's vaccine may cause "neurological disorders," including "demyelinating disease," and these disorders "may cause substantial disability, and some can be fatal if not treated promptly." Exhibit B, at 12-13.

100.     After signing the Amended Consent Form, Bri was disappointed to learn that the clinic was limiting its assessment to whether she had COVID. The staff performed two nasal swab tests and a blood draw to test for COVID, and then sent Bri home to await the results.

101.     During the visit, and in subsequent phone calls, Bri and her husband pleaded for help in treating her condition. Each time, the test clinic representatives stated that AstraZeneca's neurologists would be reaching out to Bri to discuss. But, despite these repeated assurances, AstraZeneca's neurologists never once reached out.

102.    As the weeks passed without any care, guidance, or referrals from AstraZeneca, Bri and her husband were forced to navigate the nightmare on their own.

103.    On November 24, 2020, after being checked into the emergency room, doctors asked Bri to find out from Velocity if she was administered the vaccine or a placebo. Bri's husband promptly called the clinic, and he was told by a Velocity representative that the company would check with AstraZeneca and report back.

104.    The next day, the clinic called Bri in the emergency room to inform her she had received the vaccine, not the placebo. During the call, the Velocity representative told Bri she would not be getting the second dose due to her reaction to the first dose.

105.    Bri reiterated her plea for help during this call and was told again that AstraZeneca would be reaching out.

106.    On December 17, 2020, Bri's husband emailed Velocity with recommendations from a German scientist, Dr. Harald Preuss, for certain laboratory testing that could be helpful. Velocity never responded.

107.    On January 15, 2021, Bri's husband emailed Velocity "the first batch of payment records related to Brianne's treatment for her adverse reaction" to the vaccine. Velocity did not respond.

108.    On February 9, 2021, Bri's husband followed up on his January 15 email: "Checking on updates for this. . . . When may we expect payment?" Later that day, Susan Thompson, Velocity's Site Director, emailed back: "I am sorry you have not heard anything as of yet. Hopefully I get an answers [sic] soon. I will reach out again today."

109.    No reimbursement came.

110.    On March 12, 2021, having lost Bri's income, and facing a growing and potentially limitless number of future medical bills, the Dressens applied for a refinancing of their home. The application was approved, and the Dressens received an equity loan on their home on March 17, 2021.

111.    On March 18, 2021, Bri's husband emailed Thompson: "I'd like to know when we can expect the first payment on Brianne Dressen's medical bills? Two months since submitting . . . . Expect another round soon, do I send them to you, or is there a more effective/efficient way to make this happen?" Thompson responded: "as far as I know for now send them to me and I will forward them on. I am forwarding on right now and as a follow up too."

112.    On March 24, 2021, Bri emailed Thompson with a follow-up: "Hey this is Brianne Dressen. Can you advocate a bit for us here help us get a timeline for payment? I am still not doing well, we have had to hire for after school childcare. We really need this money."

113.    The next day, March 25, 2021, Thompson responded: "Hi Brianne, I am escalating this for you. I do not understand either why it is taking so long. I am trying again. I am hopeful we should hear something soon!! I am so sorry it has taken so long!!"

114.    On April 4, 2021, Bri emailed for an update: "Just following up. Have you heard from them?" Thompson responded: "I was told they were all being processed. Still have not heard anything at all?? I will follow up again. I am so sorry for the delay."

115.    Three weeks passed. No reimbursement.

116.    On April 21, 2021, Bri's husband called and spoke with Thompson. During the call, Brian explained the mounting childcare costs they were incurring due to Bri's debilitating

condition. Thompson said to include these costs in the next submission of bills, which Brian did shortly after the call.

117.    In his April 21, 2021 email, Brian included the child care costs, "the next set of medical bills" and a copy of the Consent Form, noting: "Our attorney advised us to remind you of the compensation for injury section which I have highlighted."

118.    On April 22, 2021, Thompson responded: "I have forwarded your request." Thompson emailed again the following day: "I am hoping we hear something by next week!! Again I am so sorry this is taking so long. I have written again."

119.    Two more weeks passed. No reimbursement.

120.    On May 3, 2021, Bri followed up with a short email: "Any updates?" Thompson responded: "I am checking again. I am sorry!!"

121.    Eleven more days passed. No reimbursement.

122.    On May 14, 2021, Bri emailed Thompson: "I now need contact information for those individuals/company that would be party to legal proceedings. Absent that information, I will have to provide your names to my attorneys."

123.    On May 17, 2021, Thompson responded: "I have made some progress with AstraZeneca and will be receiving the names for you with their legal contact. I am waiting to hear back. I received that notice today so it should not be long at all. Again I apologize for the long delay. We should have some more information hopefully by tomorrow."

124.    A few minutes after receiving this email, Bri responded: "For clarification, last update states that approval for the first payment was eminent. Is this no longer the case?" Thompson responded: "I have heard there is a payment coming out but I am not sure of the exact

amount. I really am hopeful that we have an answer for you tomorrow. I just heard back from one of the project leads that it is coming."

125.    Three more weeks passed. Still no reimbursement.

126.    On June 9, 2021, Bri emailed: "Following up on this. Do I need to just get my lawyer going on this?" Velocity did not respond.

127.    Four more weeks passed. No reimbursement.

128.    On July 8, 2021, Bri emailed: "This has been 8 horrible months. Advocating for myself as a sick person to get the study sponsor to pay for medical bills that they repeatedly agreed to pay … is truly callous and inhumane. I know for them that is not very much money … but for us, that is. I appreciate your pro-active help on this matter." Velocity did not respond.

129.    On July 13, 2021, the local news channel KMYU aired a story on Bri's vaccine-induced neurological disorder and the continuing problems she was experiencing as a result.

130.    That same day, shortly after the KMYU program aired, Heather Holtman, Velocity's Manager of Clinical Operations, called the Dressens and told them a payment of $590.20 would be deposited in their account. Bri and her husband stated this was far less than the costs they had incurred, and they would only accept the $590.20 payment if AstraZeneca confirmed that additional payments would be forthcoming.

131.    Within a few hours of the July 13, 2021 phone call, Defendants deposited $590.20 on Bri's "ClinCard" – an online portal set up for study subjects. Immediately upon receiving this deposit, Bri's husband emailed Holtman:

> We just got notice that $590.20 was loaded onto the clincard. As we discussed, this is far less than what we submitted and I forwarded the bills again that I had sent to Susan in April, shortly after our call. **We discussed that I did not wish payment to be made unless it**

> **was confirmed by AstraZeneca that future payments would also**
> **be made.** Please confirm that you received the additional documents
> and that AstraZeneca promised future payment.

(emphasis in original).

132.    Six days later, Holtman responded: "I just wanted to touch base and let you know I have sent the additional medical records to AZ for approval to pay. I have not heard back from them yet but hope to this week. I will be in touch soon."

133.    On August 12, 2021, Bri emailed Holtman for an update: "Following up on this: Where are we at?" Holtman did not respond.

134.    Bri did not hear anything from AstraZeneca or Velocity for the next three months.

135.    On November 10, 2021, Bri emailed Holtman for an update. Holtman did not respond.

136.    In December of 2021, a news reporter named Brooke Conrad contacted Velocity about their failure to pay Bri for the costs of her injury. Velocity responded to the reporter with an email, stating that it "will work closely with [Bri] on any future requests."

137.    Contrary to Velocity's public assurance, Holtman emailed the Dressens on December 17, 2021, with a request to relieve AstraZeneca of all future financial responsibility for Bri's medical care in exchange for just $1,243.30.

138.    In the December 17, 2021 email, Holtman stated: "Here is the latest from AstraZeneca. If you could sign this and send it back we can get you paid."

139.    The statement that Holtman asked Bri to sign read as follows:

> I, Subject 20053220048, hereby accept the sum of $1,243.30 in full
> and final settlement of any and all claims for reimbursement of any
> costs, including medical expenses, arising from or in connection
> with AZD1222 and study D8110C00001 (the "Matter"). There are

no other outstanding balances, costs, or invoices related to the Matter, and I waive any additional claims related to the Matter. I acknowledge that this payment is made without admission of liability and that all claims I have brought or could have brought in relation to the Matter are hereby extinguished.

140.   Bri had an IV drip in her arm, at a specialty infusion center, when she and Brian

received Holtman's email. Brian replied by sending a photograph of Bri and the following

message:

This is my wife right now, getting $3500 worth of an infusion that she gets every two weeks, more than a year after her NIH diagnosed VACCINE INJURY. We sent velocity clinic research documents of medical bills far in excess of the $1700 this equates to…

We have a contract stating that they will cover medical bills, we have been waiting for this long to be insulted like this?

The way we have been and continue to be treated is simply appalling.

Finally mad…



141.    Brian tried repeatedly to get someone from Velocity on the phone that day but kept

reaching voicemail. Later that afternoon, Brian sent the following email, which read in part:

> I just called your main office three times, no answer. Called your
> direct line. No answer. Would appreciate a call please.
>
> We have asked repeatedly for updates and haven't heard anything
> from you for months regarding payment or updates on my wife,
> Brianne's, condition. During these months of no communication
> from you or AstraZeneca, we continue to accrue more and more
> medical bills, as well as our entire family adjusting to a different life
> as a result of her injury. While business went on as usual for you,
> my wife was convincing herself every single day for over a year now
> that she has to learn to live with a painful electrical sensation
> coursing through her body all day and night. Every. Single. Day.
>
> If you were serious about my wife's case, I would expect some sort
> of engagement between July and now…anything well before now,
> over a year after her injury. Certainly not $590 hastily wired to our
> account without our consent in July, 8 months into her injury; then
> silence for months followed by a last minute letter absolving the
> drug company of all responsibility in exchange for $1200, 13 long
> months into her injury.
>
> Her life, our family's lives, will never be the same.

142.    After receiving this email, Velocity's new Site Director, Ali Turner, called Bri to

address the situation. Turner followed up the next day, December 18, 2021, with an email:

> Thank you for your time on the phone yesterday and the updates you
> have provided. We continue to advocate for you and your health and
> would like to provide AstraZeneca with an update on your situation.
> Could you please send me a copy of all your medical expenses in
> whatever form you have available – be it bills, receipts, personal
> tracking information. I would like to forward this on to AstraZeneca
> immediately so that they may be in touch with you directly.

143.    On December 28, 2021, Bri's husband provided Turner with the documents she

requested, including the list of provider charges for Bri's medical care, a listing of pharmaceutical

expenses, and the payments for childcare. Brian closed the email by stating: "This is an ongoing vaccine injury and costs continue to be incurred as a result."

144.    After sending this email, the Dressens went back to waiting mode. It would be two and a half months before they would receive any response.

145.    On March 14, 2022, Bri received an email from an unnamed AstraZeneca representative. The unnamed representative provided no contact information other than an email address of D8110C00001@astrazeneca.com.

146.     In the email, the unnamed AstraZeneca representative stated: "For us to assess your claim for compensation and reimbursement of uninsured medical expenses, we will need full access to your medical records. To that end, please complete the enclosed authorization for the release of medical records and return it to AstraZeneca's mailbox, along with copies of any bills for uninsured medical expenses that you may have incurred."

147.    On April 8, 2022, Bri emailed the unnamed AstraZeneca representative with billing records showing total (non-pharmacy) charges of $187,018.70, of which the insurer had paid $105,167.68 and Bri had paid $10,766.74. Bri also included a list of the 100 prescriptions that had been issued thus far to treat her symptoms. In addition, Bri attached a compilation of medical records, including the NIH's diagnosis of her condition as "Post Vaccine Neuropathy" and a November 2021 record from her neurologist, Dr. Michael Hunter, in which he stated:

> There is not a lot of data supporting treatment in this situation as there are very few people who received AstraZeneca vaccine, similar individuals have experience symptoms similar to Brianne, as per the NIH when I discussed her case with them over the phone. Some people have responded to corticosteroid monotherapy, some of [sic] responded to IVIG monotherapy, some people have responded to IVIG with recurrent dosing. At this point, she clearly has had benefit with IVIG in regard to her symptoms.

148.    On April 14, 2022, the unnamed AstraZeneca representative acknowledged receipt of the aforementioned documents.

149.    On May 4, 2022, the unnamed AstraZeneca representative emailed again, stating that Bri needed to provide the affiliation and contact information, including email, postal address, and phone number, for the 40 medical providers identified in Bri's medical records.

150.    On June 4, 2022, despite continuing to struggle to simply make it through a day, Bri emailed the unnamed AstraZeneca representative a handwritten list of the affiliation and contact information for the 40 medical providers she had seen to date. In the margin of her handwritten list, Bri wrote in pencil "My life is in shambles."

151.    In Bri's June 4 email, she included an updated accounting of her medical expenses, which now totaled $203,808.91 in provider charges for (non-pharmacy) expenses, $108,510.80 in insurance payments for (non-pharmacy) expenses, and $13,651.01 in out-of-pocket (non-pharmacy) expenses.

152.    Bri closed her June 4 email with the following reminder: "Just a reminder, these documents do not [include] future costs incurred or my ability to make future claims, as my study injury is ongoing, requiring continual treatment."

153.    On June 6, 2022, the unnamed AstraZeneca representative acknowledged receipt of Bri's email, and stated: "We will review [the documents] and reach out to you in case further information is needed."

154.    On July 18, 2022, Bri emailed the unnamed AstraZeneca representative for an update, stating "no further communication from AstraZeneca has been received" since the June 6 acknowledgment of receipt. AstraZeneca did not respond.

155.    On August 12, 2022, the unnamed AstraZeneca representative emailed, stating:

Dear Brianne Lunt Dressen,

We have processed your latest consent forms received on 04JUN2022, and have requested the corresponding medical records.

We have however not received all medical records we need to make the needed assessments. Unfortunately, requesting medical records is a process that takes time. We will be back in touch once we have received these records and made our assessment.

156.    On August 17, 2022, Bri received a phone call from an NIH employee informing her that AstraZeneca had rejected a package of Bri's medical records that NIH had mailed to the company. Bri immediately emailed the unnamed AstraZeneca representative to let him/her know. AstraZeneca did not respond.

157.    On September 26, 2022, the unnamed AstraZeneca representative emailed Bri:

Dear Brianne Lunt Dressen,

Please be informed that the AstraZeneca Study Team has received the requested medical records. We are in the process of evaluating them and we will get back to you as soon as a decision is made regarding the claim.

Sincerely,
AstraZeneca Team

158.    The Dressens waited for a response. But the unnamed AstraZeneca representative never reached out to the Dressens again. Nor did anyone else at AstraZeneca or Velocity.

159.    AstraZeneca and Velocity refused to honor their obligations. No medical care, no medical referrals, no financial support.

**AA40**        **AA40**        **AA40**

160.    According to Bri, "I did everything they asked of me. I honored my obligations to them. They have not honored any. When they needed me, I was there, I cooperated. When I needed them, they were nowhere to be found."

### Plaintiff's Economic Damages

161.    The contract that Bri entered into with Defendants provided that the "costs of research injuries" would be compensated.

162.    The costs of Bri's research injury include, but are not limited to, past and future medical costs, including regular ongoing medical appointments, prescription medications, various forms of therapy, and aids for independent function.

163.    Prior to receiving AstraZeneca's vaccine, Bri was in excellent health. Her minimal medical needs could be met by occasional visits to her family doctor (Dr. Mary-Marie Sullivan) and one medication. Now, Bri's medical needs require ongoing consultations with various specialists, including an internist specializing in autonomic disorders (Dr. Craig Coleby), an autonomic and neuromuscular neurologist (Dr. Brent Goodman), immunologists (Dr. Richard Hendershot and Dr. Andrew Smith), a dietician (Dr. Amy Pham), and an allergy and immune specialist (Dr. Anne Maitland).

164.    Prior to receiving AstraZeneca's vaccine, Bri was on only one medication for a thyroid condition that had been stable for almost 10 years.

165.    Since receiving AstraZeneca's vaccine, Bri has been prescribed a seemingly endless series of medications, including IVIG, SCIG (Hizenta), Ketotifen, Desipramine, Naltrexone, Famotidine, Thyroxin, IV Solumedrol, Monoclonal antibodies, Dexamethasone, Neurontin (gabapentin), Amitriptyline, and Fioricet.

166.     Some of the drugs that Bri currently requires are very expensive. For example, the subcutaneous infusions of immunoglobin ("SCIG"), which is a critical part of Bri's care, cost $36,049.40 per month. Although Bri's insurer has been able to negotiate this price down to $9,909.82 a month, this still works out to over $118,000 a year – for just one drug.

167.     The costs of Bri's future medical costs, which will be the appropriate subject of qualified expert testimony, include the cost of therapies that will maximize the quality of Bri's life but which she has heretofore been unable to afford. This includes physical and occupational therapy, hyperbaric oxygen therapy, ozone therapy, IV saline therapy, and mental health therapy. Additionally, Bri's doctor has recently told her that she will need to begin Rituximab infusions, in addition to SCIG, with an expected price tag of $22,000 per infusion.

168.     In order to be made whole, a damages award for Bri's medical expenses will need to include all expenses paid by Bri's insurer, not just her own out of pocket expenses. This is because Bri's insurer has a contractual right to subrogation for both past and future expenditures. A damages award that only compensates Bri for her "out of pocket" expenses would be an illusory award, because said money would simply go the insurer, not to Bri.

169.     Other costs that Bri has incurred as a result of her research injury include, but are not limited to:

      a.  Past and future lost income from Bri not being able to work due to her disability;

      b.  Past and future loss of household services from Bri being unable to do the work around the house that she previously performed, including cooking and preparing food for the family; doing the laundry, cleaning the house, and taking the children to their regular activities;

    c.   Past and future costs of transportation to accommodate Bri's severe limitations with driving;

    d.   Past child care expenses when Bri was bedridden during the acute phase of her illness and unable to care for her children; and

    e.   Attorney fees that have been, and will continue to be, incurred as a foreseeable result of Defendants breaching their duty of good faith to cover (i.e., insure) the costs of Bri's research injury.

170.    The full extent of economic damages will be the appropriate subject of qualified expert testimony at trial.

**Plaintiff's Non-Economic (Emotional) Damages**

171.    In Utah, the breaching party in a contract action is liable for emotional damages if (A) such damages were a foreseeable result of the breach, and (B) were explicitly contemplated at the time the contract was entered into. *Cabaness v. Thomas*, 2010 UT 23, ¶ 75, 232 P.3d 486 (further explained in *Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, ¶¶ 29-32, 424 P.3d 897). Both circumstances are present in the contract at issue here.

172.    First, the damages in this case are foreseeable for the same reasons they were foreseeable in *Beck v. Farmers Ins. Exch.,* 701 P.2d 795, 802 (Utah 1985). As the Utah Supreme Court explained, "insurance frequently is purchased not only to provide funds in case of loss, but to provide peace of mind for the insured or his beneficiaries." *Cabaness*, 2010 UT 23 at ¶ 72 (quoting *Beck*., 701 P.2d at 802).

173.    Second, the potential for emotional damages was not only foreseeable, it was explicitly contemplated in the contract as the consent form specifically identifies the potential for

"mental, or emotional injury" as well as "fear of physical, mental, or emotional injury." Exhibit A, at 13.

174.    Since both conditions set forth in *Cabaness* are present, Bri is entitled to the emotional damages she suffered as a result of Defendants' wholesale breach of their obligations.

175.    For certain health conditions, including immune-mediated neuropathies, treatment delayed is treatment denied. Defendants were expressly aware of this from the moment of Plaintiff's injury, stating in the Amended Consent Form that "neurological disorders," including "demyelinating disease," "**may cause substantial disability, and some can be fatal <u>if not treated promptly</u>**." Exhibit B, at 12-13 (emphasis added).

176.    Defendants' refusal to pay for Bri's care, or provide any guidance, has resulted in Bri repeatedly missing out on interventions, including both testing and treatment, that—had they been timely provided—would have substantially improved her condition and prognosis. Defendants' failure to provide, or pay, for timely interventions has thus contributed to Bri's physical disability, and the associated emotional distress.

177.    Bri's emotional damages include, but are not limited to, the emotional distress of suffering constant neuropathic pain as a result of the ongoing delay and denial of effective early interventions; fear and distress of sending her family into financial ruin at a time of extreme physical vulnerability; and the despair of pleading with Defendants to provide care and support in a time of extreme physical distress only to be ignored again, and again, and again, as if her life did not matter, as if she was "nothing."

**FIRST CAUSE OF ACTION**
**Breach of Contract**

178.    Plaintiff incorporates the preceding paragraphs as if fully written herein.

179.    The Consent Form that Defendants drafted for the clinical trial was a unilateral offer because would-be participants had no obligation to perform. The moment, however, a participant performed, the Consent Form became a binding unilateral contract. *See Mallory v. Brigham Young Univ.*, 2014 UT 27, ¶ 23 n. 11, 332 P.3d 922 ("Unilateral offers are by definition nonbinding in that the offeree is not bound to perform if he or she chooses not to. But a unilateral offer's nonbinding nature has no bearing on whether a contract exists postacceptance. A unilateral contract *is* established if and when the offeree begins substantial performance."); *Ford v. Am. Express Fin. Advisors, Inc.*, 2014 UT 70, ¶ 11, 98 P.3d 15 ("An offer for a unilateral contract may neither be changed nor revoked once the offeree begins the performance requested by the offer." (citation omitted) (alteration in original)).

180.    Plaintiff completed substantial performance, and Defendants obtained consideration, when Plaintiff allowed the vaccine to be injected into her arm. This act constituted Plaintiff's acceptance (through performance) of Defendants' offer. At that moment, the promises in the consent form became irrevocable. *See Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399 (9th Cir. 1993) (holding that a pharmaceutical company's consent form in a clinical trial became an enforceable unilateral contract once the plaintiffs submitted themselves to the experimental treatment, and arguments to the contrary "approach[] frivolousness").

181.    Once Plaintiff was injured by the vaccine, Defendants had a contractual obligation (1) to "cover the costs" of the research injury, including but not limited to medical costs; and (2) to provide medical care and/or refer Plaintiff for medical care.

182.    Defendants breached both of these contractual obligations, and, in so doing, delayed and denied the provision of timely medical care.

183.    Defendants understood that the failure to provide timely medical care for neurological disorders, including demyelinating disease, can cause "substantial disability" and death.

184.    Plaintiff has suffered, and continues to suffer, both economic and non-economic damages, including emotional damages, as a result of Defendants' breaches, as discussed above.

185.    Based on the foregoing, Plaintiff is entitled to judgment against Defendants in an amount to be determined at trial for their breaches of contract, and which far exceeds the jurisdictional threshold.

## <u>SECOND CAUSE OF ACTION</u>
**Breach of the Duty of Good Faith and Fair Dealing**

186.    Plaintiff incorporates the preceding paragraphs as if fully written herein.

187.    Defendants had a duty of good faith and fair dealing in carrying out their obligations under the contract.

188.    Defendants breached their duty of good faith and fair dealing through a number of actions, including but not limited to:

a.    Their unconscionable delay in responding to Bri's pleas for help, despite knowing (i) she had a severe neurological disorder and (ii) such disorders "may cause substantial disability, and some can be fatal **if not treated promptly**" (Exhibit B, at 12 (emphasis added));

b.  Their insulting offer of less than $2,000 to cover all past and future costs of Bri's research injury;

c.  Their attempt to condition the aforementioned miniscule compensation (which Defendants were contractually <u>obligated</u> to provide) on Bri agreeing to release Defendants from the need to provide any further compensation; and

d.  Their request that Bri sign a modified consent form **after she was injured** that disclosed, for the first time, the potential for neurological disorders, and conditioning her seeing a clinical trial doctor (during a time of acute physical distress) on her signing this form.

189.  Plaintiff has suffered, and continues to suffer, both economic and non-economic damages, including emotional damages, as a result of Defendants' breaches, as discussed above.

190.  Based on the foregoing, Plaintiff is entitled to judgment against Defendants in an amount to be determined at trial for their breaches of the duty of good faith and fair dealing, and which far exceeds the jurisdictional threshold.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brianne Dressen prays for judgment against Defendants in an amount to be determined at trial:

1.  For economic damages, including, but not limited to, past and future medical expenses, past and future loss of household services, childcare expenses, past and future lost income, and past and future transportation costs;

2.  For non-economic damages, including emotional damages, that Plaintiff foreseeably suffered as a result of Defendants' breaches;

3.      For attorney fees pursuant to controlling case law, including but not limited to *Beck v. Farmers Ins. Exch*., 701 P.2d 795, 801-02 (Utah 1985); *Canyon Country Store v. Bracey*, 781 P.2d 414, 420 (Utah 1989); *Billings v. Union Bankers Ins. Co*., 918 P.2d 461, 468 (Utah 1996); and *Pugh v. N. Am. Warranty Servs*., 2000 UT App 121, ¶¶ 13-14, 1 P.3d 570.

4.      For prejudgment interest to the extent allowed by law; and

5.      For such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

Dated this 13th day of May, 2024.

MARSHALL OLSON & HULL, PC

By:     *Jason R. Hull*
        Jason R. Hull

SIRI & GLIMSTAD LLP
        AARON SIRI*
        ELIZABETH A. BREHM*
        MICHAEL CONNETT*

*Attorneys for Plaintiff*

\**Pro Hac Vice* motions forthcoming

# Exhibit A

# AZD1222 COVID Vaccine

*Main*

## PARTICIPANT INFORMATION SHEET AND CONSENT FORM AND HIPAA AUTHORIZATION

**TITLE:**
A Phase III Randomized, Double-blind, Placebo-controlled Multicenter Study in Adults to Determine the Safety, Efficacy, and Immunogenicity of AZD1222, a Non-replicating ChAdOx1 Vector Vaccine, for the Prevention of COVID-19

**PROTOCOL NO.:**
D8110C00001
IRB Protocol # 20202188

**SPONSOR:**
AstraZeneca AB

**INVESTIGATOR:**
Barbara E. Rizzardi, MD
3590 West 9000 South
Suite 300
West Jordan, Utah 84088
United States

**STUDY RELATED PHONE NUMBER(S):**
801-542-8190 (24 hours)

### Key Information

The purpose of this form is to give you information about the research study.

- Joining this research study is voluntary. It is your choice. Whether or not you take part is up to you. You can choose not to take part. You can decide to take part and later change your mind. Your decision will not be held against you.
- Our scientific questions are: does the study vaccine protect people from getting infected with a coronavirus called SARS-CoV-2 or getting COVID-19 illness? Is the study vaccine safe and how well is it tolerated?
- If you join, your participation in this study will last for about 2 years.
- If you join, we will ask you to have injections, blood draws, and swabs of the back of your nose.
- Here are the risks of taking part:
  - The most common risk is symptoms such as pain and tenderness where the study vaccine was injected, muscle aches or headaches after getting the study vaccine.
  - There are other, less serious risks. We will tell you more about them later in this consent form.

Main 3.0, 2020-08-27
IRB Version 3.0
US_Master Main v3.0 26Aug 2020
AA50
Document ID: 7692e9c1-196b-42b4-96b8-0dd20a5aff67
1 of 26
CERTIFIED COPY

- We do not know if getting the study vaccine will benefit you in any way.

# Purpose of the Subject Information and Consent Form

This Participant Information and Consent Form may contain words you do not understand. Please ask the study doctor or the study staff to explain any words or procedures that you do not clearly understand.

The purpose of this form is to give you information about the research study. If you sign it, you will give your permission to take part in the study. The form describes the purpose, procedures, benefits, risks, and discomforts of the research study. You should take part in the study only if you want to do so. You can say 'no' or you can say 'yes' then change your mind. You should not sign this form if you have any questions that have not been answered to your satisfaction.

Your study doctor will be paid by the sponsor to conduct this research study.

# Introduction

Coronaviruses are respiratory viruses and most often cause common-cold like symptoms every winter.

SARS-CoV-2 is a new coronavirus that first appeared in China in November 2019. It was associated with cases of pneumonia. This virus causes the illness that is now called COVID-19. People with COVID-19 may have symptoms ranging from mild symptoms or severe illness, even death. Older adults and people with medical conditions like heart or lung disease or diabetes seem to be at higher risk for developing complications from COVID-19 illness.

As of July13, 2020, there have been more than 12 million confirmed cases and 560,000 deaths worldwide. In the United States, there have been 3.2 million confirmed cases and 130,000 deaths have been reported (World Health Organization, 2020). As a response to the ongoing pandemic, AstraZeneca is developing an investigational vaccine, also known as AZD1222, for the prevention of COVID-19.

You are invited to take part in a clinical research study. To help you decide, you should understand the study and what you will have to do. To make an informed decision to take part you should know the purpose of the study, the procedures, the benefits and risks, the discomforts and the precautions taken. This process is called 'informed consent'. Please take the time to read the following information carefully and discuss it with others. Please ask your study doctor if there is anything that is not clear or if you would like more information.

It cannot be promised that the study will help you but in the future the information we get from this study may help improve the future vaccine for people with COVID-19.

If you decide that you want to take part, you will be asked to sign the informed consent form. You will be given a copy of the signed form to keep, and the original will stay at the study center.

# Why am I being invited to take part in a research study?

We invite you to take part in a research study for a vaccine for COVID-19. This study is for people 18 years old and older.

Main 3.0, 2020-08-27
IRBA version 3.0
US_Master Main v3.0 26Aug 2020

AA51

2 of 26

Document ID: 7692e9c1-196b-42b4-96b8-0dd20c5eff67
CERTIFIED COPY

# What should I know about a research study?

- Someone will explain this research study to you.
- Please read all of the following information carefully.
- Whether or not you take part is up to you.
- You can choose not to take part.
- You can decide to take part and later change your mind.
- Your decision will not be held against you.
- You can ask all the questions you want before you decide. Do not sign unless you understand the information in it and have had your questions answered to your satisfaction.
- If you sign this form and decide to take part in this research study, keep a copy of the signed form for your records. It has information, including important names and telephone numbers, that you may wish to refer to.

# Why is this research being done?

This study is being done to see if a vaccine that is being developed to prevent people from getting sick with COVID-19 is safe and effective and also to see how well it is tolerated.

# How long will the research last and what will I need to do?

This study will last for 24 months.

If you take part, you will receive a shot of either the vaccine or a placebo twice: once on Day 1 and a booster shot on Day 29. A placebo will look like the vaccine but will not have any active vaccine in it. After the shots you will have blood drawn several times for the next 24 months to assess your immune system's (how your body fights off the virus) response.

If you get sick, you may also be asked to visit the site to have a test to see if you have COVID-19.

# Is there any way being in this study could be bad for me?

This vaccine is 'investigational'. This means that the safety and effectiveness are still being looked at. It is not approved for use in the U.S. by the Food and Drug Administration (FDA). There is a chance you could have a side effect that is severe or that has not been seen before.

Currently, there is no completed clinical study of the vaccine. Over 5,000 people have received the vaccine so far. If you have severe side effects from the vaccine, the study doctor may ask you not to get a second dose of vaccine or placebo.

There is also a potential risk that if you get the vaccine in the study and then become ill with COVID-19 that your illness could be worse than if you hadn't received the vaccine.

More detailed information about the risks of this study can be found under the **"What could be the side effects of the vaccine?"** section.

# Will being in this study help me?

Main 3.0, 2020-08-27
IRBA Version 3.0
US_Master Main v3.0 26Aug 2020

AA52

Document ID: 7692e9c1-196b-42b4-96b8-0dd20a51ff67

3 of 26

AA52

CERTIFIED COPY

We cannot promise any direct benefits to you or others from your taking part in this research. However, possible benefits include being protected from getting sick with COVID-19. As we don't know if this will happen you should continue to take precautions to avoid getting infected with the virus. Your participation will provide information about the vaccine. This might benefit others in the future.

# What happens if I do not want to be in this research?

Participation in research is completely voluntary. You can decide to take part or not to take part. If you decide not to take part in this study, it will not affect your ability to receive medical care. Your decision to not participate or to withdraw later will not result in any penalty or loss of benefits to which you are otherwise entitled.

# Study details

**What will happen during this study?**

This study is a vaccine study. It involves both vaccine and a placebo (which looks like the vaccine but does not contain any actual vaccine). The vaccine is based on a weakened version of a common cold (adenovirus) virus that causes infections in chimpanzees. The adenovirus vaccine has been changed so that it can't replicate inside your body and so that it presents part of the COVID-19 virus to the body so that an immune response can be made to it. The vaccine can give you side effects that will be explained below. The placebo is made up of salt water.

Both the vaccine and placebo will be given as an injection (a 'shot'). About 30,000 people at 100 sites in the United States and possibly other countries will be in this study. People who are approved to be in the study will be put into two groups at a 2:1 ratio. This means that 20,000 people will receive the vaccine and 10,000 people will receive placebo. You have 2 out of 3 chance (like drawing straws) of receiving the vaccine. A computer program will be used to determine if you get the vaccine or placebo. Whether you get the vaccine or the placebo is random, like flipping a coin.

In addition, the study will have two main parts: a main study and a substudy. Three thousand people will take part in a sub-study that will measure the body's ability to develop the desired immune response and to see if there are side effects such as fever and swelling at the injection site. The remaining people will be enrolled in the main study. People in the sub-study will be asked how they are feeling for 7 days following their shot. They will also have their blood drawn. All participants will be followed to see if the vaccine prevents them from getting sick with the virus.

This study is "double-blind". This means that neither you nor the study doctor/study staff will know if you are receiving the vaccine. However, if you have a medical emergency the study doctor will be able to find out if you are receiving the vaccine or placebo.

You will also have the choice to provide one extra blood sample to look at your DNA. If you consent on Day 1, one blood sample (1 teaspoon) would be taken. The risks of giving this blood sample are the same as the risks explained in this informed consent form. You can still take part in this research study, even if you do not agree to donate this extra sample. The purpose of this research is described in a separate Optional Genetic Research Information and Informed Consent Form Addendum.

If you want to join this study, we will screen you to see if you are eligible. Screening will include:

- signing the informed consent form,
- you will tell us about any current medications you are taking,
- a general physical examination, and

- a pregnancy test for women who are able to have children

After you complete these activities, we will be able to tell if you are eligible to be in the study, and whether you will be in the main study or the sub-study.

You will be contacted every week for the first year of the study by telephone or email or text to see if you have any symptoms of being sick with COVID-19. If you show symptoms of being sick with COVID-19 for longer than a day, you will be asked to call the study site and may be tested for the virus. If you do have the virus, you will be contacted regularly to see how you are doing.

**The screening and assessment schedules are shown on the table below:**

**Table 1.  Screening Procedures**

| Study Period | Screening |
|---|---|
| Procedure / Study Day | Day -14 to Day -1 |
| Written informed consents/ assignment of participant  number for blinding | X |
| Review medical history | X |
| Physical examination including height, weight, vital signs and oxygen levels | X |
| Pregnancy test (urine or blood test) [a] | X |
| Assessment of side effects | X |
| Current medications and supplements | X |

a Female participants only. Pregnancy test must be negative prior to dosing

Main 3.0, 2020-08-27
IRB Version 3.0
US_Master Main v3.0 26Aug 2020
AA54
Document ID: 7692e9c1-196b-42b4-96b8-0dd20a5aff67
5 of 26
CERTIFIED COPY

**Table 2.  Schedule of Activities: Treatment and Follow-up Period – Main Study (Excluding Substudy Participants)**

| Procedure | Treatment and Follow-up Period | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Day | 1 | 8 [a] | 29 | 36 [a] | 57 | 90 | 180 | 360 | 730 |
| Window (days) | NA | ± 3 | ± 3 | ± 3 | ± 3 | ± 5 | ± 10 | ± 15 | ± 30 |
| Medical history | X | | | | | | | | |
| Brief physical exam | X | | | | | | | | |
| Vital signs | X | | | | | | | | |
| Pregnancy test – urine or blood [b] | X (predose) | | X (predose) | | | | | | |
| Review your current medications | X | X | X | X | X | | | | |
| Blood sample for Genetic Research (optional) | X (predose) | | | | | | | | |
| **Vaccine administration** | X | | X | | | | | | |
| **Tests to see if the vaccine is effective** | | | | | | | | | |
| Weekly telephone/email/text contacts - asking about COVID-19 symptoms [c] | ← | | | | | | | → | |
| Nasal swab | X (predose) | | | | | | | | |
| Blood tests | X (predose) | | X (predose) | | X | X | X | X | X |
| **Immune system assessments** | | | | | | | | | |
| Blood test to check immune system response | X (predose) | | X (predose) | | X | | | | |
| **Safety assessments** | | | | | | | | | |
| Review any side effects | X | X | X | X | X | X | X | X | X |
| Telephone contact for safety monitoring | | X | | X | | | | | |

a. Not a study site visit; participants will be contacted by telephone for safety monitoring

b. If the urine test is positive, or does not confirm whether you are pregnant then a blood test will be done.

c. Weekly contact with participants to remind them to contact the study site for testing if they have symptoms of COVID-19.

Main 3.0, 2020-08-27
IRB Version 3.0
US_Master Main v3.0 26Aug 2020
6 of 26
Document ID: 7692e9c1-196b-42b4-96b8-0dd20e2eff67
CERTIFIED COPY

**Table 3.  Schedule of Activities: Treatment and Follow-up Period-Substudy**

| Procedure | Treatment and Follow-up Period | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Day | 1 | 8 a | 15 | 29 | 36 a | 43 | 57 | 90 | 180 | 360 | 730 |
| Window (days) | NA | ± 3 | ± 1 | ± 3 | ± 3 | ± 3 | ± 3 | ± 5 | ± 10 | ± 15 | ± 30 |
| Medical history | X | | | | | | | | | | |
| Brief physical exam | X | | | | | | | | | | |
| Vital signs | X | | | | | | | | | | |
| Pregnancy test – urine or blood test b | X (predose) | | | X (predose) | | | | | | | |
| Review your current medications | X | X | X | X | X | X | X | | | | |
| Blood sample for Genetic Research (optional) | X (predose) | | | | | | | | | | |
| **Vaccine administration** | X | | | X | | | | | | | |
| Weekly telephone/email/text contacts - asking about COVID-19 symptoms c | ← | | | | | | | | | | → |
| Nasal swab | X (predose) | | | | | | | | | | |
| Blood tests | X (predose) | | X | X (predose) | | X | X | X | X | X | X |
| Blood samples for COVID-19 antibodies | X (predose) | | X | X (predose) | | X | X | | X | X | X |
| Blood sample for seasonal CoV | X (predose) | | | X (predose) | | | X | | X | X | |
| Nasal swab | X (predose) | | X | X (predose) | | X | X | | X | X | |
| Side effects (recorded daily by the participant in eDiary) | X (through Day 8) | | | X (through Day 36) | | | | | | | |
| Side effects (by staff interview) | X | X | X | X | X | X | X | X | X | X | X |
| Telephone contact for safety monitoring | | X | | | X | | | | | | |

a. Not a study site visit; participants will be contacted by telephone for safety monitoring

b. If the urine test is positive, or does not confirm whether you are pregnant then a blood test will be done.

c. Weekly contact with participants to remind them to contact the study site for testing if they have symptoms of COVID-19.

### **Participants who have COVID-19 symptoms (fever, shortness of breath, difficulty breathing) for any amount of time, as well as participants who have:**

- chills,
- cough,
- fatigue,
- muscle aches,
- body aches,
- headache,
- new loss of the sense of taste or smell,
- sore throat,
- congestion,
- runny nose,
- nausea,
- vomiting and/or diarrhea (for two or more days)

### **will have the following schedule:**

Main 3.0, 2020-08-27
IRB Version 3.0
US_Master Main v3.0 26Aug 2020

AA56

Document ID: 7692e9c1-196b-42b4-96b8-0dd20a5eff67

7 of 26

AA56

CERTIFIED COPY

**Table 4.  Schedule of Activities: Illness Visits (Participants with Symptoms)**

| Procedure [a] | Site Visit | Home Collection by Participant | | | | Site Visit for COVID-19 Positive Participants Only | | |
|---|---|---|---|---|---|---|---|---|
| **Day** | 1 | 3 | 5 | 8 | 11 | 14 | 21 | 28 |
| **Window (days)** | NA | ± 1 | ± 1 | ± 2 | ± 2 | ± 2 | ± 2 | ± 2 |
| Medical history | X | | | | | X | X | X |
| Brief physical examination | X | | | | | X | X | X |
| Vital signs (including oxygen levels) | X | | | | | X | X | X |
| Review of current medication | ← | | | | | | | → |
| Digital health device | ← | | | | | | | → |
| Symptoms associated with COVID-19 (recorded daily by participant in e-Diary) | ← | | | | | | | → |
| **COVID-19 virus assessments** | | | | | | | | |
| Nasal swab for COVID-19 (local laboratory) | X | | | | | | | |
| COVID-19 (to confirm virus type) (central laboratory) | X | | | | | X | X | X |
| Respiratory panel | X | | | | | | | |
| Saliva sample | X | X | X | X | X | X | X | X |
| **Immune system assessments** | | | | | | | | |
| Nasal swab for COVID-19 | X | | | | | X | | X |
| Blood test for anti-bodies and exploratory tests | X | | | | | X | | X |
| **Safety assessments** | | | | | | | | |
| Side effects | ← | | | | | | | → |
| Telephone contact | | X | | X | | | | |

a Only participants who test positive for COVID 19 will continue with the illness visits, including any home saliva-collection tasks. Participants who test negative for COVID 19 will be instructed to stop all illness visit assessments and return the armband digital health device and e-Diary to the site using prepaid envelopes.

# What will you have to do?

You will have to:

- go to the study visits,
- follow the instructions the study doctor/study staff give you
- get the shots
- You will have several blood draws during this study. The total amount of blood drawn is about 82 teaspoons.
- You must not take part in any other studies or donate blood while you are taking part in this study.
- Once you finish the study or if you leave early, it is important for you to speak with the study doctor for follow-up care. Exit tests may be needed.
- All routine vaccinations are not allowed (except flu) less than 30 days after the last dose of vaccine. Please talk to your study doctor before you have any other vaccinations.

**Armband for vital signs:**

- If you agree to be in this study and start having symptoms of COVID-19, you will be asked to wear a device (an armband from Current Health) when you come to the study site for your first illness visit. You will be trained by study staff on the use of the device. It should be worn continuously each day until instructed by study staff to stop.

The device keeps track of your vital signs, such as:

- how fast you are breathing,
- how you're your heart is beating,
- your temperature,
- how much oxygen in your blood, and
- how much you move.

Main 3.0, 2020-08-27
IRBA Version 3.0
US_Master Main v3.0 26Aug 2020
AA57
Document ID: 7692e9c1-196b-42b4-96b8-0dd20a35ff67
8 of 26
CERTIFIED COPY

This information will be wirelessly sent to your care team for them to review. The data from the armband device will be monitored and you may be called by a nurse service if it looks like the device is not sending out information properly or if there is concern that your vital signs are too high or too low. If there are issues with the device, you will need to call the study center so that study staff can help to fix the problem.

**eDiary:**

- People in the substudy and those having illness visits will keep a record of their symptoms in an electronic Diary (eDiary).  If you do not have a cell phone or a computer with internet access, or if your cell phone will not support the app for the eDiary, the site may lend you an electronic device that you can use.  It will look like a cell phone but its only purpose is so you can keep track of your symptoms. If you are not sure how to use the device, the study team will give you instructions. You can have someone fill out the eDiary for you or have someone help you fill out the eDiary. If someone else fills out the eDiary for you or helps you fill it out, they will be able to see your private health information. The information you enter into the eDiary will be sent automatically to your site care team.  The site may contact you if any of your symptoms become severe.

**Saliva samples:**

- If you start having symptoms of COVID-19, you will be asked to provide up to 8 saliva samples, so that we can see if COVID-19 is in saliva. The first saliva collection will be performed at the study site by the study staff. During this first "illness" visit, you will receive a saliva kit and be shown how to use it. You will collect 4 samples at home. You may be contacted at home with a video call so that someone can help explain how to collect the saliva sample properly. If you don't want to be called, you can get paper instructions. You will either ship the saliva samples to our COVID-19 testing laboratory or bring them back to your next site visit if you are positive with COVID-19. All instructions will be provided to you in the participant training material during the first "illness" visit. You will also have 3 more saliva samples collected at the study site.
- As part of the COVID-19 testing some your personal information will be collected including your name, address and telephone number. This information is collected because by US law positive test results have to be reported to relevant state or local public health agencies. If your test is positive for COVID-19 you may get a phone call from your state or local public health departments to allow them to efficiently track the virus.

# What alternative treatments are available?

Taking part in this study is your choice. You may choose to take part or not to take part. Right now, there are no other vaccines or other drugs that have been shown to prevent people from getting sick with COVID-19.

# What are the possible disadvantages or risks of taking part?

Getting this vaccine may also involve risks to your health that we don't know about right now.

# What could be the side effects of the vaccine?

*If you suffer any of these side effects (or any others not listed) or you think you are experiencing a side effect, during this study, please tell your study doctor immediately* (see <u>'Who should you contact with questions?').</u>

Over 5,000 people have received at least 1 dose of the vaccine to date. Thirty people have received a second dose.

Reactions to the vaccination:

Following vaccination you may feel some discomfort on your arm where you get the shot. This usually gets better within 5 minutes. Later, you might feel pain when you move your arm, but this should go away in a few days. Pain and tenderness where people received the shot were the most common side effects and these were usually mild.

General reactions:

Chills, fevers, headache, feeling tired, nausea and body aches were common overall side effects. These side effects were usually mild or moderate in nature though a small number of them were also considered severe. Most of reported side effects appeared within 24-48 hours after the shot. These usually went away within 1-7 days.

People who have received the vaccine have also had decreases in their blood counts; in the cells that help fight infections and in the cells that help form blood clots. These decreases have resolved within a few days and have not been associated with any other side effects so far.

Any side effects or other health issues that happen to you during the study will be followed up by the study doctor.

Serious Reactions:

With any vaccination there is a risk of rare serious side effects, such as an allergic reaction.

The vaccine is not familiar to your body. Your body's immune system may react to this. Strong allergic reactions to vaccines (anaphylaxis) are rare and require treatment right away but can result in death. These reactions can happen hours or days after the injection. Symptoms may include:

- swelling of the lips,
- difficulty breathing,
- fainting,
- dizziness,
- wheezing when you breathe,
- fast pulse,
- sweating,
- hives or rash
- low blood pressure
- diarrhea

If this happens, medication for treating allergic reactions will be available. The research team is trained to treat allergic reactions.

Another reaction that is also very rare can cause an illness called Guillain-Barré syndrome (GBS). This illness causes muscle weakness that can range from being mild to being very severe (can cause paralysis and can be fatal). Most of adults who become sick recover after their illness. Symptoms of GBS are:

- Weakness
- Tingling in the legs or arms and upper body.

There is also a possible risk that if you get the vaccine in the study and then become ill with COVID-19 that your illness could be worse than if you had not received the vaccine.

Main 3.0, 2020-08-27
IRB Version 3.0
US_Master Main v3.0 26Aug 2020

AA59

Document ID: 7692e9c1-196b-42b4-96b8-0dd20e4ff67

10 of 26

AA59
CERTIFIED COPY

In the past, experimental vaccines were studied against another coronavirus (called SARS), which also infects the lungs. In some cases, animals that received certain types of SARS vaccines appeared to develop *more severe* lung inflammation when they were later infected with SARS compared with animals that had not been vaccinated.

An experimental vaccine tested in the 1960s for a different respiratory virus (RSV) resulted in some infants developing *more severe* lung inflammation when they were later infected with the virus. Two of the infants died. Other versions of RSV vaccines have not caused these severe reactions.

In other studies, animals that received two shots of this vaccine (AZD1222) and then were infected with COVID-19 had the virus in the intestinal tract but were not sicker than animals that received one shot. It is possible that people who get two shots of this vaccine could also have the COVID-19 virus present in their intestinal tract if they get infected for a longer period of time than people who get infected but didn't get the vaccine. As a result, you should practice good hygiene like hand washing, to avoid spreading the virus to other people.

You should get medical help and contact the study doctor or staff if you have any of these or any other side effects during the study.

# What are the side effects of the study procedures?

Some of the study procedures may create some discomforts. You may experience none, some or all of those listed below:

- As with any injection (shot), the vaccine injection in your muscle may cause the area to become sore or tender, red, bruised, itchy and swollen. These effects usually get better without treatment.

Blood samples:

- Drawing blood may cause slight pain and bruising at the site where the needle enters. Rarely, people feel light-headed or even faint.
- You could have a reaction at the sites where your blood is collected. This could include redness, bruising, swelling, bleeding, or pain.
- The volume of blood drawn over the study period should not affect the health of volunteers.

You may experience the following side effects while wearing the digital health device:

- A very minor skin irritation under the wearable device: This is restricted to minor skin redness that resolves shortly after removal of the device
- Minor discomfort during sleeping
- Ecchymosis (a discoloration of the skin, typically caused by bruising) of the upper arm near to the wearable device in patients who are taking blood thinners.

Nasal and oral swabs:

- You may feel some discomfort (pressure) from having a sample taken with a swab in your nose and/or mouth.

**Pregnancy Risks:**

We do not know if the vaccine may cause harm to an unborn baby. Women taking part in this study must have a negative pregnancy test during Day 1 and Day 29. During this study, participants must use highly-effective forms of birth control for 28 days prior to Day 1. They also must agree to continue using a highly effective form of birth control for 60 days after their last dose (injection) of the vaccine on Day 29.

Main 3.0, 2020-08-27
IRB Version 3.0
US_Master Main v3.0 26Aug 2020

AA60                    AA60

11 of 26

Document ID: 7692e9c1-196b-42b4-96b8-0dd20a5aff67
CERTIFIED COPY

Inconsistent abstinence, the rhythm method, and withdrawal are NOT acceptable methods of preventing pregnancy.

Highly effective forms of birth control include:

Barrier methods: Intrauterine devices (IUD), having both 'tubes tied", not having sex, or having a partner who has had a vasectomy.

Hormonal methods: Birth control pills, injections and patches that are progestogen only or combine estrogen and progestogen.

If you do become pregnant during the study, we will contact you to see what the outcome of your pregnancy was.

# Expenses

There will be no cost to you for taking part in this study. You will be provided with all vaccines, examinations and medical care related to the study at no cost to you.

# Payment

You will be reimbursed for time and travel in the amounts of $125.00 per each completed study visit and $30.00 for each completed phone call. If you are chosen to participate in the Reactogenicity Sub-Study you will receive $125.00 per each completed study visit. If you qualify to come in for an Illness visit you will receive $125.00 per each completed site visit and $25.00 for each day you complete a home collection of saliva. You will be paid within 5 business days of each completed study visit or phone call.

# What happens when the research study stops?

If the study is stopped, you will be told and your study doctor will make plans for your care, if needed.

You can be withdrawn from the study at any point if the study doctor decides that this is best for your health or you are not following study procedures

If you have a reaction after the injection of vaccine, your participation may be stopped by the study doctor or sponsor without your consent.

After the study is completed, persons who received the placebo may be offered the opportunity to receive the vaccine if there are doses available. The study doctor will consider the best option for your care.

# Compensation for study related injury

If there is an emergency, call 911 right away or go to the emergency room and contact your study doctor as soon as you can.

If you become ill or are injured while you are in this research study, you must tell your study doctor straight away. The study doctor will provide medical treatment or refer you for treatment.

Main 3.0, 2020-08-27
IRBA version 3.0
US_Master Main v3.0 26Aug 2020

AA61

Document ID: 7692e9c1-196b-42b4-96b8-0dd2aaeaff67

12 of 26

CERTIFIED COPY

Injuries that have been caused by the vaccine, tests or procedures are called 'research 'injuries'. Injuries caused by your usual medical care are not research injuries.

The Sponsor has an insurance policy to cover the costs of research injuries as long as you have followed your study doctor´s instructions. Sponsor will pay the costs of medical treatment for research injuries, provided that the costs are reasonable, and you did not cause the injury yourself.

The U.S. National Institutes of Health (NIH) does not have a way to provide direct compensation for a research related injury.

If you have medical insurance, please check with your insurance company that taking part in this research study will not affect your coverage.

Sponsor may also compensate you in accordance with the law of the United States. By signing this form you do not give up any legal right you may have.

Due to the coronavirus public health crisis, the federal government has issued an order that may limit your right to sue if you are injured or harmed while participating in this COVID-19-related clinical study.

If the order applies, it limits your right to sue the researchers, healthcare providers, any Sponsor or manufacturer or distributor involved with the Study. You may be prevented from making claims for injuries that have a causal relationship with the use of the investigational product in this Study, including, but not limited to, claims for death; physical, mental, or emotional injury, illness, disability, or condition; fear of physical, mental, or emotional injury, illness, disability, or condition, including any need for medical monitoring; and loss of or damage to property, including business interruption loss.

However, the federal government has a program that may provide compensation to you or your family if you experience serious physical injuries or death. If funds are appropriated by Congress, compensation for injuries may be available to you under this Countermeasures Injury Compensation Program. To find out more about the Countermeasures Injury Compensation Program" go to https://www.hrsa.gov/cicp/about/index.html or call 1-855-266-2427.

# What if new information about the vaccine becomes available?

You will be told if any important new information becomes available that may affect your willingness to continue taking part in the study. If this happens, your study doctor will contact you as soon as possible, and will discuss whether you should continue in the study. If you decide not to continue, your study doctor will make arrangements for your care to continue if needed. If you decide to continue in the study, you may be asked to sign a new consent form.

Also, if new information becomes available, your study doctor may stop your participation without your consent. If this happens, the reasons will be explained and arrangements made for your care, if you need follow-care.

# What will happen if you don't want to continue with the study?

You can stop taking part in the study at any time without giving any reason. This will not affect your future treatment or your relationship with your study doctor. If you wish to stop taking part, please tell the study doctor immediately. You may be asked to return to the study center for an end-of-study

Main 3.0, 2020-08-27
IRB Version 3.0
US_Master Main v3.0 26Aug 2020

AA62

13 of 26
Document ID: 7692e9c1-196b-42b4-96b8-0dd2ba9aff67
CERTIFIED COPY

assessment. You may also be asked for permission to be contacted at a later date by your study doctor to collect information about any symptoms you might have. You may also be asked for your permission to have a relative contacted, to have your doctor contacted or for information from your medical records to be shared.

Your study doctor or the sponsor may withdraw you from the study without your consent if the study is not helping you, if you do not follow the study directions, or if you have a serious side effect related to the vaccine. The sponsor, FDA, US Government Office for Human Research Protections or the Institutional Review Board (IRB) may also stop the study at any time for any reason. If your study doctor thinks it is in your best interest to withdraw you from the study, or if the study is stopped for any other reason, he/she will explain the reasons and arrange for your care to continue.

# What will happen to my data and biosamples gathered in the study?

### Which data and biosamples are collected?

In order to conduct the study, the Study site and some COVID-19 testing vendors (including labs) will have to collect and register information about your identity (such as your name, address, telephone number, and health insurance number) as well as data that is necessary to assess your health conditions such as your medical condition and medical history (this may include information from your physicians/ available in your medical records), your life style, your demographics (age, gender, ethnic and racial background). COVID-19 testing vendors will need to collect these data from you to be compliant to the CARES Act Section 18115 Federal law (e.g. in order to do contact tracing if you test positive for COVID-19).

In addition, the study site will collect biosamples from you (such as blood samples) and these samples will be labeled with a code and not your name or other information that could identify you. These will be analysed and the data from the analysis will be part of your coded data. The key to the code will be kept by the study staff at the site but will not be shared with the Sponsor or other researchers who may use these samples.

### What are my data and biosamples needed for?

Your data and biosamples are needed for the Sponsor to develop the vaccine, get permission to introduce and keep it on the market, monitor its safety and get it reimbursed by governments i.e., throughout the vaccine development program. Therefore, they will be used as planned in this study as well as within related research activities necessary for this vaccine development program in order to:

- understand how the vaccine works in the body,
- better understand the studied disease and associated health problems,
- learn from past studies to plan new studies or improve scientific analysis methods,
- publish research results in scientific journals or use them for educational purposes.

Your biosamples will not be used for commercial profit.

### Who can access my data and biosamples?

Only at the study site, your name and contact details will be accessible to the study doctor and the study team to conduct the study. Non-medical personnel acting on behalf of the sponsor and being bound by a duty of confidentiality as well as Health authorities, such as the US Food and Drug Administration (FDA) and the Institutional Review Board (IRB) as well as people from the US National Institutes of Health, the Coronavirus Prevention Network and the United States Biomedical Advanced Research and

Main 3.0, 2020-08-27
IRBA Version 3.0
US_Master Main v3.0 26Aug 2020
AA63                    AA63
Document ID: 7692e9c1-196b-42b4-96b8-0dd20ecaff67
14 of 26
AA63
CERTIFIED COPY

Development Agency may also be given access to this data only to verify that the study is carried out in compliance with legal and quality requirements.

The study site will share your data and biosamples with the sponsor and vendors, but only after they have been coded (which means that your name, contact details or health insurance number, have been replaced by a code). Health authorities (such as the FDA) and people helping AstraZeneca to run the study, including members of the AstraZeneca group of companies, contractors, sub-contractors and any company that AstraZeneca goes into business with, or sells all or part of its business to, will be allowed to see your personal information but they will not know who you are unless they are study inspectors.

The sponsor may share your coded data and biosamples with its Research partners and Service providers for the purposes of the vaccine development program.

In order to ensure proper conduct and accurate results of the study and to get permission to market the vaccine, the sponsor will share your coded data with health authorities (such as the FDA) and possibly with the IRB. They may also be shared with scientific journals, so the study results can be reviewed by independent scientists and to ensure the accuracy of results. Researchers from for example AstraZeneca, other health related companies, and universities might ask to use information from this study, including your information and samples for other medical, healthcare or scientific related research. The researchers may combine the results from this study with results from other studies. If AstraZeneca shares your information AstraZeneca will make sure that they cannot find out who you are and that such research is in line with this document. The use of your coded personal information for these scientific research purposes is based on your agreement. If a vaccine is marketed for commercial use, you will not share in any profits.

Your medical files may be reviewed at the study center (or study doctor's office) or remotely (outside of the study center) in order to confirm that the information collected from you was recorded correctly and to verify that the study procedures were performed properly.

In **none** of these cases your identity will be revealed to AZ.

Some of the above-mentioned persons may be located outside the United States (US). If this other country does not have equivalent personal data protection standards than the US, appropriate Safeguards (such as contracts and technical Security measures) will be adopted to protect and maintain the confidentiality of your data and biosamples. In case another organization takes over development or commercialisation of the vaccine, your coded data or biosamples may be transmitted to them. They will then have to protect your data and biosamples in the same way as described herein. You can ask your study doctor to see the information that has been collected about you. If you think any of it is wrong, you can ask your study doctor in writing if it can be changed or removed, in accordance with your country's laws. You can also ask that we restrict the use of your personal information. If you change your mind about taking part, we cannot remove the personal information that was collected for this research study before you stopped.

We have a Certificate of Confidentiality from the US government to help protect your privacy. With the certificate, we do not have to release information about you to someone who is not connected to the study, such as the courts or police. Sometimes we can't use the certificate. Since the US National Institutes of Health funds this research, we cannot withhold information from it.

A description of this clinical trial will be available on http://www.ClinicalTrials.gov, as required by U.S. law. This website will not include information that can identify you. At most, the website will include a summary of the results. You can search this website at any time.

# Who else may have access to my contact information and

Main 3.0, 2020-08-27
IRBA version 3.0
US_Master Main v3.0 26Aug 2020

AA64                     AA64

Document ID: 7692e9c1-196b-42b4-96b8-0dd2b3caff67

15 of 26

CERTIFIED COPY

# why?

Your name or contact details may be shared with service providers (such as Vault Health and Current Health Real Time Monitoring), in order to:

- Allow the service provider to reach out to you either during or after the Study, to ask your opinion on the provided Clinical Trial Transparency materials such as the Thank you card, Trial Result Summary or Study Arm Postcard.
- Reimburse you for your time, effort and certain expenses related to your participation.
- Allow call-centers to reach you for telephone interviews related to the study.
- Set up and manage your accounts for any apps or other devises that are used in the study.
- Collect information on whether you are alive or not ("vital status information").

The service providers must keep your name or contact details private and will **NOT** share any information that can directly identify you with the sponsor.

# How long will my coded data and biosamples be kept?

The study site and the sponsor are obliged to keep all study data for 25 years after the end of the study, unless there is a legal requirement for keeping them longer. Your coded data will then be deleted or anonymised, and your biosamples returned to your study doctor or destroyed as soon as possible after the tests for the vaccine development program are completed unless you authorise the sponsor to use them for future research (a tick box in the Consent page will allow you to make this choice).

All biosamples will be securely stored on behalf of the sponsor at COVANCE CENTRAL LABORATORY SERVICES L.P., 8211 SciCor Drive, Indianapolis, IN, 46214-2985 USA, for up to 15 years. Please note that the location of the biosamples may change at the request of the sponsor.

# What are my rights under data protection law?

You have the right to review which of your data are collected and being used; you can also ask for a copy of this data, ask for restriction of use of this data, or ask to have incorrect data rectified.

To ensure the scientific integrity of the study, you will not be able to review some of the data or receive a copy of it until the study ends, because in this study, neither you nor the study doctor know if you are receiving the vaccine or the placebo.

To exercise these restricted rights, please contact preferably the study doctor. Contact details of the Data Protection Officer (DPO) are: Sponsor Data Protection Officer privacy@astrazeneca.com or c/o the Chief Privacy Officer, AstraZeneca, Academy House, 136 Hills Road, Cambridge CB2 8PA, England". If there are issues related to the use of your data, you have the right to file a complaint with your local data protection authority or with the sponsor's DPO.

# What does anonymised data mean?

Health authorities (such as the FDA) as well as pharmaceutical companies believe that access to clinical studies data advances clinical science and medical knowledge and is in the best interest of patients and public health, provided that patient privacy is protected. Therefore, the sponsor may generate and share internally or with other researchers an anonymised set of your data collected in the study (e.g., on

Main 3.0, 2020-08-27
IRB Version 3.0
US_Master Main v3.0 26Aug 2020

AA65

16 of 26
Document ID: 7692e9c1-196b-42b4-96b8-0dc20e5eff67
CERTIFIED COPY

www.clinicalstudydatarequest.com). This means your coded data will be stripped of your Patient code as well as of any other information that could reasonably be used to identify you such as your date of birth.

# How to find out more after the study?

Trial Result Summaries are a short and easy to understand summary of the results of this study. These will be added to www.trialsummaries.com within 1 year of the last study participants last site visit. You can visit www.trialsummaries.com website anytime to sign up to be notified via email when the trial results summary of your study is available.  Or, please let your study doctor know if you need a printed copy of the document. You will also receive information on the treatment you received in this study. This will be shared with you around the same time as the Trial Results Summary.

Technical Information about this research study will be posted on http://astrazenecaclinicaltrials.com. This website does not contain any information about you.

# FUTURE RESEARCH INFORMATION

In addition to participating in the clinical study, we would like to know if you would be willing that your coded data and leftover biosamples are used in future research projects with appropriate ethical review. Your consent to future research means that you also consent to provide additional biosamples for use in these same future research projects.

You are being asked to consent to the use of your coded data and biosamples for future research. If you decide not to do so, you may still take part in the clinical study.

**What is future research?**

Future research is important to advance science and public health. At present, however, it is not possible to foresee all details of future scientific research projects. These future scientific research projects are beyond the scope of the clinical study and the use of samples and data as outlined above and may occur whilst the study is ongoing or after the study has finished.

Your coded data and biosamples may only be used for scientific health-related research to find new ways to detect, treat, prevent or cure health problems.

They may also be used jointly with information from other sources outside typical clinical research settings, e.g. from public research databases. However, they will not be combined with other information in a way that could identify you. Your coded data and biosamples may also be anonymized for some of the future scientific research.

**How will my coded data and biosamples for future research be handled?**

All biosamples will be securely stored on behalf of the sponsor at an AZ-assigned biobank for up to 15 years. Please note that the location of the biosamples may change at the request of the sponsor.

Any additional data generated from your biosamples will be stored as long as necessary for scientific research objectives and allowed by law and will be destroyed or anonymised thereafter. For more information on Sponsors internal Document Retention policy you may go to www.astrazenecapersonaldataretention.com.

**May my coded data and biosamples be shared?**

Main 3.0, 2020-08-27
IRBA version 3.0
US_Master Main v3.0 26Aug 2020

AA66                    AA66

17 of 26

Document ID: 7692e9c1-196b-42b4-96b8-0dd2ba5eff67
CERTIFIED COPY

The sponsor may share your coded data and biosamples with research partners or deposit them in scientific databases. Research partners may include researchers from universities, research hospitals, and companies.

Some of the above-mentioned recipients may be located outside your country. The data protection laws which apply in those countries may not be as stringent as the laws in your country. Nevertheless, appropriate safeguards and security measures will be taken in order to protect and maintain the confidentiality of your biosamples and coded data as described in this section.

**How will my privacy be protected?**

Your coded data and biosamples will be participant to appropriate safeguards and will only be used for the purpose of scientific health related research. They will not be used to contact you or to affect your care or any other decision affecting your life such as insurance rates or employment opportunities.

You have the same rights as the ones described in the section "*What are your rights under data protection law?*".

**What if I want to withdraw from future research?**

Your participation in future research is voluntary. You are entitled to withdraw your consent for future research at any time, without giving a reason and without a negative effect on your standard of medical care. If you wish to withdraw, please inform your study doctor. There will not be any penalty or loss of benefits to which you are otherwise entitled if you decide not to take part or if you withdraw early.

You may continue to participate in the clinical study even if you choose to withdraw from future research.

If you withdraw from future research, your coded data and biosamples will not be used for future research and your samples will be destroyed as soon as possible. Your coded data (either copied from the clinical study database or newly generated) will also be destroyed unless this information is already included in analyses or used in scientific publications or if the coded data been anonymized and therefore we can't identify your data or biosamples.

**Results from Future Research?**

We may have to study coded data and biosamples from many people over many years before we can know if the results of future research are meaningful.

Therefore, you should not expect to receive individual results from future research projects. We will not give any such data to your doctor and we will not put them in your medical record as they are not individual valid results.

**Authorization to use and disclose protected health information for research:**

The United States government has issued a privacy rule to protect the privacy rights of patients. This rule was issued under a law called the Health Insurance Portability and Accountability Act of 1996 (HIPAA). The Privacy Rule is designed to protect the confidentiality of your protected health information (PHI). The document you are reading, called an "Authorization," explains how your PHI will be used and disclosed (shared) for purposes of the research study and describes your rights with respect to such information.

In working with the sponsor, your study doctor, will use and share protected health information about you. This is information about your health that also includes your name, address, telephone number or other facts that could identify the health information as yours. This includes information in your medical record and information created or collected during the study. This information may include your medical history, physical exam and laboratory test results, and certain health information indicating or relating to a

Main 3.0, 2020-08-27
IRBA version 3.0
US_Master Main v3.0 26Aug 2020

AA67

Document ID: 7692e9c1-196b-42b4-96b8-0dd2baadff67

18 of 26

CERTIFIED COPY

AA67

particular condition. Some of these tests may have been done as part of your regular care. The study doctor will use this information about you to complete this research.

In most cases, the study doctor will use your initials and assign a code number to your information that is shared with the sponsor. Except when required by law, you will not be identified by name, address, telephone number or other facts that could identify the health information as yours. The sponsor and its representatives (which include companies that are contracted by the sponsor to perform services for the study) may review or copy your protected health information at the study site. Regulatory authorities (such as the FDA) and the Institutional Review Board (IRB) may also review or copy your information to make sure that the study is done properly or for other purposes required by law.

By signing this Consent form, you allow the study doctor and his/her team to use your protected health information to carry out and evaluate this study. You also allow the study doctor to share your protected health information with:

- The sponsor and its representatives
- The Institutional Review Board (IRB) that reviewed this research. The IRB is a group of scientists and non-scientists who review the ethics of research. The goal of the IRB is to protect the rights and welfare of study subjects.
- The U.S. Food and Drug Administration (FDA)
- Other local, US and international regulatory entities including people from the US National Institutes of Health, the Coronavirus Prevention Network and the United States Biomedical Advanced Research and Development Agency
- Laboratories for testing biospecimens
- Vendors for this study working for or with the sponsor such as Current Health and Vault Health.

Your protected health information may be further shared by the groups above. If shared by them, the information will no longer be covered by the Privacy Rule. However, these groups are committed to keeping your health information confidential.

You have the right to see and get a copy of your records related to the study for as long as the study doctor has this information. However, by signing this Consent form you agree that you might not be able to review or receive your records related to the study until after the study has been completed.

You may choose to withdraw this Authorization to Use and Disclose Protected Health Information for Research at any time, but you must notify the study doctor in writing. If you withdraw your permission, you will not be able to continue being in the research study.

If you withdraw from the study and withdraw your Authorization, no new information will be collected for study purposes unless the information concerns a side effect related to the study. If a side effect occurs, your entire medical record may be reviewed. All information that has already been collected for study purposes, and any new information about a side effect related to the study, will be sent to the study sponsor.

If you withdraw from the study but do not withdraw your Authorization, new protected health information may be collected until this study ends.

If you do not withdraw this Authorization, it will remain in effect.

If the research site is located in California, Delaware, Indiana, Washington, or Wisconsin this authorization will expire on 31Dec2070.

There is no expiration of this authorization except for research conducted in the states listed above.

You do not have to sign this Authorization, but if you do not, you cannot participate in this research study or receive study-related treatment. If you withdraw this Authorization in the future, you will no

Main 3.0, 2020-08-27
IRBA version 3.0
US_Master Main v3.0 26Aug 2020

AA68

Document ID: 7692e9c1-196b-42b4-96b8-0dd2bacaff67

19 of 26
AA68
CERTIFIED COPY

longer be able to participate in this study. Your decision to withdraw your Authorization or not to participate will not involve any penalty or loss of access to treatment or other benefits to which you are otherwise entitled.

# What will happen to the results of this clinical study?

The results of this study will be used to make informed clinical decisions for developing this new vaccine. If you want the results to be made available to you, please talk to your study doctor. Results from clinical studies are often published in scientific journals, however, your personal information will remain confidential.

# Who has reviewed the study?

All research studies are reviewed by an independent group of people, called a research ethics committee or Institutional Review Board (IRB), to protect your safety, rights, well-being and dignity. This study has been reviewed by an IRB.

# Who should you contact with questions?

A short summary of the results will be added to www.trialsummaries.com when the study has ended. You can visit this website for more information or let your study doctor know if you need a printed copy.

If you have any questions or concerns about your participation in this research study, or if you feel that you have experienced a research-related injury or reaction to the vaccine, or have a complaint about the research study, contact the research team at the phone number(s) listed above on the first page.

This research is being overseen by an Institutional Review Board ("IRB"). An IRB is a group of people who perform independent review of research studies. You may talk to them at (888) 303-2224 or (800) 562-4789, irb@cgirb.com if:

- You have questions, concerns, or complaints that are not being answered by the research team.
- You are not getting answers from the research team.
- You cannot reach the research team.
- You want to talk to someone else about the research.
- You have questions about your rights as a research subject.

**Thank you for reading this and considering if you will take part in this study.**

Main 3.0, 2020-08-27
IRBA/ersion 3.0
US_Master Main v3.0 26Aug 2020
AA69
Document ID: 7692e9c1-196b-42b4-96b8-0dc20ac0ff67
20 of 26
CERTIFIED COPY

# Signatures

Participant                                                                    Required

**Consent and Authorization form**

I confirm the following:

I have read (or had read to me) and understand the information sheet for the study. I have had time to think about taking part. BLD

I am satisfied my questions have been answered. BLD

I agree to be part of this study, to follow the study procedures and to provide the information the study doctor, nurses, or other staff members ask from me. BLD

I understand that I am free to stop taking part in this study at any time without giving a reason and without my medical care or rights being affected. BLD

I will receive a copy of this signed and dated information sheet and consent form to keep for myself. BLD

I agree if the study doctor is not my personal doctor, my personal doctor may be told about my taking part in this study and asked for medical information about me. BLD

I agree to my samples being taken and used as described in this information sheet. BLD

I give permission for my personal information to be collected and used as part of this clinical study and to be:

- sent outside of the study center only with my participant identification number;
- reviewed at the study center as part of my medical records, which may include my name, address, telephone number, date of birth, gender, race and ethnicity, and other information that could be used to identify me;
- reviewed, processed and disclosed by and to the Sponsor and other persons and organizations assisting with the study, including the central laboratory and study monitors for purposes related to the study;
- reviewed or audited by appropriately authorized organizations;
- reviewed by and sent to regulatory authorities (such as the FDA) or health insurers in my country or other countries; and
- sent to other countries where laws protecting my personal information may be less strict than the laws in this country, or to countries without any personal data protection laws.

BLD

I understand I may also be contacted at a later date(s) for my permission in connection with this or any related sub-study. BLD

I agree to the use of my coded data and biosamples for future research, as described in the Future Research section, including the collection of additional biosamples and where necessary for the research, possible analyses of my genetic information.
- ◉ Yes

○ No

By signing this document I agree to take part in this study, as set out in the Information Sheet and Consent Form and authorize the release of my medical records and protected health information related to this study to the sponsor and its representatives, the Institutional Review Board (IRB), laboratories for testing biospecimens (as applicable), the FDA and other regulatory agencies as described above. I have been told that I will receive a signed and dated copy of this Consent and Authorization for my records.

2020-11-04

Brianne Lunt Dressen                                                          Date

Main 3.0, 2020-08-27
IRB Version 3.0
US_Master Main v3.0 26Aug 2020
AA71
Document ID: 7692e9c1-196b-42b4-96b8-0dd2b5aff67
22 of 26
CERTIFIED COPY

Investigator/Authorized Designee                                          <span style="color:red">Required</span>

- I have fully and carefully explained the study to the person named above and confirm that, to the best of my knowledge, they clearly understand the nature, risks and benefits of taking part in this study.
- I confirm that I gave them all opportunities to ask questions about the study, and that I answered all the questions they asked correctly and to the best of my ability.
- I confirm that they have not been forced into giving consent, and that they have given their consent freely and voluntarily.
- I confirm they will be given a copy of this Information Sheet and Consent Form.



                                                                          2020-11-04

                      Janice Ly                                            Date

# Audit Trail

*Document Label*  *Main*

**Document Version Number**   3.0

**Document Version Date**   2020-08-27

**Document ID**   7692e9c1-196b-42b4-96b8-0dd20a3aff67

| Timestamp | Action | Description |
|---|---|---|
| 2020-11-04 20:42:26 UTC | Signed Documents | Signed document 3.0, confirmed by jly@velocityclinical.com |
| 2020-11-04 20:41:58 UTC | Signature | Investigator/Authorized Designee signed the document. |
| 2020-11-04 20:41:36 UTC | Signature | Participant signed the document. |
| 2020-11-04 20:39:56 UTC | Signature Cleared | patient_4a21c43a-8ba1-4f97-9da3-a4fb9db0e4a3@email.com cleared signature Participant. |
| 2020-11-04 20:39:10 UTC | Signature | Participant signed the document. |
| 2020-11-04 20:19:20 UTC | Understood | Who should you contact with questions? |
| 2020-11-04 20:19:12 UTC | Viewed | Who should you contact with questions? |
| 2020-11-04 20:19:12 UTC | Understood | Who has reviewed the study? |
| 2020-11-04 20:19:07 UTC | Viewed | Who has reviewed the study? |
| 2020-11-04 20:19:07 UTC | Understood | What will happen to the results of this clinical study? |
| 2020-11-04 20:19:03 UTC | Viewed | What will happen to the results of this clinical study? |
| 2020-11-04 20:19:02 UTC | Understood | FUTURE RESEARCH INFORMATION |
| 2020-11-04 20:18:50 UTC | Viewed | FUTURE RESEARCH INFORMATION |
| 2020-11-04 20:18:50 UTC | Understood | How to find out more after the study? |
| 2020-11-04 20:18:46 UTC | Viewed | How to find out more after the study? |
| 2020-11-04 20:18:46 UTC | Understood | What does anonymised data mean? |
| 2020-11-04 20:18:41 UTC | Viewed | What does anonymised data mean? |
| 2020-11-04 20:18:41 UTC | Understood | What are my rights under data protection law? |
| 2020-11-04 20:18:36 UTC | Viewed | What are my rights under data protection law? |
| 2020-11-04 20:18:36 UTC | Understood | How long will my coded data and biosamples be kept? |
| 2020-11-04 20:18:31 UTC | Viewed | How long will my coded data and biosamples be kept? |
| 2020-11-04 20:18:31 UTC | Understood | Who else may have access to my contact information and why? |
| 2020-11-04 20:18:25 UTC | Viewed | Who else may have access to my contact information and why? |
| 2020-11-04 20:18:25 UTC | Understood | What will happen to my data and biosamples gathered in the study? |
| 2020-11-04 20:18:08 UTC | Viewed | What will happen to my data and biosamples gathered in the study? |
| 2020-11-04 20:18:08 UTC | Understood | What will happen if you don't want to continue with the study? |
| 2020-11-04 20:18:00 UTC | Viewed | What will happen if you don't want to continue with the study? |
| 2020-11-04 20:17:59 UTC | Understood | What if new information about the vaccine becomes available? |
| 2020-11-04 20:17:53 UTC | Viewed | What if new information about the vaccine becomes available? |

Main 3.0, 2020-08-27
IRB Version 3.0
US_Master Main v3.0 26Aug 2020

AA73

Document ID: 7692e9c1-196b-42b4-96b8-0dd20a3aff67

24 of 26

CERTIFIED COPY

| 2020-11-04 20:17:52 UTC | Understood | Compensation for study related injury |
| 2020-11-04 20:17:27 UTC | Viewed | Compensation for study related injury |
| 2020-11-04 20:17:26 UTC | Understood | What happens when the research study stops? |
| 2020-11-04 20:17:19 UTC | Viewed | What happens when the research study stops? |
| 2020-11-04 20:17:19 UTC | Understood | Payment |
| 2020-11-04 20:17:06 UTC | Viewed | Payment |
| 2020-11-04 20:17:06 UTC | Understood | Expenses |
| 2020-11-04 20:17:03 UTC | Viewed | Expenses |
| 2020-11-04 20:17:02 UTC | Understood | What are the side effects of the study procedures? |
| 2020-11-04 20:16:54 UTC | Viewed | What are the side effects of the study procedures? |
| 2020-11-04 20:16:54 UTC | Understood | What could be the side effects of the vaccine? |
| 2020-11-04 20:13:59 UTC | Viewed | What could be the side effects of the vaccine? |
| 2020-11-04 20:13:59 UTC | Understood | What are the possible disadvantages or risks of taking part? |
| 2020-11-04 20:13:52 UTC | Viewed | What are the possible disadvantages or risks of taking part? |
| 2020-11-04 20:13:51 UTC | Understood | What alternative treatments are available? |
| 2020-11-04 20:13:40 UTC | Viewed | What alternative treatments are available? |
| 2020-11-04 20:13:40 UTC | Understood | What will you have to do? |
| 2020-11-04 20:13:07 UTC | Viewed | What will you have to do? |
| 2020-11-04 20:13:06 UTC | Understood | Study details |
| 2020-11-04 20:09:45 UTC | Viewed | Study details |
| 2020-11-04 20:09:44 UTC | Understood | What happens if I do not want to be in this research? |
| 2020-11-04 20:09:36 UTC | Viewed | What happens if I do not want to be in this research? |
| 2020-11-04 20:09:36 UTC | Understood | Will being in this study help me? |
| 2020-11-04 20:09:13 UTC | Viewed | Will being in this study help me? |
| 2020-11-04 20:09:13 UTC | Understood | Is there any way being in this study could be bad for me? |
| 2020-11-04 20:07:59 UTC | Viewed | Is there any way being in this study could be bad for me? |
| 2020-11-04 20:07:58 UTC | Understood | How long will the research last and what will I need to do? |
| 2020-11-04 20:07:31 UTC | Viewed | How long will the research last and what will I need to do? |
| 2020-11-04 20:07:31 UTC | Understood | Why is this research being done? |
| 2020-11-04 20:07:25 UTC | Viewed | Why is this research being done? |
| 2020-11-04 20:07:25 UTC | Understood | What should I know about a research study? |
| 2020-11-04 20:07:02 UTC | Viewed | What should I know about a research study? |
| 2020-11-04 20:07:02 UTC | Understood | Why am I being invited to take part in a research study? |
| 2020-11-04 20:06:56 UTC | Viewed | Why am I being invited to take part in a research study? |
| 2020-11-04 20:06:55 UTC | Understood | Introduction |
| 2020-11-04 20:06:32 UTC | Viewed | Introduction |
| 2020-11-04 20:06:31 UTC | Understood | Purpose of the Subject Information and Consent Form |
| 2020-11-04 20:06:21 UTC | Viewed | Purpose of the Subject Information and Consent Form |
| 2020-11-04 20:06:20 UTC | Understood | PARTICIPANT INFORMATION SHEET AND CONSENT FORM AND HIPAA AUTHORIZATION |

Main 3.0, 2020-08-27
IRB Version 3.0
US_Master Main v3.0 26Aug 2020

AA74

Document ID: 7692e9c1-196b-42b4-96b8-0dd282faff67

25 of 26

AA74

CERTIFIED COPY

| | | |
|---|---|---|
| 2020-11-04 20:05:47 UTC | Viewed | PARTICIPANT INFORMATION SHEET AND CONSENT FORM AND HIPAA AUTHORIZATION |
| 2020-11-04 20:05:47 UTC | Begin Consent | Viewed Getting Started and accepted policy |

Digitally signed using
SecureConsent, Certified on
2020-11-04 20:42:36 UTC

Main 3.0, 2020-08-27
IRB Version 3.0
US_Master Main v3.0 26Aug 2020

AA75

26 of 26
Document ID: 7692e9c1-196b-42b4-96b8-0dd2f7aff67
CERTIFIED COPY

AA75

# Exhibit B

IRB APPROVED
AS MODIFIED
Nov 06, 2020

**PARTICIPANT INFORMATION SHEET AND CONSENT FORM
AND HIPAA AUTHORIZATION**

**TITLE:**                   A Phase III Randomized, Double-blind, Placebo-controlled Multicenter Study in Adults to Determine the Safety, Efficacy, and Immunogenicity of AZD1222, a Non-replicating ChAdOx1 Vector Vaccine, for the Prevention of COVID-19

**PROTOCOL NO.:**      D8110C00001
IRB Protocol # 20202188

**SPONSOR:**          AstraZeneca AB

**INVESTIGATOR:**      Barbara E. Rizzardi, MD
3590 West 9000 South
Suite 300
West Jordan, Utah 84088
United States

**STUDY RELATED
PHONE NUMBER(S):**   801-542-8190 (24 hours)

IRB Version 4.0
US Master Main _v5.0USA4.0 03Nov2020 (based on Study Master v5.0 27Oct2020)
Page **1** of **26**
AA77           AA77           AA77

IRB APPROVED
AS MODIFIED
Nov 06, 2020

**Key Information**

The purpose of this form is to give you information about the research
    study.

- Joining this research study is voluntary. It is your choice. Whether or not you
  take part is up to you. You can choose not to take part. You can decide to
  take part and later change your mind. Your decision will not be held against
  you.
- Our scientific questions are: does the study vaccine protect people
  from getting infected with a coronavirus called SARS-CoV-2 or
  getting COVID-19 illness? Is the study vaccine safe and how well is
  it tolerated?
- If you join, your participation in this study will last for about 2 years.
- If you join, we will ask you to have injections, blood draws, and
  swabs of the back of your nose.
- Here are the risks of taking part:

  o The most common risk is symptoms such as pain and tenderness where
    the study vaccine was injected, muscle aches or headaches after getting
    the study vaccine.
  o There are other, less serious risks. We will tell you more about
    them later in this consent form.

- We do not know if getting the study vaccine will benefit you in any
  way.

**Purpose of the Subject Information and Consent Form**
This Participant Information and Consent Form may contain words you do not
understand.  Please ask the study doctor or the study staff to explain any words or
procedures that you do not clearly understand.

The purpose of this form is to give you information about the research study.  If you
sign it, you will give your permission to take part in the study.  The form describes
the purpose, procedures, benefits, risks, and discomforts of the research study.  You
should take part in the study only if you want to do so.  You can say 'no' or you can
say 'yes' then change your mind.  You should not sign this form if you have any
questions that have not been answered to your satisfaction.

Your study doctor will be paid by the sponsor to conduct this research study.

**Introduction**
Coronaviruses are respiratory viruses and most often cause common-cold like
symptoms every winter.

SARS-CoV-2 is a new coronavirus that first appeared  in China in November 2019. It
was associated with cases of pneumonia.  This virus causes the illness that is now
called COVID-19. People with COVID-19 may have symptoms ranging from mild

IRB APPROVED
AS MODIFIED
Nov 06, 2020

symptoms or severe illness, even death. Older adults and people with medical conditions like heart or lung disease or diabetes seem to be at higher risk for developing complications from COVID-19 illness.

As of October 18, 2020, there have been more than 40 million confirmed cases and >1.1 million deaths worldwide.  As a response to the ongoing pandemic, AstraZeneca is developing an investigational vaccine, also known as AZD1222, for the prevention of COVID-19.

You are invited to take part in a clinical research study. To help you decide, you should understand the study and what you will have to do. To make an informed decision to take part you should know the purpose of the study, the procedures, the benefits and risks, the discomforts and the precautions taken. This process is called 'informed consent'. Please take the time to read the following information carefully and discuss it with others. Please ask your study doctor if there is anything that is not clear or if you would like more information.

It cannot be promised that the study will help you but in the future the information we get from this study may help improve the future vaccine for people with COVID-19.

If you decide that you want to take part, you will be asked to sign the informed consent form. You will be given a copy of the signed form to keep, and the original will stay at the study center.

**Why am I being invited to take part in a research study?**
We invite you to take part in a research study for a vaccine for COVID-19.  This study is for people 18 years old and older.

**What should I know about a research study?**
- Someone will explain this research study to you.
- Please read all of the following information carefully.
- Whether or not you take part is up to you.
- You can choose not to take part.
- You can decide to take part and later change your mind.
- Your decision will not be held against you.
- You can ask all the questions you want before you decide. Do not sign unless you understand the information in it and have had your questions answered to your satisfaction.
- If you sign this form and decide to take part in this research study, keep a copy of the signed form for your records. It has information, including important names and telephone numbers, that you may wish to refer to.

**Why is this research being done?**
This study is being done to see if a vaccine that is being developed to prevent people from getting sick with COVID-19 is safe and effective and also to see how well it is tolerated.

IRB APPROVED
AS MODIFIED
Nov 06, 2020

**How long will the research last and what will I need to do?**
This study will last for 24 months.

If you take part, you will receive a shot of either the vaccine or a placebo twice: once on Day 1 and a booster shot on Day 29. A placebo will look like the vaccine but will not have any active vaccine in it.  After the shots you will have blood drawn several times for the next 24 months to assess your immune system's (how your body fights off the virus) response.

If you get sick, you may also be asked to visit the site to have a test to see if you have COVID-19.

**Is there any way being in this study could be bad for me?**
This vaccine is 'investigational'. This means that the safety and effectiveness are still being looked at. It is not approved for use in the U.S. by the Food and Drug Administration (FDA).  There is a chance you could have a side effect that is severe or that has not been seen before.

Currently, there is no completed clinical study of the vaccine. Over 10,000 people have received the vaccine so far. If you have severe side effects from the vaccine, the study doctor may ask you not to get a second dose of vaccine or placebo.

There is also a potential risk that if you get the vaccine in the study and then become ill with COVID-19 that your illness could be worse than if you hadn't received the vaccine.

More detailed information about the risks of this study can be found under the **"What could be the side effects of the vaccine?"** section.

**Will being in this study help me?**
We cannot promise any direct benefits to you or others from your taking part in this research. However, possible benefits include being protected from getting sick with COVID-19. As we don't know if this will happen you should continue to take precautions to avoid getting infected with the virus. Your participation will provide information about the vaccine.  This might benefit others in the future.

**What happens if I do not want to be in this research?**
Participation in research is completely voluntary. You can decide to take part or not to take part. If you decide not to take part in this study, it will not affect your ability to receive medical care. Your decision to not participate or to withdraw later will not result in any penalty or loss of benefits to which you are otherwise entitled.

**Study details**

**What will happen during this study?**
This study is a vaccine study. It involves both vaccine and a placebo (which looks like the vaccine but does not contain any actual vaccine). The vaccine is based on a weakened version of a common cold (adenovirus) virus that causes infections in chimpanzees. The adenovirus vaccine has been changed so that it can't replicate

IRB APPROVED
AS MODIFIED
Nov 06, 2020

inside your body and so that it presents part of the COVID-19 virus to the body so that an immune response can be made to it. The vaccine can give you side effects that will be explained below. The placebo is made up of salt water.

Both the vaccine and placebo will be given as an injection (a 'shot').  About 40,000 people at approximately 300 sites globally will be in this study. People who are approved to be in the study will be put into two groups at a 2:1 ratio. This means that approximately 27,000 people will receive the vaccine and approximately 13,000 people will receive placebo.  You have 2 out of 3 chance (like drawing straws) of receiving the vaccine.  A computer program will be used to determine if you get the vaccine or placebo.  Whether you get the vaccine or the placebo is random, like flipping a coin.

In addition, the study will have two main parts: a main study and a substudy.  Three thousand people will take part in a sub-study in the United States (U.S.) that will measure the body's ability to develop the desired immune response and to see if there are side effects such as fever and swelling at the injection site.  The remaining people will be enrolled in the main study.  People in the sub-study will be asked how they are feeling for 7 days following their shot.  They will also have their blood drawn. All participants will be followed to see if the vaccine prevents them from getting sick with the virus.

This study is "double-blind". This means that neither you nor the study doctor/study staff will know if you are receiving the vaccine.  However, if you have a medical emergency the study doctor will be able to find out if you are receiving the vaccine or placebo.

You will also have the choice to provide one extra blood sample to look at your DNA. If you consent on Day 1, one blood sample (approximately 1 teaspoon) would be taken. The risks of giving this blood sample are the same as the risks explained in this informed consent form.  You can still take part in this research study, even if you do not agree to donate this extra sample. The purpose of this research is described in a separate Optional Genetic Research Information and Informed Consent Form Addendum.

If you want to join this study, we will screen you to see if you are eligible.  Screening will include:

- signing the informed consent form,
- you will tell us about any current medications you are taking,
- a general physical examination, and
- a pregnancy test for women who are able to have children

After you complete these activities, we will be able to tell if you are eligible to be in the study, and whether you will be in the main study or the sub-study.

You will be contacted every week for the first year of the study by telephone or email or text to see if you have any symptoms of being sick with COVID-19. If you show symptoms of being sick with COVID-19 for longer than a day, you will be asked to

IRB APPROVED
AS MODIFIED
Nov 06, 2020

call the study site and may be tested for the virus. If you do have the virus, you will be contacted regularly to see how you are doing.

**The screening and assessment schedules are shown on the table below:**

**Table 1.  Screening Procedures**

| Study Period | Screening |
|---|---|
| **Procedure / Study Day** | **Day -14 to Day -1** |
| Written informed consents/ assignment of participant  number for blinding | X |
| Review medical history | X |
| Physical examination including height, weight, vital signs and oxygen levels | X |
| Pregnancy test (urine or blood test) [a] | X |
| Assessment of side effects | X |
| Current medications and supplements | X |

[a] Female participants only. Pregnancy test must be negative prior to dosing

IRB APPROVED
AS MODIFIED
Nov 06, 2020

**Table 2.  Schedule of Activities: Treatment and Follow-up Period – Main Study (Excluding Substudy Participants)**

| Procedure | Treatment and Follow-up Period | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Day | 1 | 8 [a] | 29 | 36 [a] | 57 | 90 | 180 | 360 | 730 |
| Window (days) | NA | ± 3 | -3 to +7 | ± 3 | ± 3 | ± 5 | ± 10 | ± 15 | ± 30 |
| Medical history | X | | | | | | | | |
| Brief physical exam | X | | | | | | | | |
| Vital signs | X | | | | | | | | |
| Pregnancy test – urine or blood [b] | X (predose) | | X (predose) | | | | | | |
| Review your current medications | X | X | X | X | X | | | | |
| Blood sample for Genetic Research (optional) | X (predose) | | | | | | | | |
| **Vaccine administration** | X | | X | | | | | | |
| **Tests to see if the vaccine is effective** | | | | | | | | | |
| Weekly telephone/email/text contacts - asking about COVID-19 symptoms [c] | ←———————————————→ | | | | | | | | |
| Nasal swab | X (predose) | | | | | | | | |
| Blood tests | X (predose) | | X (predose) | | X | X | X | X | X |
| **Immune system assessments** | | | | | | | | | |
| Blood test to check immune system response | X (predose) | | X (predose) | | X | | | | |
| **Safety assessments** | | | | | | | | | |
| Review any side effects | X | X | X | X | X | X | X | X | X |
| Telephone contact for safety monitoring | | X | | X | | | | | |

a. Not a study site visit; participants will be contacted by telephone for safety monitoring
b. If the urine test is positive, or does not confirm whether you are pregnant then a blood test will be done.
c. Weekly contact with participants to remind them to contact the study site for testing if they have symptoms of COVID-19.

IRB APPROVED
AS MODIFIED
Nov 06, 2020

**Table 3.  Schedule of Activities: Treatment and Follow-up Period-Substudy**

| Procedure | Treatment and Follow-up Period | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Day | 1 | 8 a | 15 | 29 | 36 a | 43 | 57 | 90 | 180 | 360 | 730 |
| Window (days) | NA | ± 3 | ± 1 | -3 to +7 | ± 3 | ± 3 | ± 3 | ± 5 | ± 10 | ± 15 | ± 30 |
| Medical history | X | | | | | | | | | | |
| Brief physical exam | X | | | | | | | | | | |
| Vital signs | X | | | | | | | | | | |
| Pregnancy test – urine or blood test  b | X (predose) | | | X (predose) | | | | | | | |
| Review your current medications | X | X | X | X | X | X | X | | | | |
| Blood sample for Genetic Research (optional) | X (predose) | | | | | | | | | | |
| **Vaccine administration** | X | | | X | | | | | | | |
| Weekly telephone/email/text contacts - asking about COVID-19 symptoms c | ←——————————————————————→ | | | | | | | | | | |
| Nasal swab | X (predose) | | | | | | | | | | |
| Blood tests | X (predose) | | X | X (predose) | | X | X | X | X | X | X |
| Blood samples for COVID-19 antibodies | X (predose) | | X | X (predose) | | X | X | | X | X | X |
| Blood sample for seasonal CoV | X (predose) | | | X (predose) | | | X | | X | X | |
| Nasal swab | X (predose) | | X | X (predose) | | X | X | | X | X | |
| Side effects (recorded daily by the participant in eDiary) | X (through Day 8) | | | X (through Day 36) | | | | | | | |
| Side effects (by staff interview) | X | X | X | X | X | X | X | X | X | X | X |
| Telephone contact for safety monitoring | | X | | | X | | | | | | |

a. Not a study site visit; participants will be contacted by telephone for safety monitoring
b. If the urine test is positive or does not confirm whether you are pregnant then a blood test will be done.
c. Weekly contact with participants to remind them to contact the study site for testing if they have symptoms of COVID-19.

**Participants who have COVID-19 symptoms (fever, shortness of breath, difficulty breathing) for any amount of time, as well as participants who have:**

- chills,
- cough,
- fatigue,
- muscle aches,

IRB APPROVED
AS MODIFIED
Nov 06, 2020

- body aches,
- headache,
- new loss of the sense of taste or smell,
- sore throat,
- congestion,
- runny nose,
- nausea,
- vomiting and/or diarrhea (for two or more days)

**will have the following schedule:**

**Table 4.  Schedule of Activities: Illness Visits (Participants with Symptoms)**

| Procedure [a] | Site Visit | Home Collection by Participant | | | | Site Visit for COVID-19 Positive Participants Only | | |
|---|---|---|---|---|---|---|---|---|
| **Day** | **1** | **3** | **5** | **8** | **11** | **14** | **21** | **28** |
| **Window (days)** | **NA** | **± 1** | **± 1** | **± 2** | **± 2** | **± 2** | **± 2** | **± 2** |
| Medical history | X | | | | | X | X | X |
| Brief physical examination | X | | | | | X | X | X |
| Vital signs (including oxygen levels) | X | | | | | X | X | X |
| Review of current medication | ←————————————————————————→ | | | | | | | |
| Digital health device | ←————————————————————————→ | | | | | | | |
| Symptoms associated with COVID-19 (recorded daily by participant in e-Diary) | ←————————————————————————→ | | | | | | | |
| **COVID-19 virus assessments** | | | | | | | | |
| Nasal swab for COVID-19 (local laboratory) | X | | | | | | | |
| COVID-19 (to confirm virus type) (central laboratory) | X | | | | | X | X | X |
| Respiratory panel | X | | | | | | | |
| Saliva sample | X | X | X | X | X | X | X | X |
| **Immune system assessments** | | | | | | | | |
| Nasal swab for COVID-19 | X | | | | | X | | X |
| Blood test for anti-bodies and exploratory tests | X | | | | | X | | X |
| **Safety assessments** | | | | | | | | |
| Side effects | ←————————————————————————→ | | | | | | | |
| Telephone contact | | | X | | X | | | |

[a]   Only participants who test positive for COVID 19 will continue with the illness visits, including any home saliva-collection tasks. Participants who test negative for COVID 19 will be instructed to stop all illness visit assessments and return the armband digital health device and e-Diary using prepaid envelopes.

**What will you have to do?**
You will have to:

- go to the study visits,
- follow the instructions the study doctor/study staff give you
- get the shots
- You will have several blood draws during this study.  The total amount of blood drawn is about 82 teaspoons.

IRB APPROVED
AS MODIFIED
Nov 06, 2020

- You must not take part in any other studies or donate blood while you are taking part in this study.
- Once you finish the study or if you leave early, it is important for you to speak with the study doctor for follow-up care.  Exit tests may be needed.
- All routine vaccinations are not allowed (except flu) less than 30 days after the last dose of vaccine. Please talk to your study doctor before you have any other vaccinations.

**Armband for vital signs:**
- If you agree to be in this study and start having symptoms of COVID-19, you will be asked to wear a device (an armband from Current Health) when you come to the study site for your first illness visit. You will be trained by study staff on the use of the device. It should be worn continuously each day until instructed by study staff to stop.

The device keeps track of your vital signs, such as:

- how fast you are breathing,
- how your heart is beating,
- your temperature,
- how much oxygen in your blood, and
- how much you move.

This information will be wirelessly sent to your care team for them to review. The data from the armband device will be monitored and you may be called by either a monitoring team or the site staff if it looks like the device is not sending out information properly or if there is concern that your vital signs are too high or too low. If there are issues with the device, you will need to call the study center so that study staff can help to fix the problem.

**eDiary:**
- People in the substudy and those having illness visits will keep a record of their symptoms in an electronic Diary (eDiary).  If you do not have a cell phone or a computer with internet access, or if your cell phone will not support the app for the eDiary, the site may lend you an electronic device that you can use.  It will look like a cell phone but its only purpose is so you can keep track of your symptoms. If you are not sure how to use the device, the study team will give you instructions. You can have someone fill out the eDiary for you or have someone help you fill out the eDiary. If someone else fills out the eDiary for you or helps you fill it out, they will be able to see your private health information. The information you enter into the eDiary will be sent automatically to your site care team.  The site may contact you if any of your symptoms become severe.

**Saliva samples:**
- If you start having symptoms of COVID-19, you will be asked to provide up to 8 saliva samples, so that we can see if COVID-19 is in saliva.  The first saliva collection will be performed at the study site by the study staff. During this first

IRB APPROVED
AS MODIFIED
Nov 06, 2020

"illness" visit, you will receive a saliva kit and be shown how to use it.  You will collect 4 samples at home. You may be contacted at home with a video call so that someone can help explain how to collect the saliva sample properly. If you don't want to be video-called, you can call the dedicated phone line for support and follow the paper instructions. You will bring the saliva samples back to your next site visit if you are positive with COVID-19.  All instructions will be provided to you in the participant training material during the first "illness" visit.  You will also have 3 more saliva samples collected at the study site.

- As part of the COVID-19 testing some your personal information will be collected including your name, address and telephone number. This information is collected because by US law positive test results have to be reported to relevant state or local public health agencies. If your test is positive for COVID-19 you may get a phone call from your state or local public health departments to allow them to efficiently track the virus.

**What alternative treatments are available?**
Taking part in this study is your choice. You may choose to take part or not to take part.  Right now, there are no other vaccines or other drugs that have been shown to prevent people from getting sick with COVID-19.

**What are the possible disadvantages or risks of taking part?**
Getting this vaccine may also involve risks to your health that we don't know about right now.

**What could be the side effects of the vaccine?**
*If you suffer any of these side effects (or any others not listed) or you think you are experiencing a side effect, during this study, please tell your study doctor immediately* (see 'Who should you contact with questions?').

Over 10,000 people have received at least 1 dose of the vaccine to date. Approximatley 4800 people have received a second dose.

Reactions to the vaccination:
Following vaccination you may feel some discomfort on your arm where you get the shot. This usually gets better within 5 minutes. Later, you might feel pain when you move your arm, but this should go away in a few days. Pain and tenderness where people received the shot were the most common side effects and these were usually mild.

General reactions:
Chills, fevers, headache, feeling tired, nausea and body aches were common overall side effects. These side effects were usually mild or moderate in nature though a small number of them were also considered severe.  Most of reported side effects appeared within 24-48 hours after the shot. These usually went away within 1-7 days.

People who have received the vaccine have also had decreases in their blood counts; in the cells that help fight infections and in the cells that help form blood

IRB APPROVED
AS MODIFIED
Nov 06, 2020

clots. These decreases have resolved within a few days and have not been associated with any other side effects so far.

Any side effects or other health issues that happen to you during the study will be followed up by the study doctor.

Serious Reactions:
With any vaccination there is a risk of rare serious side effects, such as an allergic reaction.

The vaccine is not familiar to your body. Your body's immune system may react to this. Strong allergic reactions to vaccines (anaphylaxis) are rare and require treatment right away but can result in death. These reactions can happen hours or days after the injection. Symptoms may include:

- swelling of the lips,
- difficulty breathing,
- fainting,
- dizziness,
- wheezing when you breathe,
- fast pulse,
- sweating,
- hives or rash
- low blood pressure
- diarrhea

If this happens, medication for treating allergic reactions will be available. The research team is trained to treat allergic reactions.

Several types of vasculitis (inflammation of blood vessels) have been reported with use of various vaccines. Vasculitis causes changes in the blood vessel walls which can restrict blood flow, resulting in organ and tissue damage.

If you develop a rash of bluish purple or red spots, bumps or sores, numbness or weakness in a hand or foot,you should promptly notify your healthcare provider and the study team.

Neurological disorders (demyelinating disease) that affect the peripheral and central nervous system (CNS) may occur. They may cause substantial disability, and some can be fatal if not treated promptly.

In another Phase 3 study of the AZD1222 vaccine, two participants who received the AZD1222 vaccine were initially diagnosed with a serious condition called transverse myelitis, or inflammation of the spinal cord.  Symptoms of transverse myelitis include weakness, numbness, tingling, trouble walking, and bowel/bladder issues.

One participant (who received AZD1222) was found to have pre-existing multiple sclerosis which had not been diagnosed before. Multiple sclerosis is a known cause

IRB APPROVED
AS MODIFIED
Nov 06, 2020

of transverse myelitis.  However, it is unknown whether the vaccine contributed to the transverse myelitis event.  The second participant, who also received AZD1222, did not have any significant past medical history but developed serious nervous system symptoms and had spinal cord findings consistent with transverse myelitis. An evaluation of this participant's condition, including to identify its cause, is ongoing. A third participant, who did not receive AZD1222, but did receive the control vaccine (an approved vaccine to prevent people from getting infected with a kind of bacteria called meningococcus), also developed transverse myelitis.  An investigation into the exact cause of this condition is ongoing for this patient.  It is not known whether either AZD1222 or the control vaccine being studied caused these events.

If you develop neurologic symptoms like abnormal sensations, muscle weakness or blurred vision, you should promptly notify your healthcare provider and the study team.

There is also a possible risk that if you get the vaccine in the study and then become ill with COVID-19 that your illness could be worse than if you had not received the vaccine.

In the past, experimental vaccines were studied against another coronavirus (called SARS), which also infects the lungs. In some cases, animals that received certain types of SARS vaccines appeared to develop *more severe* lung inflammation when they were later infected with SARS compared with animals that had not been vaccinated.

An experimental vaccine tested in the 1960s for a different respiratory virus (RSV) resulted in some infants developing *more severe* lung inflammation when they were later infected with the virus. Two of the infants died. Other versions of RSV vaccines have not caused these severe reactions.

In other studies, animals that received two shots of this vaccine (AZD1222) and then were infected with COVID-19 had the virus in the intestinal tract but were not sicker than animals that received one shot. It is possible that people who get two shots of this vaccine could also have the COVID-19 virus present in their intestinal tract if they get infected for a longer period of time than people who get infected but didn't get the vaccine. As a result, you should practice good hygiene like hand washing, to avoid spreading the virus to other people.

You should get medical help and contact the study doctor or staff if you have any of these or any other side effects during the study.

**What are the side effects of the study procedures?**
Some of the study procedures may create some discomforts. You may experience none, some or all of those listed below:

- As with any injection (shot), the vaccine injection in your muscle may cause the area to become sore or tender, red, bruised, itchy and swollen. These effects usually get better without treatment.

IRB APPROVED
AS MODIFIED
Nov 06, 2020

Blood samples:

- Drawing blood may cause slight pain and bruising at the site where the needle enters. Rarely, people feel light-headed or even faint.
- You could have a reaction at the sites where your blood is collected. This could include redness, bruising, swelling, bleeding, or pain.
- The volume of blood drawn over the study period should not affect the health of volunteers.

You may experience the following side effects while wearing the digital health device:

- A very minor skin irritation under the wearable device: This is restricted to minor skin redness that resolves shortly after removal of the device
- Minor discomfort during sleeping
- Ecchymosis (a discoloration of the skin, typically caused by bruising) of the upper arm near to the wearable device in patients who are taking blood thinners.

Nasal and oral swabs:

- You may feel some discomfort (pressure) from having a sample taken with a swab in your nose and/or mouth.

**Pregnancy Risks:**
We do not know if the vaccine may cause harm to an unborn baby.  Women taking part in this study must have a negative pregnancy test during Day 1 and Day 29. During this study, participants must use highly-effective forms of birth control for 28 days prior to Day 1. They also must agree to continue using a highly effective form of birth control for 60 days after their last dose (injection) of the vaccine on Day 29.

Inconsistent abstinence, the rhythm method, and withdrawal are NOT acceptable methods of preventing pregnancy.

Highly effective forms of birth control include:

Barrier methods: Intrauterine devices (IUD), having both 'tubes tied", not having sex, or having a partner who has had a vasectomy.

Hormonal methods: Birth control pills, injections and patches that are progestogen only or combine estrogen and progestogen.

If you do become pregnant during the study, we will contact you to see what the outcome of your pregnancy was.

IRB APPROVED
AS MODIFIED
Nov 06, 2020

**Expenses**
There will be no cost to you for taking part in this study. You will be provided with all vaccines, examinations and medical care related to the study at no cost to you.

**Payment**
You will be reimbursed for time and travel in the amounts of $125.00 per each completed study visit and $30.00 for each completed phone call. If you are chosen to participate in the Reactogenicity Sub-Study you will receive $125.00 per each completed study visit.  If you qualify to come in for an Illness visit you will receive $125.00 per each completed site visit and $25.00 for each day you complete a home collection of saliva.  You will be paid within 5 business days of each completed study visit or phone call.

**What happens when the research study stops?**
If the study is stopped, you will be told and your study doctor will make plans for your care, if needed.

You can be withdrawn from the study at any point if the study doctor decides that this is best for your health or you are not following study procedures

If you have a reaction after the injection of vaccine, your participation may be stopped by the study doctor or sponsor without your consent.

After the study is completed, persons who received the placebo may be offered the opportunity to receive the vaccine if there are doses available.  The study doctor will consider the best option for your care.

**Compensation for study related injury**
If there is an emergency, call 911 right away or go to the emergency room and contact your study doctor as soon as you can.

If you become ill or are injured while you are in this research study, you must tell your study doctor straight away. The study doctor will provide medical treatment or refer you for treatment.

Injuries that have been caused by the vaccine, tests or procedures are called 'research 'injuries'. Injuries caused by your usual medical care are not research injuries.

The Sponsor has an insurance policy to cover the costs of research injuries as long as you have followed your study doctor´s instructions. Sponsor will pay the costs of medical treatment for research injuries, provided that the costs are reasonable, and you did not cause the injury yourself.

The U.S. National Institutes of Health (NIH) does not have a way to provide direct compensation for a research related injury.

If you have medical insurance, please check with your insurance company that taking part in this research study will not affect your coverage.

IRB APPROVED
AS MODIFIED
Nov 06, 2020

Sponsor may also compensate you in accordance with the law of the United States. By signing this form you do not give up any legal right you may have.

Due to the coronavirus public health crisis, the federal government has issued an order that may limit your right to sue if you are injured or harmed while participating in this COVID-19-related clinical study.

If the order applies, it limits your right to sue the researchers, healthcare providers, any Sponsor or manufacturer or distributor involved with the Study. You may be prevented from making claims for injuries that have a causal relationship with the use of the investigational product in this Study, including, but not limited to, claims for death; physical, mental, or emotional injury, illness, disability, or condition; fear of physical, mental, or emotional injury, illness, disability, or condition, including any need for medical monitoring; and loss of or damage to property, including business interruption loss.

However, the federal government has a program that may provide compensation to you or your family if you experience serious physical injuries or death. If funds are appropriated by Congress, compensation for injuries may be available to you under this Countermeasures Injury Compensation Program.  To find out more about the Countermeasures Injury Compensation Program" go to https://www.hrsa.gov/cicp/about/index.html or call 1-855-266-2427.

**What if new information about the vaccine becomes available?**
You will be told if any important new information becomes available that may affect your willingness to continue taking part in the study. If this happens, your study doctor will contact you as soon as possible, and will discuss whether you should continue in the study. If you decide not to continue, your study doctor will make arrangements for your care to continue if needed. If you decide to continue in the study, you may be asked to sign a new consent form.

Also, if new information becomes available, your study doctor may stop your participation without your consent. If this happens, the reasons will be explained and arrangements made for your care, if you need follow-care.

**What will happen if you don't want to continue with the study?**
You can stop taking part in the study at any time without giving any reason. This will not affect your future treatment or your relationship with your study doctor. If you wish to stop taking part, please tell the study doctor immediately. You may be asked to return to the study center for an end-of-study assessment. You may also be asked for permission to be contacted at a later date by your study doctor to collect information about any symptoms you might have.  You may also be asked for your permission to have a relative contacted, to have your doctor contacted or for information from your medical records to be shared.

Your study doctor or the sponsor may withdraw you from the study without your consent if the study is not helping you, if you do not follow the study directions, or if you have a serious side effect related to the vaccine.  The sponsor, FDA, US Government Office for Human Research Protections or the Institutional Review

IRB APPROVED
AS MODIFIED
Nov 06, 2020

Board (IRB) may also stop the study at any time for any reason. If your study doctor thinks it is in your best interest to withdraw you from the study, or if the study is stopped for any other reason, he/she will explain the reasons and arrange for your care to continue.

**What will happen to my data and biosamples gathered in the study?**

**Which data and biosamples are collected?**
In order to conduct the study, the Study site and some COVID-19 testing vendors (including labs) will have to collect and register information about your identity (such as your name, address, telephone number, and health insurance number) as well as data that is necessary to assess your health conditions such as your medical condition and medical history (this may include information from your physicians/ available in your medical records), your life style, your demographics (age, gender, ethnic and racial background).  COVID-19 testing vendors will need to collect these data from you to be compliant to the CARES Act Section 18115 Federal law (e.g.  in order to do contact tracing if you test positive for COVID-19).

In addition, the study site will collect biosamples from you (such as blood samples) and these samples will be labeled with a code and not your name or other information that could identify you. These will be analysed and the data  from the analysis will be part of your coded data. The key to the code will be kept by the study staff at the site but will not be shared with the Sponsor or other researchers who may use these samples.

**What are my data and biosamples needed for?**
Your data and biosamples are needed for the Sponsor to develop the vaccine, get permission to introduce and keep it on the market, monitor its safety and get it reimbursed by governments i.e., throughout the vaccine development program. Therefore, they will be used as planned in this study as well as within related research activities necessary for this vaccine development program in order to:

- understand how the vaccine works in the body,
- better understand the studied disease and associated health problems,
- learn from past studies to plan new studies or improve scientific analysis methods,
- publish research results in scientific journals or use them for educational purposes.

Your biosamples will not be used for commercial profit.

**Who can access my data and biosamples?**
Only at the study site, your name and contact details will be accessible to the study doctor and the study team to conduct the study. Non-medical personnel acting on behalf of the sponsor and being bound by a duty of confidentiality as well as Health authorities, such as the US Food and Drug Administration (FDA) and the Institutional Review Board (IRB) as well as people from the US National Institutes of Health, the Coronavirus Prevention Network and the United States Biomedical Advanced

IRB APPROVED
AS MODIFIED
Nov 06, 2020

Research and Development Agency may also be given access to this data only to verify that the study is carried out in compliance with legal and quality requirements.

The study site will share your data and biosamples with the sponsor and vendors, but only after they have been coded (which means that your name, contact details or health insurance number, have been replaced by a code). Health authorities (such as the FDA) and people helping AstraZeneca to run the study, including members of the AstraZeneca group of companies, contractors, sub-contractors and any company that AstraZeneca goes into business with, or sells all or part of its business to, will be allowed to see your personal information but they will not know who you are unless they are study inspectors.

The sponsor may share your coded data and biosamples with its Research partners and Service providers for the purposes of the vaccine development program.

In order to ensure proper conduct and accurate results of the study and to get permission to market the vaccine, the sponsor will share your coded data with health authorities (such as the FDA) and possibly with the IRB. They may also be shared with scientific journals, so the study results can be reviewed by independent scientists and to ensure the accuracy of results. Researchers from for example AstraZeneca, other health related companies, and universities might ask to use information from this study, including your information and samples for other medical, healthcare or scientific related research. The researchers may combine the results from this study with results from other studies. If AstraZeneca shares your information AstraZeneca will make sure that they cannot find out who you are and that such research is in line with this document. The use of your coded personal information for these scientific research purposes is based on your agreement. If a vaccine is marketed for commercial use, you will not share in any profits.

Your medical files may be reviewed at the study center (or study doctor's office) or remotely (outside of the study center) in order to confirm that the information collected from you was recorded correctly and to verify that the study procedures were performed properly.

In **none** of these cases your identity will be revealed to AZ.

Some of the above-mentioned persons may be located outside the United States (US). If this other country does not have equivalent personal data protection standards than the US, appropriate Safeguards (such as contracts and technical Security measures) will be adopted to protect and maintain the confidentiality of your data and biosamples. In case another organization takes over development or commercialisation of the vaccine, your coded data or biosamples may be transmitted to them. They will then have to protect your data and biosamples in the same way as described herein. You can ask your study doctor to see the information that has been collected about you. If you think any of it is wrong, you can ask your study doctor in writing if it can be changed or removed, in accordance with your country's laws. You can also ask that we restrict the use of your personal information. If you change your mind about taking part, we cannot remove the personal information that was collected for this research study before you stopped.

IRB APPROVED
AS MODIFIED
Nov 06, 2020

We have a Certificate of Confidentiality from the US government to help protect your privacy. With the certificate, we do not have to release information about you to someone who is not connected to the study, such as the courts or police. Sometimes we can't use the certificate. Since the US National Institutes of Health funds this research, we cannot withhold information from it.

A description of this clinical trial will be available on http://www.ClinicalTrials.gov, as required by U.S. law. This website will not include information that can identify you. At most, the website will include a summary of the results. You can search this website at any time.

**Who else may have access to my contact information and why?**
Your name or contact details may be shared with service providers (such as Vault Health and Current Health Real Time Monitoring), in order to:

- Allow the service provider to reach out to you either during or after the Study, to ask your opinion on the provided Clinical Trial Transparency materials such as the Thank you card, Trial Result Summary or Study Arm Postcard.
- Reimburse you for your time, effort and certain expenses related to your participation.
- Allow call-centers to reach you for telephone interviews related to the study.
- Set up and manage your accounts for any apps or other devises that are used in the study.
- Collect information on whether you are alive or not ("vital status information").

The service providers must keep your name or contact details private and will **NOT** share any information that can directly identify you with the sponsor.

**How long will my coded data and biosamples be kept?**
The study site and the sponsor are obliged to keep all study data for 25 years after the end of the study, unless there is a legal requirement for keeping them longer. Your coded data will then be deleted or anonymised, and your biosamples returned to your study doctor or destroyed as soon as possible after the tests for the vaccine development program are completed unless you authorise the sponsor to use them for future research (a tick box in the Consent page will allow you to make this choice).

All biosamples will be securely stored on behalf of the sponsor at COVANCE CENTRAL LABORATORY SERVICES and then may be transferred at the end of the study to an AstraZeneca-assigned biobank for long term storage for up to 15 years.

**What are my rights under data protection law?**
You have the right to review which of your data are collected and being used; you can also ask for a copy of this data, ask for restriction of use of this data, or ask to have incorrect data rectified.

To ensure the scientific integrity of the study, you will not be able to review some of the data or receive a copy of it until the study ends, because in this study, neither you nor the study doctor know if you are receiving the vaccine or the placebo.

IRB APPROVED
AS MODIFIED
Nov 06, 2020

To exercise these restricted rights, please contact preferably the study doctor. Contact details of the Data Protection Officer (DPO) are: Sponsor Data Protection Officer privacy@astrazeneca.com or c/o the Chief Privacy Officer, AstraZeneca, Academy House, 136 Hills Road, Cambridge CB2 8PA, England". If there are issues related to the use of your data, you have the right to file a complaint with your local data protection authority or with the sponsor's DPO.

**What does anonymised data mean?**
Health authorities (such as the FDA) as well as pharmaceutical companies believe that access to clinical studies data advances clinical science and medical knowledge and is in the best interest of patients and public health, provided that patient privacy is protected. Therefore, the sponsor may generate and share internally or with other researchers an anonymised set of your data collected in the study (e.g., on www.clinicalstudydatarequest.com). This means your coded data will be stripped of your Patient code as well as of any other information that could reasonably be used to identify you such as your date of birth.

**How to find out more after the study?**
Trial Result Summaries are a short and easy to understand summary of the results of this study. These will be added to www.trialsummaries.com within 1 year of the last study participants last site visit. You can visit www.trialsummaries.com website anytime to sign up to be notified via email when the trial results summary of your study is available. Or, please let your study doctor know if you need a printed copy of the document. You will also receive information on the treatment you received in this study. This will be shared with you around the same time as the Trial Results Summary.

Technical Information about this research study will be posted on http://astrazenecaclinicaltrials.com. This website does not contain any information about you.

**FUTURE RESEARCH INFORMATION**
In addition to participating in the clinical study, we would like to know if you would be willing that your coded data and leftover biosamples are used in future research projects with appropriate ethical review.

You are being asked to consent to the use of your coded data and biosamples for future research. If you decide not to do so, you may still take part in the clinical study.

**What is future research?**
Future research is important to advance science and public health. At present, however, it is not possible to foresee all details of future scientific research projects. These future scientific research projects are beyond the scope of the clinical study and the use of samples and data as outlined above and may occur whilst the study is ongoing or after the study has finished.

Your coded data and biosamples may only be used for scientific health-related research to find new ways to detect, treat, prevent or cure health problems.

IRB APPROVED
AS MODIFIED
Nov 06, 2020

They may also be used jointly with information from other sources outside typical clinical research settings, e.g. from public research databases. However, they will not be combined with other information in a way that could identify you. Your coded data and biosamples may also be anonymized for some of the future scientific research.

**How will my coded data and biosamples for future research be handled?**
All biosamples will be securely stored on behalf of the sponsor at an AZ-assigned biobank for up to 15 years.  Please note that the location of the biosamples may change at the request of the sponsor.

Any additional data generated from your biosamples will be stored as long as necessary for scientific research objectives and allowed by law and will be destroyed or anonymised thereafter. For more information on Sponsors internal Document Retention policy you may go to www.astrazenecapersonaldataretention.com.

**May my coded data and biosamples be shared?**
The sponsor may share your coded data and biosamples with research partners or deposit them in scientific databases. Research partners may include researchers from universities, research hospitals, and companies.

Some of the above-mentioned recipients may be located outside your country. The data protection laws which apply in those countries may not be as stringent as the laws in your country. Nevertheless, appropriate safeguards and security measures will be taken in order to protect and maintain the confidentiality of your biosamples and coded data as described in this section.

**How will my privacy be protected?**
Your coded data and biosamples will be participant to appropriate safeguards and will only be used for the purpose of scientific health related research. They will not be used to contact you or to affect your care or any other decision affecting your life such as insurance rates or employment opportunities.

You have the same rights as the ones described in the section "*What are your rights under data protection law?".*

**What if I want to withdraw from future research?**
Your participation in future research is voluntary. You are entitled to withdraw your consent for future research at any time, without giving a reason and without a negative effect on your standard of medical care. If you wish to withdraw, please inform your study doctor. There will not be any penalty or loss of benefits to which you are otherwise entitled if you decide not to take part or if you withdraw early.

You may continue to participate in the clinical study even if you choose to withdraw from future research.

If you withdraw from future research, your coded data and biosamples will not be used for future research and your samples will be destroyed as soon as possible. Your coded data (either copied from the clinical study database or newly generated)

IRB APPROVED
AS MODIFIED
Nov 06, 2020

will also be destroyed unless this information is already included in analyses or used in scientific publications or if the coded data been anonymized and therefore we can't identify your data or biosamples.

**Results from Future Research?**
We may have to study coded data and biosamples from many people over many years before we can know if the results of future research are meaningful.

Therefore, you should not expect to receive individual results from future research projects. We will not give any such data to your doctor and we will not put them in your medical record as they are not individual valid results.

**Authorization to use and disclose protected health information for research:**
The United States government has issued a privacy rule to protect the privacy rights of patients. This rule was issued under a law called the Health Insurance Portability and Accountability Act of 1996 (HIPAA). The Privacy Rule is designed to protect the confidentiality of your protected health information (PHI). The document you are reading, called an "Authorization," explains how your PHI will be used and disclosed (shared) for purposes of the research study and describes your rights with respect to such information.

In working with the sponsor, your study doctor, will use and share protected health information about you. This is information about your health that also includes your name, address, telephone number or other facts that could identify the health information as yours. This includes information in your medical record and information created or collected during the study. This information may include your medical history, physical exam and laboratory test results, and certain health information indicating or relating to a particular condition.  Some of these tests may have been done as part of your regular care. The study doctor will use this information about you to complete this research.

In most cases, the study doctor will use your initials and assign a code number to your information that is shared with the sponsor. Except when required by law, you will not be identified by name, address, telephone number or other facts that could identify the health information as yours. The sponsor and its representatives (which include companies that are contracted by the sponsor to perform services for the study) may review or copy your protected health information at the study site. Regulatory authorities (such as the FDA) and the Institutional Review Board (IRB) may also review or copy your information to make sure that the study is done properly or for other purposes required by law.

By signing this Consent form, you allow the study doctor and his/her team to use your protected health information to carry out and evaluate this study. You also allow the study doctor to share your protected health information with:

- The sponsor and its representatives
- The Institutional Review Board (IRB) that reviewed this research. The IRB is a group of scientists and non-scientists who review the ethics of research. The goal of the IRB is to protect the rights and welfare of study subjects.

IRB APPROVED
AS MODIFIED
Nov 06, 2020

- The U.S. Food and Drug Administration (FDA)
- Other local, US and international regulatory entities including people from the US National Institutes of Health, the Coronavirus Prevention Network and the United States Biomedical Advanced Research and Development Agency
- Laboratories for testing biospecimens
- Vendors for this study working for or with the sponsor such as Current Health and Vault Health.

Your protected health information may be further shared by the groups above. If shared by them, the information will no longer be covered by the Privacy Rule. However, these groups are committed to keeping your health information confidential.

You have the right to see and get a copy of your records related to the study for as long as the study doctor has this information. However, by signing this Consent form you agree that you might not be able to review or receive your records related to the study until after the study has been completed.

You may choose to withdraw this Authorization to Use and Disclose Protected Health Information for Research at any time, but you must notify the study doctor in writing.  If you withdraw your permission, you will not be able to continue being in the research study.

If you withdraw from the study and withdraw your Authorization, no new information will be collected for study purposes unless the information concerns a side effect related to the study. If a side effect occurs, your entire medical record may be reviewed. All information that has already been collected for study purposes, and any new information about a side effect related to the study, will be sent to the study sponsor.

If you withdraw from the study but do not withdraw your Authorization, new protected health information may be collected until this study ends.

If you do not withdraw this Authorization, it will remain in effect.

If the research site is located in California, Delaware, Indiana, Washington, or Wisconsin this authorization will expire on 31Dec2070.

There is no expiration of this authorization except for research conducted in the states listed above.

You do not have to sign this Authorization, but if you do not, you cannot participate in this research study or receive study-related treatment. If you withdraw this Authorization in the future, you will no longer be able to participate in this study. Your decision to withdraw your Authorization or not to participate will not involve any penalty or loss of access to treatment or other benefits to which you are otherwise entitled.

IRB APPROVED
AS MODIFIED
Nov 06, 2020

**What will happen to the results of this clinical study?**
The results of this study will be used to make informed clinical decisions for developing this new vaccine. If you want the results to be made available to you, please talk to your study doctor. Results from clinical studies are often published in scientific journals, however, your personal information will remain confidential.

**Who has reviewed the study?**
All research studies are reviewed by an independent group of people, called a research ethics committee or Institutional Review Board (IRB), to protect your safety, rights, well-being and dignity. This study has been reviewed by an IRB.

**Who should you contact with questions?**
A short summary of the results will be added to www.trialsummaries.com when the study has ended. You can visit this website for more information or let your study doctor know if you need a printed copy.

If you have any questions or concerns about your participation in this research study, or if you feel that you have experienced a research-related injury or reaction to the vaccine, or have a complaint about the research study, contact the research team at the phone number(s) listed above on the first page.

This research is being overseen by an Institutional Review Board ("IRB"). An IRB is a group of people who perform independent review of research studies. You may talk to them at (888) 303-2224 or (800) 562-4789, irb@cgirb.com if:

- You have questions, concerns, or complaints that are not being answered by the research team.
- You are not getting answers from the research team.
- You cannot reach the research team.
- You want to talk to someone else about the research.
- You have questions about your rights as a research subject.

**Thank you for reading this and considering if you will take part in this study.**

IRB APPROVED
AS MODIFIED
Nov 06, 2020

**Consent and Authorization form**

I confirm the following:

- I have read (or had read to me) and understand the information sheet for the study.  I have had time to think about taking part.
- I am satisfied my questions have been answered.
- I agree to be part of this  study, to follow the study procedures and to provide the information the study doctor, nurses, or other staff members ask from me.
- I understand that I am free to stop taking part in this study at any time without giving a reason and without my medical care or rights being affected.
- I will receive a copy of this signed and dated information sheet and consent form to keep for myself.
- I agree if the study doctor is not my personal doctor, my personal doctor may be told about my taking part in this study and asked for medical information about me.
- I agree to my samples being taken and used as described in this information sheet.
- I give permission for my personal information to be collected and used as part of this clinical study and to be:

  - sent outside of the study center only with my participant identification number;
  - reviewed at the study center as part of my medical records, which may include my name, address, telephone number, date of birth, gender, race and ethnicity, and other information that could be used to identify me;
  - reviewed, processed and disclosed by and to the Sponsor and other persons and organizations assisting with the study, including the central laboratory and study monitors for purposes related to the study;
  - reviewed or audited by appropriately authorized organizations;
  - reviewed by and sent to regulatory authorities (such as the FDA) or health insurers in my country or other countries; and
  - sent to other countries where laws protecting my personal information may be less strict than the laws in this country, or to countries without any personal data protection laws.

- I understand I may also be contacted at a later date(s) for my permission in connection with this or any related sub-study.

The text boxes on the right read *Participant initial*.

| I agree to the use of my coded data and biosamples for future research, as described in the Future Research section, including the collection of additional biosamples and where necessary for the research, possible analyses of my genetic information. | Yes ☐ | No ☐ |
|---|---|---|

IRB APPROVED
AS MODIFIED
Nov 06, 2020

By signing this document I agree to take part in this study, as set out in the Information Sheet and Consent Form and authorize the release of my medical records and protected health information related to this study to the sponsor and its representatives, the Institutional Review Board (IRB), laboratories for testing biospecimens (as applicable), the FDA and other regulatory agencies as described above.  I have been told that I will receive a signed and dated copy of this Consent and Authorization for my records.

**My name:**

**Signed (by me):**                                    **Date:**

**Investigator/Authorized Designee:**
- ✓ I have fully and carefully explained the study to the person named above and confirm that, to the best of my knowledge, they clearly understand the nature, risks and benefits of taking part in this study.
- ✓ I confirm that I gave them all opportunities to ask questions about the study, and that I answered all the questions they asked correctly and to the best of my ability.
- ✓ I confirm that they have not been forced into giving consent, and that they have given their consent freely and voluntarily.
- ✓ I confirm they will be given a copy of this Information Sheet and Consent Form.

**Name of Investigator/Authorized Designee:**

**Signed:**                                    **Date:**

KAMIE F. BROWN (8520)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
P. O. Box 45385
Salt Lake City, UT 84145-0385
Tel: (801) 532-1500
Fax: (801) 532-7543
kbrown@rqn.com

ARTHUR E. BROWN (*pro hac vice forthcoming*)
ALEXANDER COUSINS (*pro hac vice forthcoming*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000
arthur.brown@arnoldporter.com
alexander.cousins@arnoldporter.com

*Attorneys for AstraZeneca AB and AstraZeneca Pharmaceuticals LP*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BRIANNE DRESSEN, | **ASTRAZENECA DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |
| Plaintiff, | |
| v. | Case No. 2:24-cv-00337-RJS-CMR |
| ASTRAZENECA AB; ASTRAZENECA PHARMACEUTICALS LP; and VELOCITY CLINICAL RESEARCH, INC., | Judge Robert J. Shelby |
| | Magistrate Judge Cecilia M. Romero |
| Defendants. | |

Defendants AstraZeneca AB and AstraZeneca Pharmaceuticals LP (collectively, "AstraZeneca") move to dismiss Plaintiff's Complaint, Dkt. # 1 ("Compl"). Plaintiff's action is barred by the Public Readiness and Emergency Preparedness Act ("PREP Act"), 42 U.S.C. §§ 247d-6d *et seq*., time-barred, and fails to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6).

**AA103**                                    **AA103**                                    **AA103**

## INTRODUCTION

Plaintiff's claims fail on multiple grounds. *First*, this action is barred by the PREP Act, which renders AstraZeneca "***immune from suit and liability under Federal and State law with respect to all claims for loss*** caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure," such as AstraZeneca's COVID-19 vaccine. 42 U.S.C. § 247d-6d(a)(1) (emphasis added). The PREP Act was an integral component of the United States' response to the COVID-19 pandemic, providing pharmaceutical companies immunity from suit and liability to supercharge the rapid development and deployment of vaccines and treatments for the novel virus. *See Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19*, 85 Fed. Reg. 15,198 (Mar. 17, 2020). With the protections of the PREP Act in place, AstraZeneca and its partners successfully developed a lifesaving vaccine in a matter of months, an unprecedented scientific achievement.

Plaintiff concedes that the PREP Act applies to her case, which alleges personal injuries relating to the administration of AstraZeneca's COVID-19 vaccine in a clinical trial. Compl. ¶¶ 32, 62-63. Attempting to avoid the Act, however, Plaintiff argues that AstraZeneca waived its statutory immunity by agreeing in the clinical trial Informed Consent Form ("ICF") to "pay the costs of medical treatment" for injuries caused by the vaccine. *Id.* ¶ 58 (quoting Dkt. # 1-1 at 14 (Exhibit A (ICF) at 13)). Plaintiff's argument fails under Utah law, which requires an "explicit[] state[ment]" of clear and unmistakable intent to find that a party waived a statutory right. *Pioneer Builders Co. of Nev. Inc. v. K D A Corp.*, 437 P.3d 539, 542 (Utah Ct. App. 2018) (citation omitted). Plaintiff not only fails to allege an explicit statement of AstraZeneca's clear and

unmistakable intent to waive its PREP Act immunity, but expressly pleads that the ICF *referenced* the PREP Act and informed trial participants that it "may limit your right to sue." Compl. ¶ 61 (emphasis omitted); *see also id.* ¶¶ 62-63.

*Second*, although styled as a breach of contract action, the Complaint makes clear that this is a product liability case alleging personal injuries from the administration of AstraZeneca's COVID-19 vaccine. Accordingly, Plaintiff's claims are time-barred under the Utah Product Liability Act's two-year statute of limitations, which "applies to actions, ***in both tort and contract***, arising from injury caused by a defective product." *Utah Loc. Gov't Tr. v. Wheeler Mach. Co.*, 199 P.3d 949, 957 (Utah 2008) (emphasis added); *see* Utah Code Ann. § 78B-6-706. Plaintiff has framed her claims artfully in an attempt to plead around the PREP Act, but "Utah courts look to the nature of the action and not the pleading labels chosen" when "characterizing a cause of action." *Failor v. MegaDyne Med. Prods., Inc.*, 213 P.3d 899, 905 (Utah Ct. App. 2009) (quoting *Records v. Briggs*, 887 P.2d 864, 868 (Utah Ct. App. 1994)).

Plaintiff alleges neurological injuries caused by AstraZeneca's COVID-19 vaccine and is seeking to recover economic and non-economic damages, including medical expenses, lost wages, childcare costs, and compensation for emotional harm. Those are precisely the types of injuries and damages alleged in a typical product liability case. Moreover, Plaintiff fails to allege any provision in the ICF – the purported contract at issue – where AstraZeneca committed to compensate trial participants for lost wages, childcare costs, or emotional harm. Thus, Plaintiff is seeking damages far beyond what could be recovered in a breach of contract action. Indeed, Plaintiff seeks to recover medical expenses paid by her *insurer*, which allegedly has a "contractual right to subrogation" of any damages award in this case. Compl. ¶ 168. That argument further

demonstrates that Plaintiff's claims sound in tort, as "a subrogation claim is derived from an injured party's claim against a ***tortfeasor***." *State Farm Mut. Auto. Ins. Co. v. Green*, 89 P.3d 97, 101 (Utah 2003) (emphasis added). Because Plaintiff alleges that she was injured in November 2020 and requested compensation from Defendants in early 2021, *see* Compl. ¶¶ 1, 11-12, 70, 107, her claims are time-barred under the Utah Product Liability Act's two-year statute of limitations, Utah Code Ann. § 78B-6-706.

*Third*, even if the ICF had waived AstraZeneca's PREP Act immunity (it did not), any waiver would be strictly confined to "the ***costs of medical treatment*** for research injuries, provided that the costs are reasonable, and you did not cause the injury yourself." ICF at 13 (emphasis added).[1] The PREP Act would still preclude Plaintiff from recovering economic or non-economic damages other than her reasonable "costs of medical treatment." *Id.* In addition, Plaintiff's emotional damages claim fails on the merits, as emotional damages are available for breach of contract only when "'specific language' and 'obligations' in the contract . . . show that at the time the parties formed the contract, they contemplated that emotional distress damages might flow from a breach of the contract." *Ward v. McGarry*, 511 P.3d 1213, 1217 (Utah Ct. App. 2022) (citing *Gregory & Swapp, PLLC v. Kranendonk*, 424 P.3d 897 (Utah 2018)). No such language exists in the ICF.

Therefore, AstraZeneca's Motion to Dismiss should be granted with prejudice.

---

[1] The ICF defines "research injuries" as "[i]njuries that have been caused by the vaccine, tests or procedures." ICF at 13.

**ALLEGED FACTS**

"In 2020, the COVID pandemic was raging." Compl. ¶ 4. On March 17, 2020, then-U.S. Secretary of Health and Human Services Alex M. Azar II declared that the pandemic constituted "a public health emergency." 85 Fed. Reg. at 15,198; *see* Compl. ¶¶ 32, 62 (citing declaration). The federal declaration stated that the pandemic represented "a significant public health challenge that require[d] a sustained, coordinated proactive response by the Government in order to contain and mitigate the spread" of the deadly virus. 85 Fed. Reg. at 15,198. To that end, the Secretary urged the "manufacture, testing, development, distribution, administration, and use" of COVID-19 vaccines and activated the PREP Act to help ensure that safe and effective vaccines could be made available to the public as soon as possible. *Id.* at 15,201-02; *see* Compl. ¶¶ 32, 62 (citing declaration).

By the fall of 2020, COVID-19 vaccines were in development, and a clinical trial for AstraZeneca's vaccine was taking place in Salt Lake County. Compl. ¶ 6. The trial was administered by Defendant Velocity Clinical Research, Inc. ("Velocity"). *Id.* ¶ 43. Plaintiff alleges that she enrolled in the Salt Lake trial and went to Velocity's clinic on November 4, 2020. *Id.* ¶¶ 6-7, 64, 67-68. As alleged by Plaintiff, within an hour of receiving the vaccine, her right arm began "tingling and prickling," and the sensation spread over the next few hours. *Id.* ¶¶ 11-12, 70. That evening, Plaintiff experienced blurred and double vision, headaches, sound sensitivity, tinnitus, nausea, vomiting, fever, and chills. *Id.* ¶¶ 13, 70. The following day, Plaintiff's fever and chills had ended, but her other symptoms worsened. *Id.* ¶¶ 14, 71. Plaintiff alleges that the next morning she called the Velocity clinic, which asked her to come in for evaluation. *Id.* ¶ 94. Plaintiff did so on November 6, 2020. *Id.* Following the evaluation, Velocity's lead investigator for the

trial, Dr. Barbara Rizzardi, told Plaintiff that she may have Multiple Sclerosis ("MS") and referred her to a neurologist for further testing. *Id.* ¶ 95.

Plaintiff alleges that her symptoms worsened over the next several months and that she sought medical care on several occasions, including a three-day hospital admission. *Id.* ¶¶ 15-16, 73-81. Plaintiff alleges experiencing various neurological symptoms, but her precise medical condition is not clearly defined. The Complaint alleges a variety of possible diagnoses including: postural orthostatic tachycardia syndrome ("POTS"), *id.* ¶ 84; post-vaccine neuropathy, *id.* ¶ 85; dysautonomia, including chronic inflammatory demyelinating polyneuropathy, *id.* ¶ 30; vaccine-induced demyelinating disease, *id.* ¶ 92; and "Post Acute Covid Vaccine Syndrome," *id.* ¶ 88. At present, Plaintiff alleges that "some of [her] acute symptomology has improved," but she continues to experience pain and remains unable to work, engage in athletic activity, drive a vehicle further than short distances, or "parent the way she had." *Id.* ¶ 18. Plaintiff alleges that she requires ongoing medical consultations with various specialists and has been prescribed a significant number of medications. *Id.* ¶¶ 163, 165.

When Plaintiff first enrolled in the clinical trial, she received an ICF that identified the steps involved in the study, potential side effects, and procedures if she suffered any adverse reaction. *Id.* ¶¶ 8, 50, 65. The ICF further addressed the extent to which Plaintiff may be entitled to receive "[c]ompensation for study related injury" from AstraZeneca. *Id.* ¶ 9. Specifically, the ICF stated:

> The Sponsor has an insurance policy to cover the costs of research injuries as long as you have followed your study doctor's instructions. Sponsor will pay the *costs of medical treatment* for research injuries, provided that the costs are reasonable, and you did not cause the injury yourself.

*Id.* ¶ 9 (quoting ICF at 13) (emphasis added). In addition, the ICF provided that if a participant is injured during the study, then Velocity's "study doctor will provide medical treatment or refer you for treatment." *Id.* However, the ICF also stated:

> Due to the coronavirus public health crisis, the federal government has issued an order that **may limit your right to sue** if you are injured or harmed while participating in this COVID-19-related clinical study.

ICF at 13 (emphasis added); *see* Compl. ¶ 61. Plaintiff understood the "order" to be Secretary Azar's March 2020 PREP Act declaration. Compl. ¶ 62. Aware of these provisions, Plaintiff "confirmed her agreement by signing" the ICF. *Id.* ¶ 68.

Plaintiff alleges that she sought "assistance or support from AstraZeneca and its research team," as well as from Velocity and its staff, following her initial evaluation at the Velocity clinic in November 2020. *Id.* ¶¶ 19, 101. Specifically, Plaintiff alleges a series of email and phone inquiries in which she and her husband requested reimbursement for her medical expenses, beginning in January 2021. *See generally id.* ¶¶ 106-57.

Plaintiff filed this lawsuit on May 13, 2024, asserting two causes of action against AstraZeneca and Velocity ("Defendants"). The first cause of action, Breach of Contract, alleges that the ICF was a binding contract in which Defendants promised "(1) to 'cover the costs' of the research injury, including but not limited to medical costs; and (2) to provide medical care and/or refer Plaintiff for medical care." *Id.* ¶ 181. Plaintiff alleges that Defendants breached those alleged obligations and delayed and denied provision of timely medical care. *Id.* ¶ 182.

Plaintiff's second cause of action, Breach of the Duty of Good Faith and Fair Dealing, alleges that Defendants breached their duty of good faith and fair dealing by allegedly providing delayed responses to her inquiries; offering $1,833.50 in payment for past and future medical

expenses; attempting to condition the payment on her agreement to release claims for further compensation; and conditioning her access to an evaluation by clinical trial staff on her agreement to sign an amended consent form disclosing a risk of neurological disorders. *Id.* ¶¶ 187-88.

For both claims, Plaintiff seeks identical economic and non-economic damages. *Id.* ¶¶ 184, 189. Specifically, Plaintiff seeks past and future medical expenses, past and future loss of household services, childcare expenses, past and future lost income, and past and future transportation costs. *Id.* ¶¶ 162-69, Prayer for Relief ¶ 1. Plaintiff also seeks emotional damages and attorney fees. *Id.* ¶¶ 174-77, Prayer for Relief ¶¶ 2-3. As set forth herein, both of Plaintiff's claims should be dismissed with prejudice.

<u>**STANDARD OF REVIEW**</u>

A motion to dismiss "under Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the plaintiff's complaint." *Braun v. United States*, No. 1:22-cv-00108-RJS-CMR, 2023 WL 6158943, at *4 (D. Utah Sept. 21, 2023) (unpublished). To survive dismissal under Rule 12(b)(6), a complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the Court must accept as true all well-pled factual allegations in a complaint, it "need not accept '[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements,' or allegations plainly contradicted by properly considered documents or exhibits." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 678). Moreover, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Kerr v. Polis*, 20 F.4th 686, 700 n.9 (10th Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). "A court

may resolve a motion to dismiss under Rule 12(b)(6) on the basis of an affirmative defense, such as the statute of limitations or statutory immunity, when the facts establishing the defense are apparent on the face of the complaint." *Silver v. Quora, Inc.*, No. CV 15-830, 2016 WL 9777159, at *2 (D.N.M. June 13, 2016) (unpublished), *aff'd*, 666 F. App'x 727 (10th Cir. 2016) (not selected for publication).

## ARGUMENT

### I.     THIS ACTION IS BARRED BY THE PREP ACT.

#### A.     The PREP Act Immunizes AstraZeneca From Liability and Suit for All Claims Arising from or Related to Use of Its COVID-19 Vaccine.

As a threshold matter, Plaintiff's claims are fully barred by the PREP Act. Enacted by Congress in 2005, the PREP Act provides complete immunity "from suit and liability" for manufacturers of "covered countermeasures" intended to "diagnose, mitigate, prevent, treat, or cure a pandemic or epidemic." 42 U.S.C. § 247d-6d(a)(1), (i)(1)-(2), (i)(7)(A)(i); *see, e.g.*, *Cannon v. Watermark Ret. Cmtys., Inc.*, 45 F.4th 137, 138-39 (D.C. Cir. 2022); *Bird v. State*, 537 P.3d 332, 336 (Wyo. 2023). Congress adopted the statute "'[t]o encourage the expeditious development and deployment of medical countermeasures during a public health emergency' by allowing the [U.S.] Secretary [of Health and Human Services] 'to limit legal liability for losses relating to the administration of medical countermeasures such as diagnostics, treatments, and vaccines.'" *Cannon*, 45 F.4th at 139 (quoting Kevin J. Hickey, Cong. Rsch. Serv., LSB10443, The PREP Act and Covid-19, Part 1: Statutory Authority to Limit Liability for Medical Countermeasures 1 (updated Apr. 13, 2022), https://crsreports.congress.gov/product/pdf/LSB/LSB10443); *see also* Defs.' Mem. in Supp. of Mot. to Dismiss 3d Am. Compl. at 36, *Smith v. U.S. Health Res. & Servs. Admin.*, No. 3:23-cv-1425 (W.D. La. Apr. 8, 2024), ECF 53-1 ("the federal government's interest

in maintaining PREP Act immunity is . . . to protect the public health by encouraging the availability of countermeasures to combat public health emergencies").

PREP Act immunity is triggered when the HHS Secretary issues a declaration that a disease or other health condition or threat "constitutes a public health emergency," 42 U.S.C. § 247d-6d(b)(1), and applies to "all claims," under "Federal and State law," for "loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure," *id.* § 247d-6d(a)(1). "[T]he sole exception" to the immunity is for "an exclusive Federal cause of action" available for "death or serious physical injury proximately caused by willful misconduct" by a "covered person." *Id.* § 247d-6d(d)(1); *see id.* § 247d-6d(c)(1)(A) (defining "willful misconduct"); *id.* § 247d-6d(i)(2)(B) (defining "covered person" to include manufacturers of covered countermeasures). In lieu of civil claims, the PREP Act established "the 'Covered Countermeasure Process Fund' for purposes of providing timely, uniform, and adequate compensation to eligible individuals for covered injuries directly caused by the administration or use of a covered countermeasure." *Id.* § 247d-6e(a). Seeking relief through the federal fund is a prerequisite to bringing suit under the PREP Act's willful misconduct exception. 42 C.F.R. § 110.1; 42 U.S.C. § 247d-6e(a), (d)(1).

AstraZeneca's immunity for claims concerning its COVID-19 vaccine was triggered by Secretary Azar's PREP Act declaration for the pandemic on March 17, 2020. 85 Fed. Reg. 15,198; *see Cannon*, 45 F.4th at 140; Compl. ¶¶ 62-63. The declaration defines "covered countermeasures," in relevant part, as "any antiviral, any other drug, any biologic, any diagnostic, any other device, or *any vaccine*, used to treat, diagnose, cure, prevent, or mitigate COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom." 85 Fed. Reg. at 15,202 (emphasis

added); *see* 42 U.S.C. § 247d-6d(i)(1), (i)(7) (defining "covered countermeasure"). The definition extends to products "authorized for investigational or emergency use." 85 Fed. Reg. at 15,202; *see* 42 U.S.C. § 247d-6d(i)(7)(B)(ii) (defining a category of covered countermeasure as including products in clinical trials under section 505(i) of the Federal Food, Drug & Cosmetic Act, 21 U.S.C. § 355(i)). Though Secretary Azar and his successors have amended the Declaration, the definition of "covered countermeasure" to include COVID-19 vaccines authorized for investigational use is materially unchanged. *See* 85 Fed. Reg. 79,190, 79,196 (Dec. 9, 2020) (Fourth Amendment); 88 Fed. Reg. 30,769, 30,774 (May 12, 2023) (Eleventh Amendment).

As Plaintiff concedes, Compl. ¶ 32, the PREP Act immunizes AstraZeneca, its corporate family, and other countermeasure manufacturers and providers from claims arising from administration and use of COVID-19 vaccines and treatments, including in clinical trials, 42 U.S.C. § 247d-6d(a) (defining scope of immunity and claims precluded); *id.* § 247d-6d(i)(4) (defining "manufacturer" to include parents, subsidiaries, and affiliates).[2] The immunity sweeps broadly, applying to "any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the design, development, clinical testing or investigation . . . or use of such countermeasure." *Id.* § 247d-6d(a)(2)(B). Recognizing the PREP Act's expansive scope, courts across the country have routinely dismissed all manner of claims against covered persons. *See, e.g.*, *Fust v. Gilead Scis.*, No. 2:23-cv-2853, 2024 WL 732965, at *6-7 (C.D. Cal. Feb. 21, 2024) (unpublished) (dismissing

---

[2] Plaintiff's Complaint names both AstraZeneca Pharmaceuticals LP, a U.S. entity, and AstraZeneca AB, a Swedish entity, as defendants, and defines them collectively as "AstraZeneca." Compl. ¶¶ 38-40. Because PREP Act immunity applies equally to both entities, AstraZeneca similarly does not differentiate between them in this brief.

with prejudice personal injury claim against manufacturer of COVID-19 treatment and collecting cases dismissing claims under the PREP Act); *Storment v. Walgreen, Co.*, No. 1:21-cv-00898, 2022 WL 2966607, at *1-3 (D.N.M. July 27, 2022) (unpublished) (dismissing with prejudice claim against pharmacy alleging injuries from a fall after vaccination); *Bird*, 537 P.3d at 336-37 (affirming summary judgment for defendant in vaccine injury claim against State of Wyoming); *M.T. ex rel. M.K. v. Walmart Stores, Inc.*, 528 P.3d 1067, 1084-85 (Kan. Ct. App. 2023) (remanding with instructions to dismiss claim against pharmacy concerning alleged administration of vaccine to minor without parental consent).

The PREP Act requires dismissal of this case on the same basis. Plaintiff undisputedly brings "claim[s] for loss" that have "a causal relationship with the administration to or use by an individual of a covered countermeasure," 42 U.S.C. § 247d-6d(a)(2)(B), *i.e.*, administration of AstraZeneca's COVID-19 vaccine in a clinical trial, Compl. ¶ 68. AstraZeneca is thus completely immune not only from liability for all of Plaintiff's alleged injuries, but also from *suit*. Because no amendments to the Complaint could impact AstraZeneca's immunity, the Court should dismiss this case with prejudice. *See N. Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1235 n.22 (10th Cir. 2021) ("dismissal with prejudice is generally appropriate under Rule 12(b)(6) when amending the complaint would be futile"); *Total Quality Sys., Inc. v. Universal Synaptics Corp.*, No. 1:22-cv-00167-RJS-DAO, 2024 WL 2396979, at *14 n.143 (D. Utah May 23, 2024) (unpublished) (same); *see also, e.g.*, *Storment*, 2022 WL 2966607, at *3-4 (unpublished) (dismissing PREP-Act-immunized claims with prejudice).

### B.   AstraZeneca Has Not Waived Its PREP Act Immunity.

Contrary to Plaintiff's conclusory assertion otherwise, Compl. ¶ 35, AstraZeneca has not waived its immunity from suit and liability under the PREP Act. Under Utah law, "[a] waiver of any statutorily guaranteed right must be explicitly stated, so that the parties' intent is clear and unmistakable." *JENCO LC v. SJI LLC*, 541 P.3d 321, 333 (Utah Ct. App. 2023) (quoting *Pioneer Builders Co. of Nev. Inc. v. K D A Corp.*, 437 P.3d 539, 542 (Utah Ct. App. 2018)). Utah courts "will not infer from a general contractual provision that the parties intended to waive" statutory rights. *Id.* at 333 (quoting *Pioneer Builders*, 437 P.3d at 542); *see also, e.g.*, *Sysco Corp. v. Lab. Comm'n*, 502 P.3d 1242, 1246 (Utah Ct. App. 2021) (same); *Medley v. Medley*, 93 P.3d 847, 849 (Utah Ct. App. 2004) (same). Importantly, "failure to reserve a statutorily protected right is not the equivalent of a waiver of that right." *Pioneer Builders*, 437 P.3d at 543.

In asserting that AstraZeneca waived its PREP Act immunity, Compl. ¶ 35, Plaintiff refers to a sentence on page 13 of the ICF that states: "Sponsor will pay the costs of medical treatment for research injuries, provided that the costs are reasonable, and you did not cause the injury yourself." ICF at 13. That language is far from an "explicit[] state[ment]" of clear and unmistakable intent to waive AstraZeneca's PREP Act immunity from suit and liability. *Pioneer Builders*, 437 P.3d at 542 (quoting *Larsen Beverage v. Lab. Comm'n*, 250 P.3d 82, 85 (Utah Ct. App. 2011)). It does not reference the PREP Act at all, let alone explicitly. *Larsen Beverage*, 250 P.3d at 85. As Utah courts have explained, "waiver is 'the intentional relinquishment of a known right[,]' and . . . in order for waiver to occur, 'there must be an existing right . . . , a knowledge of its existence, and an *intention* to relinquish it.'" *JENCO LC*, 541 P.3d at 333 (quoting *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 942 (Utah 1993)) (emphasis added). The ICF

language Plaintiff relies on is a "general contractual provision," that cannot plausibly communicate

an unmistakable "intention" to relinquish AstraZeneca's statutory immunity. *Id.*

At most, that language – read in isolation – does not expressly "*reserve*" AstraZeneca's

statutory immunity, which is "not the equivalent of a waiver." *Pioneer Builders*, 437 P.3d at 543

(emphasis added). However, properly reading the contract "as a whole," *Thatcher v. Lang*, 462

P.3d 397, 405 (Utah Ct. App. 2020) (quoting *Gillmor v. Macey*, 121 P.3d 57, 65 (Utah Ct. App.

2005)), AstraZeneca *did* reserve its PREP Act rights in the ICF, using language that Plaintiff

herself cites elsewhere in the Complaint, *see* Compl. ¶¶ 53, 173. On the very same page that

contains the sentence on which Plaintiff's case hinges, the ICF also states:

> Due to the coronavirus public health crisis, the federal government
> has issued an order that may limit your right to sue if you are injured
> or harmed while participating in this COVID-19-related clinical
> study.
>
> If the order applies, it limits your right to sue the researchers,
> healthcare providers, any Sponsor or manufacturer or distributor
> involved with the Study. You may be prevented from making claims
> for injuries that have a causal relationship with the use of the
> investigational product in this Study, including, but not limited to,
> claims for death; physical, mental, or emotional injury, illness,
> disability, or condition; fear of physical, mental, or emotional injury,
> illness, disability, or condition, including any need for medical
> monitoring; and loss of or damage to property, including business
> interruption loss.
>
> However, the federal government has a program that may provide
> compensation to you or your family if you experience serious
> physical injuries or death. If funds are appropriated by Congress,
> compensation for injuries may be available to you under this
> Countermeasures Injury Compensation Program. To find out more
> about the Countermeasures Injury Compensation Program" go to
> https://www.hrsa.gov/cicp/about/index.html  or  call  1-855-266-
> 2427.

ICF at 13. This language plainly refers to the PREP Act and Secretary Azar's declaration for the COVID-19 pandemic, 85 Fed. Reg. 15,198, which Plaintiff concedes. Compl. ¶ 62. By informing study participants that their ability to sue AstraZeneca is limited by federal law, AstraZeneca expressly reserved its statutory rights under the PREP Act. In the face of these provisions, Plaintiff cannot plausibly claim that the ICF, properly interpreted as a whole, contains an explicit statement of clear and unmistakable intent to waive AstraZeneca's PREP Act immunity. *See JENCO LC*, 541 P.3d at 333.

Moreover, AstraZeneca cannot possibly have waived its PREP Act immunity with respect to Plaintiff's claim for breach of the duty of good faith and fair dealing. Compl. ¶ 188. Under Utah law, the implied covenant of good faith and fair dealing plays a "limited role" by "inferring as a term of every contract a duty to perform in the good faith manner that the parties surely would have agreed to if they had foreseen and addressed the circumstance giving rise to their dispute." *Young Living Essential Oils, LC v. Marin*, 266 P.3d 814, 816 (Utah 2011); *see also, e.g.*, *Vander Veur v. Groove Ent. Techs.*, 452 P.3d 1173, 1177 (Utah 2019) (same). Plaintiff does not expressly allege that AstraZeneca waived its PREP Act immunity from implied covenant claims, nor could she; a waiver of statutory immunity under Utah law must be "clear and unmistakable," *Pioneer Builders*, 437 P.3d at 542, but the implied covenant doctrine addresses terms that a court "may imply or read . . . into the agreement," *Terry v. Hinds*, 47 F. Supp. 3d 1265, 1274 (D. Utah 2014). Absent a complete waiver of PREP Act immunity, which Plaintiff concedes did not occur, Compl. ¶¶ 32, 63, AstraZeneca could not have clearly and unmistakably waived its immunity for claims under a contract term that exists only by implication. Put differently, Plaintiff cannot plausibly argue that AstraZeneca unmistakably waived its statutory immunity in connection with

circumstances that the contracting parties had not "foreseen and addressed" in the express terms of the ICF. *Young Living Essential Oils*, 266 P.3d at 816.

Accordingly, no waiver has occurred, and Plaintiff's claims are entirely barred by the PREP Act. Plaintiff's Complaint should therefore be dismissed with prejudice.

## II.   THE UTAH PRODUCT LIABILITY ACT BARS THIS ACTION AS UNTIMELY.

Independent of the PREP Act, this action is also time-barred. Despite Plaintiff framing this case as a contract dispute, it is unquestionably a product liability action seeking damages for injuries allegedly caused by a defective product. Accordingly, the Utah Product Liability Act's two-year statute of limitations applies. Utah Code Ann. § 78B-6-706. Because Plaintiff's alleged injury occurred in November 2020 and she requested compensation from Defendants in January 2021 – more than three years ago – this case is untimely.

### A.   Plaintiff's Complaint Sounds In Product Liability.

While styled as a contract case, the substance of Plaintiff's claims and the damages she seeks make clear that this action sounds in product liability. In *Utah Local Government Trust v. Wheeler Machinery Co.*, 199 P.3d 949 (Utah 2008), the Utah Supreme Court explained that "product liability encompasses all actions seeking money damages for injury to people or property resulting from defective products." *Id.* at 951 (citing 1 David G. Owen et al., *Madden & Owen on Products Liability* § 1:5 (3d ed. 2000)). Accordingly, "[t]he Utah Product Liability Act applies to actions, in both tort and contract, arising from injury caused by a defective product." *Id.* at 957; *see also, e.g.*, *Mecham v. C.R. Bard, Inc.*, No. 2:19-cv-00750, 2020 WL 2768997, at *3 (D. Utah May 27, 2020) (unpublished) (same). That conclusion flows from the text of the Utah Product Liability Act, which applies to "any action for damages for personal injury, death, or property

damage allegedly caused by a defect in a product." Utah Code Ann. § 78B-6-703(1); *see Wheeler Machinery*, 199 P.3d at 952 (discussing Section 78B-6-703(1)). In light of the Act's expansive sweep, its statute of limitations has "broad application" and governs any claim concerning a product that is allegedly defective when furnished to the plaintiff. *Wheeler Machinery*, 199 P.3d at 952 (citing *Strickland v. Gen. Motors Corp.*, 852 F. Supp. 956, 959 (D. Utah 1994)); *see also Strickland*, 852 F. Supp. at 959 (explaining the text of the Product Liability Act "suggests that the Utah legislature . . . intended that all claims against a manufacturer, based on a defective product, be subject to [the Act's statute of limitations], regardless of the theory alleged").

Utah courts' expansive construction of the product liability act is consistent with their general, practical approach to construing the claims in a complaint. "In characterizing a cause of action, Utah courts look to the nature of the action and not the pleading labels chosen." *Failor v. MegaDyne Med. Prods., Inc.*, 213 P.3d 899, 905 (Utah Ct. App. 2009) (quoting *Records v. Briggs*, 887 P.2d 864, 868 (Utah Ct. App. 1994)); *see also Jensen v. Sawyers*, 130 P.3d 325, 333 (Utah 2005) ("[W]hether a claim exists should be based on the 'nature of the action and not the pleading labels chosen.'" (quoting *Davidson Lumber Sales, Inc. v. Bonneville Inv., Inc.*, 794 P.2d 11, 14 (Utah 1990))). In general, courts in Utah "are most concerned with the true nature of the wrong and the injury as evidenced in the substance of the pleadings." *Records*, 887 P.2d at 868 (collecting cases); *see also Lord v. Shaw*, 665 P.2d 1288, 1290 (Utah 1983) ("The substance of the pleading and the nature of the issues which are raised, rather than the pleader's designation of the cause of action, control the issue.").

Here, Plaintiff seeks compensation for personal injuries allegedly caused by a defective pharmaceutical product – just as in a standard product liability suit. *See, e.g.*, Compl. ¶¶ 167-69,

174-77. The fact that Plaintiff styled the case as a contract action to plead around AstraZeneca's PREP Act immunity, *see id.* ¶¶ 32-34, is irrelevant; the Court must "look to the nature of the action and not the pleading labels chosen." *Failor*, 213 P.3d at 905. The "true nature" of this action is confirmed by the personal injuries alleged and the types of damages sought. *Records*, 887 P.2d at 868. The ICF language that allegedly waived AstraZeneca's PREP Act immunity – which Plaintiff concedes is her only possible avenue to sue, Compl. ¶ 35 – covers only "the costs of medical treatment for *research injuries*" when "reasonable" and not self-inflicted. ICF at 13 (emphasis added). The ICF defines "research injuries" as "[i]njuries that have been *caused by the vaccine, tests or procedures.*" *Id.* (emphasis added). Thus, to prove her claims, Plaintiff must necessarily establish medical causation, a core element of any personal injury product liability case.

The types of damages Plaintiff requests further confirm that her claims sound in product liability. Plaintiff demands economic damages far beyond the costs of medical treatment, including past and future "lost income," "loss of household services," "costs of transportation," and "[p]ast child care expenses," Compl. ¶ 169, as well as non-economic damages for emotional distress, *id.* ¶¶ 171-77. Plaintiff does not allege any contractual provisions in which AstraZeneca agreed to compensate trial participants for such expenses, which are quintessential product liability damages. Moreover, Plaintiff seeks to recover medical treatment costs paid by her insurer, on the alleged basis that her "insurer has a contractual right to subrogation." *Id.* ¶ 169. Plaintiff's argument lays bare that this is a tort case in all but name, as "a subrogation claim is derived from an injured party's claim against a ***tortfeasor***." *State Farm Mut. Auto. Ins. Co. v. Green*, 89 P.3d 97, 101 (Utah 2003) (emphasis added); *see also GNS P'ship v. Fullmer*, 873 P.2d 1157, 1160 (Utah Ct. App.

1994) ("The doctrine of subrogation allows an insurer . . . to step into the shoes of its insured and *recoup its losses from a tort-feasor* whose negligence caused the loss" (cleaned up)).

For all of these reasons, under well-defined Utah law, Plaintiff's claims sound in product liability and are governed by the Utah Product Liability Act.

**B.     Plaintiff's Claims Are Time-Barred.**

Considering "[t]he substance of the pleading and the nature of the issues which are raised," *Lord*, 665 P.2d at 1290, this case is time-barred under the Utah Product Liability Act's two-year statute of limitations, Utah Code Ann. § 78B-6-706. Plaintiff alleges that her injury occurred in November 2020 and that she first requested compensation from Defendants in January 2021. Compl. ¶¶ 7-12, 64-70, 107-08. Accordingly, she was aware of her potential claim by January 2021 at the latest. Thus, Plaintiff's two-year limitations period expired no later than January 2023. Plaintiff did not file this lawsuit until May 13, 2024, so her claims are time-barred as a matter of law under the Utah Product Liability Act. Plaintiff's Complaint should therefore be dismissed with prejudice.

**III.    ANY PURPORTED WAIVER OF ASTRAZENECA'S PREP ACT IMMUNITY IS STRICTLY LIMITED TO REASONABLE OUT-OF-POCKET COSTS OF MEDICAL TREATMENT.**

Alternatively, if neither the PREP Act nor the Utah Product Liability Act bar this action in full, the Court should nonetheless dismiss Plaintiff's claims for all damages except reasonable out-of-pocket medical treatment costs. Any purported waiver of AstraZeneca's PREP Act immunity would be strictly limited to those costs, as they are the only type of compensation specifically referenced in the ICF. AstraZeneca would remain immune "from suit and liability" for all of Plaintiff's other claimed damages, including economic damages other than medical treatment

costs; emotional damages; and attorney fees. 42 U.S.C. § 247d-6d(a)(1). Further, even if a broader range of damages were available (it is not), Plaintiff is not entitled to emotional damages or attorney fees for an alleged breach of the ICF. Finally, Plaintiff's cause of action for breach of the implied duty of good faith and fair dealing fails to state a claim. Plaintiff articulates no plausible basis for recovery and seeks identical damages as for express breach, so the claim is both meritless and redundant.

### A.   Any Available Economic Damages Are Limited To Reasonable Out-of-Pocket Medical Treatment Costs.

Any waiver of AstraZeneca's PREP Act immunity is strictly limited to "the costs of medical treatment for research injuries, provided that the costs are reasonable, and you did not cause the injury yourself." ICF at 13. That language cannot plausibly be read to include or provide for any economic damages beyond Plaintiff's out-of-pocket costs of treating her alleged research injury. Nothing in the contract contemplates AstraZeneca paying study participants compensation for lost income, loss of household services, costs of transportation, or childcare expenses. *Contra* Compl. ¶ 169, Prayer for Relief ¶ 1. Thus, claims for damages for those expenses are completely barred by AstraZeneca's PREP Act immunity, limited waiver or not.

Moreover, Plaintiff's attempt to recover medical treatment costs incurred by her insurer fails as a matter of law. *See* Compl. ¶ 168. Plaintiff lacks standing to recover costs incurred by her insurer because she has not alleged that such expenses are the result of "an actual or an imminent harm" to her. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010); *see also Tennille v. W. Union Co.*, 809 F.3d 555, 563 (10th Cir. 2015) (holding that the Tenth Circuit "share[s] the Supreme Court's 'reluctance to endorse standing theories that rest on speculation about the decisions of independent actors'") (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414

(2013)). Furthermore, Plaintiff fails to attach an insurance policy or identify any contractual language that purportedly establishes her insurer's subrogation rights.

### B.    Non-Economic Damages Are Unavailable As A Matter of Law.

Moreover, PREP Act immunity aside, emotional damages are presumptively unavailable in breach of contract cases under Utah law. "Normally there is no recovery of damages for mental anguish stemming from a breach of contract" because "an award of damages in a breach of contract case attempts to place the aggrieved party in the same *economic* position the party would have been in if the contract was not breached." *Gregory & Swapp, PLLC v. Kranendonk*, 424 P.3d 897, 904 (Utah 2018) (citations omitted) (emphasis added). Utah courts recognize that "'[s]ome type of mental anguish, anxiety, or distress is apt to result from the breach of any contract which causes pecuniary loss.'" *Id.* at 905 (quoting *Cabaness v. Thomas*, 232 P.3d 486, 508 (Utah 2010)). However, "it is well established that these damages are not 'the natural and probable result of the breach' and 'are deemed to be too remote to have been in the contemplation of the parties at the time the contract was entered into to be considered as an element of compensatory damages.'" *Id.* (quoting *Cabaness*, 232 P.3d at 508).

For emotional damages to be recoverable in a breach of contract action, "[s]omething in the contract . . . must show that the parties contemplated granting relief for more than the typical mental anguish and discouragement that results from a breach of contract." *Id.* Importantly, that principle holds even when a contract concerns sensitive, personal matters. *See Ward*, 511 P.3d at 1216-17 (holding the fact that a contract pertained to deletion of intimate photos was insufficient to create a factual issue regarding whether it contemplated emotional damages). Stated otherwise, "[d]amages related to emotional distress or mental anguish" must have been "both a foreseeable

result of the breach of contract and *explicitly* within the contemplation of the parties at the time the contract was entered into," *Cabaness*, 232 P.3d at 508, which "seldom happens," *Gregory & Swapp*, 424 P.3d at 905.

Plaintiff has not and cannot allege facts triggering this rare exception. Plaintiff identifies no specific language in the ICF showing that the parties explicitly contemplated emotional damages for breach of contract. Plaintiff points solely to the language discussing the PREP Act, Compl. ¶¶ 53, 173, which states in part that the Act may "*prevent*[]" a trial participant "from making claims for injuries that have a causal relationship with the use of the [study product], including, but not limited to, claims for . . . mental[] or emotional injury," ICF at 13 (emphasis added). At most, that language acknowledges that plaintiffs might bring claims for emotional damages stemming from alleged adverse reactions (and that AstraZeneca is immune from suits on those grounds). Nothing in the ICF suggests that the parties explicitly contemplated emotional damages arising from a *breach of the ICF,* which Plaintiff repeatedly insists is distinct from a product liability claim. Compl. ¶¶ 33-34. Unless a plaintiff shows that "at the time the parties formed the contract, they contemplated that emotional distress damages *might flow from a breach of the contract*," emotional damages are barred. *Ward*, 511 P.3d at 1216 (emphasis added) (citing *Gregory & Swapp*, 424 P.3d at 897). Plaintiff's misinterpretations of the ICF language are unavailing.

Plaintiff's claim for non-economic emotional damages fails as a matter of Utah law, and the Court should dismiss her claim with prejudice. Courts may not consider "[t]estimony and extrinsic evidence" in determining availability of emotional damages for breach, so no discovery or factfinding is appropriate. *Gregory & Swapp*, 424 P.3d at 906. Instead, courts must simply

"analyze[] whether the nature and language of the contract plainly show that non-economic damages were explicitly contemplated by the parties at the time the contract was formed." *Id.* Nothing in the ICF meets that requirement, so Plaintiff's emotional damages claim fails.

**C.      Plaintiff Fails To State A Claim For Attorney Fees.**

Attorney fees are also unavailable as a matter of law. "Attorney fees are generally recoverable in Utah only when authorized by statute or contract." *McKitrick v. Gibson*, 541 P.3d 949, 954 (Utah 2024) (quoting *Reighard v. Yates*, 285 P.3d 1168, 1182 (Utah 2012)); *accord Busico v. Carver*, 542 P.3d 956, 972 (Utah Ct. App. 2023) ("In Utah, attorney fees are awardable only if authorized by statute or by contract." (citation omitted)). No statute or contract provides for Plaintiff to recover fees here. The Complaint demands fees exclusively by reference to case law that concerns fee awards as a sanction for defendant insurers' bad-faith refusal to pay or settle claims. Compl., Prayer For Relief, ¶ 3. As one of Plaintiff's own cases explains, Utah courts "have carved out a narrow exception" to the no-fees default rule "in the insurance context." *Pugh v. N. Am. Warranty Servs., Inc.*, 1 P.3d 570, 574 (Utah Ct. App. 2000). The exception applies only "[w]hen an insurance company breaches the implied covenant to perform its obligations in good faith." *Id.* (citing *Collier v. Heinz*, 827 P.2d 982, 984 (Utah Ct. App. 1992)). This is not an insurance case, nor did AstraZeneca breach any implied covenant of good faith.

Therefore, the Court should dismiss Plaintiff's request for attorney fees.

**D.      Plaintiff's Claim For Breach Of The Duty Of Good Faith And Fair Dealing Is Meritless.**

In addition to being barred by the PREP Act, Plaintiff's implied covenant claim fails on the merits. Utah courts observe strict limits on the covenant's scope to prevent the "misuse" of judicially implied contractual terms, which "threatens 'commercial certainty and breed[s] costly

litigation.'" *Young Living Essential Oils*, 266 P.3d at 816 (quoting *Kham & Nate's Shoes No. 2,*
*Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990)). The covenant "cannot be read
to establish new, independent rights or duties to which the parties did not agree ex ante," nor
"create rights and duties inconsistent with express contractual terms," and courts "will not use [the]
covenant to achieve an outcome in harmony with the court's sense of justice but inconsistent with
the express terms of the applicable contract." *1143 Oakwood Village LLC v. Albertsons, Inc.*, 104
P.3d 1226, 1240 (Utah 2004); *accord Airstar Corp. v. Keystone Aviation, LLC*, 514 P.3d 568, 580-
81 (Utah Ct. App. 2022). Plaintiff flouts those principles here to assert an amorphous, unbounded
right to recovery from AstraZeneca. *See* Compl. ¶ 188. Moreover, Plaintiff pleads the same
"economic and non-economic damages" for breach of the implied covenant as for express breach.
*Id.* ¶¶ 184, 189. Accordingly, this claim is redundant, and Plaintiff's entitlement to recovery (if
any) is limited on the same grounds as the express breach claim.

      Because there is no basis for Plaintiff's breach of good faith and fair dealing claim, this
cause of action should be dismissed.

## **CONCLUSION**

      For the reasons set forth above, AstraZeneca respectfully requests that this Court grant its
Motion to Dismiss Plaintiff's Complaint in its entirety with prejudice.

DATED this 28th day of June 2024.

RAY QUINNEY & NEBEKER P.C.


  /s/ Kamie F. Brown
Kamie F. Brown

ARTHUR E. BROWN (*pro hac vice forthcoming*)
ALEXANDER COUSINS (*pro hac vice forthcoming*)
**ARNOLD & PORTER KAYE SCHOLER LLP**

*Attorneys for AstraZeneca AB and AstraZeneca Pharmaceuticals LP*

Jason R. Hull [11202]
jhull@mohtrial.com
Anikka T. Hoidal [16489]
ahoidal@mohtrial.com
**MARSHALL OLSON & HULL, PC**
Newhouse Building
Ten Exchange Place, Suite 350
Salt Lake City, Utah 84111
Tel: (801) 456-7655

*Attorneys for Plaintiff*

*Admitted Pro Hac Vice*

Aaron Siri*
aaron@sirillp.com
Elizabeth A. Brehm*
ebrehm@sirillp.com
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Ste 500
New York, NY 10151
Tel: (888) 747-4529

Michael Connett*
mconnett@sirillp.com
**SIRI & GLIMSTAD LLP**
700 S. Flower St., Suite 1000
Los Angeles, CA 90017
Tel: (888) 747-4529

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BRIANNE DRESSEN,<br><br>    Plaintiff,<br><br>v.<br><br>ASTRAZENECA AB; ASTRAZENECA PHARMACEUTICALS LP; and VELOCITY CLINICAL RESEARCH, INC.,<br><br>    Defendants. | **PLAINTIFF'S OPPOSITION TO ASTRAZENECA'S MOTION TO DISMISS**<br><br>***Oral Argument Requested***<br><br>Case No: 2:24-cv-00337-RJS-CMR<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

I.   THE PREP ACT DOES NOT IMMUNIZE ASTRAZENECA FROM VIOLATIONS
     OF CONTRACTUAL OBLIGATIONS IT VOLUNTARILY ENTERED ...................... 2

     A.  Courts Have Recognized that the PREP Act Does Not Apply to Contract Claims ..... 2

     B.  Extending PREP Act Immunity to Cover Contractual Violations Would Undermine
         the Act's Purpose ............................................................................................. 3

II.  EVEN IF THE PREP ACT APPLIES TO CONTRACT CLAIMS, ASTRAZENECA
     CLEARLY AND UNMISTAKABLY WAIVED ITS IMMUNITY ................................ 6

     A.  AstraZeneca's Unequivocal, Express Promise to Pay the Costs of Research Injuries
         Constitutes a Waiver Under Utah Law ............................................................... 6

     B.  AstraZeneca's Interpretation of the Contract Violates Black Letter Principles by
         Ignoring and Rendering Meaningless the Promise to Pay the Costs of Injuries ........... 8

     C.  AstraZeneca Is Incorrect that Waivers of Statutory Rights Need to Be Explicitly
         Stated ................................................................................................................. 9

III. PLAINTIFF'S CASE IS NOT TIME-BARRED UNDER THE *RELEVANT* STATUTE
     OF LIMITATIONS (UTAH CODE § 78B-2-309(1)(b)) ................................................ 11

     A.  Under the Relevant Statute of Limitations, Plaintiff Had Six Years to File Her Claim
         ............................................................................................................................ 11

     B.  AstraZeneca Fails to Cite or Acknowledge the Controlling Statute and Case Law,
         and Relies on Case Law Regarding Inapposite Breach of Warranty Claims ............. 13

     C.  The Types of Damages that Plaintiff Seeks Have No Bearing on Whether the Cause
         of Action Sounds in Contract or Tort ............................................................... 14

IV.  PLAINTIFF HAS PLEADED A PLAUSIBLE CLAIM FOR BREACHES OF THE
     IMPLIED DUTY OF GOOD FAITH ............................................................................ 14

     A.  The Waiver Analysis Has No Bearing on the Implied Duty of Good Faith ............... 15

i

B.  Plaintiff Has Alleged Breaches of Duties That Come Squarely Within the Implied Covenant of Good Faith and Fair Dealing .................................................................. 15

C.  Plaintiff's Express and Implied Breach Claims Are Not Redundant .......................... 17

V.    THE GENERAL AND CONSEQUENTIAL DAMAGES PLAINTIFF SEEKS ARE ALL PROPERLY RECOVERABLE IN CONTRACT UNDER THE SPECIFIC CIRCUMSTANCES OF THIS CASE ........................................................... 17

A.  Plaintiff Is Entitled to Attorney Fees if She Prevails ................................................. 17

B.  The Plain Meaning of "Costs of Research Injuries" Is Expansive and Not Limited to Medical Expenses ................................................................................................... 19

C.  The Contract Does Not Limit Medical Expenses to "Out of Pocket" Costs .............. 21

D.  Plaintiff Has Pleaded Plausible Grounds for Emotional Damages ............................ 23

CONCLUSION ..................................................................................................................... 25

CERTIFICATE OF SERVICE ............................................................................................. 27

AA130                                AA130                                AA130

# TABLE OF AUTHORITIES

**Cases**

*Alf v. State Farm Fire & Casualty Co.*,
  850 P.2d 1272 (Utah 1993) ................................................................................. 20

*Am. Sav. & Loan Ass'n v. Blomquist*,
  445 P.2d 1 (Utah 1968) ...................................................................................... 9

*Auto Club Prop. Cas. Ins. Co. v. Moser*,
  874 S.E.2d 295 (W. Va. 2022) ..................................................................... 21, 22

*Beck v. Farmers Ins. Exch.*,
  701 P.2d 795 (Utah 1985) ........................................................................... 16, 23

*Bracklein v. Realty Insurance Co.*,
  80 P.2d 471 (1938) ............................................................................................ 12

*Brady v. Park*,
  2019 UT 16, 445 P.3d 395 ..................................................................... 20, 21, 25

*Brehany v. Nordstro, Inc.*,
  812 P.2d 49 (Utah 1991) .................................................................................... 15

*Brigham Young Univ. v. Paulsen Constr. Co.*,
  744 P.2d 1370 (Utah 1987) .......................................................................... 12, 14

*Cabaness v. Thomas*,
  2010 UT 23, 232 P.3d 486 ........................................................................... 23, 24

*Daines v. Vincent*,
  2008 UT 51, 190 P.3d 1269 ................................................................................ 9

*Davidson Lumber Sales, Inc. v. Bonneville Inv., Inc.*,
  794 P.2d 11 (Utah 1990) .................................................................................... 13

*DCR, Inc. v. Peak Alarm Co.*,
  663 P.2d 433 (Utah 1983) .................................................................................. 12

*Forrester v. White*,
  484 U.S. 219 (1988) ........................................................................................... 3

*Fusion Diagnostic Labs., LLC v. Atila Biosystems, Inc.*,
  No. 2:24-cv-00184, 2024 U.S. Dist. LEXIS 106927 (D.N.J. June 16, 2024) ....................... 3, 4

AA131                          AA131                          AA131

*Golchin v. Liberty Mut. Ins. Co.*,
  993 N.E.2d 684 (Mass. 2013) ........................................................................... 22

*Gregory & Swapp, PLLC v. Kranendonk*,
  2018 UT 36, 424 P.3d 897 .................................................................... 23, 24, 25

*Guerrier v. Mid-Century Ins. Co.*,
  663 N.W.2d 131 (Neb. 2003) ...................................................................... 22, 23

*Haro v. Kaiser Found. Hosps.*,
  No. CV 20-6006, 2020 U.S. Dist. LEXIS 162522 (C.D. Cal. Sep. 3, 2020) .............................. 3

*Heaton Contract Mfg., LLC v. Noble.Com, Inc.*,
  No. 20-CV-1875, 2023 U.S. Dist. LEXIS 162261 (E.D. Wis. Apr. 20, 2023) ........................... 3

*Hewitt v. Helms*,
  459 U.S. 460 (1983) ........................................................................................... 7

*Home Sav. & Loan v. Aetna Cas. & Sur. Co.*,
  817 P.2d 341 (Utah Ct. App. 1991) ................................................................ 21

*In re Cloward*,
  608 B.R. 759 (Bankr. D. Utah 2019) ............................................................... 7

*Larsen Beverage v. Labor Comm'n*,
  2011 UT App 69, 250 P.3d 82 ............................................................. 6, 10, 11

*Leonard v. Ala. State Bd. of Pharmacy*,
  61 F.4th 902 (11th Cir. 2023) ........................................................................... 4

*Lynch v. United States*,
  292 U.S. 571 (1934) ........................................................................................... 5

*Mecham v. C.R. Bard, Inc.*,
  No. 2:19-cv-00750-JNP, 2020 U.S. Dist. LEXIS 93671 (D. Utah May 27, 2020) .............. 13

*Medley v. Medley*,
  2004 UT App 179, 93 P.3d 847 .................................................................. 6, 11

*Metro. Edison Co. v. NLRB*,
  460 U.S. 693 (1983) ......................................................................................... 10

*Monaco Apartment Homes v. Figueroa*,
  2021 UT App 50, 489 P.3d 1132 ................................................................... 21

iv

*Moorman v. Nationwide Mut. Inc. Co.*,
    148 S.E.2d 874 (Va. 1966) ........................................................................ 22

*Morrison v. Lindsey Lawn & Garden, Inc.*,
    No. 13-1467, 2014 U.S. Dist. LEXIS 27146 (E.D. Pa. Mar. 4, 2014) ................... 20

*NL Indus. v. Commercial Union Ins. Co.*,
    65 F.3d 314 (3d Cir. 1995) ......................................................................... 5

*NOAA Md., LLC v. Adm'r of the GSA*,
    997 F.3d 1159 (Fed. Cir. 2021) ................................................................... 20

*Olmos v. Holder*,
    780 F.3d 1313 (10th Cir. 2015) ................................................................... 5

*Parker v. St. Lawrence Cty. Pub. Health Dep't*,
    102 A.D.3d 140 (N.Y. App. Div. 2012) ........................................................ 2

*Pioneer Builders Co. of Nev. v. K D A Corp.*,
    2018 UT App 206, 437 P.3d 539 ............................................................... 6, 8

*Poulsen v. Farmers Ins. Exch.*,
    2016 UT App 170, 382 P.3d 1058 ........................................................... 20, 25

*Pugh v. N. Am. Warranty Servs.*,
    2000 UT App 121, 1 P.3d 570 ........................................................... passim

*Quality Diagnostics Int'l, LLC v. Azure Biotech, Inc.*,
    No. 4:23-CV-3886, 2024 U.S. Dist. LEXIS 9058 (S.D. Tex. Jan. 18, 2024) ........... 3

*Records v. Briggs*,
    887 P.2d 864 (Utah Ct. App. 1994) ........................................................ 12, 14

*Saleh v. Farmers Ins. Exch.*,
    2006 UT 20, 133 P.3d 428 ...................................................................... 17

*Samsel v. Allstate Ins. Co.*,
    59 P.3d 281 (Ariz. 2002) .................................................................... 22, 23

*Sonic Indus. LLC v. Olympia Cascade Drive Ins LLC*,
    No. CIV-22-449, 2022 U.S. Dist. LEXIS 152033 (W.D. Okla. Aug. 24, 2022) ......... 5

*State by Div. of Consumer Prot. v. GAF Corp.*,
    760 P.2d 310 (Utah 1988) ......................................................................... 5

*Strickland v. Gen. Motors Corp.*,
    852 F. Supp. 956 (D. Utah 1994) ................................................................. 13

*Teamsters v. Lucas Flour Co.*,
    369 U.S. 95 (1962) .............................................................................. 10, 15

*Terry v. Hinds*,
    47 F. Supp. 3d 1265 (D. Utah 2014) ......................................................... 8, 17

*Texas v. United States*,
    292 U.S. 522 (1934) .................................................................................... 4

*Thatcher v. Lang*,
    2020 UT App 38, 462 P.3d 397 .................................................................... 8

*United States Tr. Co. v. New Jersey*,
    431 U.S. 1 (1977) ........................................................................................ 5

*Utah Local Gov't Tr. v. Wheeler Mach. Co.*,
    2008 UT 84, 199 P.3d 949 (Utah 2008) ..................................................... 13

*Vander Veur v. Groove Entm't Techs.*,
    2019 UT 64, 452 P.3d 1173 ................................................................... 15, 16

*Viza Elecs., LLC v. Paradigm Clinical Research. Inst., Inc.*,
    No. 3:22-cv-49, 2022 U.S. Dist. LEXIS 172193 (W.D.N.C. Sept. 23, 2022) ........... 3

*Ward v. Intermountain Farmers Ass'n*,
    907 P.2d 264 (Utah 1995) ......................................................................... 12

*Ward v. McGarry*,
    2022 UT App 62, 511 P.3d 1213 ................................................................. 24

*Warger v. Shauers*,
    574 U.S. 40 (2014) ...................................................................................... 5

*Webb v. R.O.A. Gen., Inc.*,
    773 P.2d 834 (Utah Ct. App. 1989) .............................................................. 9

*WorkCare, Inc. v. Plymouth Med., LLC*,
    No. 8:21-cv-00864, 2021 U.S. Dist. LEXIS 168341 (C.D. Cal. Aug. 20, 2021) ......... 3

         

**Statutes**

42 U.S.C. § 247d-6d ................................................................................................ 2

Utah Code § 78-12-23(2) ...................................................................................... 11

Utah Code § 78B-2-309(1)(b) ............................................................................. 11

Utah Code § 78B-6-706 ....................................................................................... 13

Utah Code Ann. § 31A-1-301(48)(a)(i) ............................................................. 18

**Other Authorities**

Black's Law Dictionary 721 (5th ed. 1979) ....................................................... 18

**Treatises**

6 J.E. Thomas & C.J. Robinette, New Appleman on Insurance Law § 64.04[2] (2012) ............. 22

Restatement (Second) of Torts § 899 (1979) ..................................................... 13

## **INTRODUCTION**

AstraZeneca asks this Court to do what no court has ever done: grant "complete immunity" for *contractual violations* so long as the violations relate to the administration of covered countermeasures under the PREP Act. While immunity under the PREP Act is expansive, it has its limits. Each court that has addressed claims of immunity for state *contract* claims has rightfully held that the PREP Act does not apply. Ignoring this case law, AstraZeneca cites inapposite cases dealing with state *tort* claims.

The "complete immunity" theory which AstraZeneca asks this Court to adopt is not found in the express language of the statute and would undermine the purpose of the PREP Act, not advance it. Complete immunity would create an anarchic business environment, disincentivizing honest companies from entering into contracts related to covered countermeasures and disincentivizing would-be participants like Brianne Dressen from volunteering for the clinical trials that are essential to the development of vaccines. Such staggering costs would come with no corresponding benefit, other than allowing companies to lie and defraud others without consequence; but no reasonable company needs that incentive to help this country. The "complete immunity" rule would lead to absurd and unreasonable results, and thus should be rejected accordingly.

Even if PREP Act immunity did apply to contract claims (it does not), AstraZeneca waived its immunity by clearly and unmistakably promising to pay the cost of research injuries. It is immaterial that AstraZeneca did not "explicitly" describe its promise as a waiver, as the U.S. Supreme Court and Utah Supreme Court have long made clear that waivers of statutory rights need not be explicit.

AstraZeneca's contention that Plaintiff's case is time-barred is similarly meritless. Its motion relies on the *wrong* statute of limitations as well as inapposite case law concerning breaches of warranty. Plaintiff's claims are timely, and undeniably so, when considered against Utah's statute of limitations for breaches of *written* contract and the Utah Supreme Court's precedential standard for applying this statute. Remarkably, AstraZeneca's motion mentions neither.

AstraZeneca's other arguments on the implied duty of good faith and damages are equally unavailing for the reasons discussed herein. The Court should deny the motion.

## ARGUMENT

### I. THE PREP ACT DOES NOT IMMUNIZE ASTRAZENECA FROM VIOLATIONS OF CONTRACTUAL OBLIGATIONS IT VOLUNTARILY ENTERED

#### A. Courts Have Recognized that the PREP Act Does Not Apply to Contract Claims

In its motion, AstraZeneca claims that the PREP Act provides "complete immunity" for any claim of loss causally related to the administration[1] of a covered countermeasure, including losses arising from contractual violations. Dkt. 24 at 9. To support its argument, AstraZeneca states that "courts across the country have routinely dismissed all manner of claims against covered persons." *Id.* at 11-12. All of the cases AstraZeneca cites, however, involve state *tort* claims, *id.* at 11-12, which courts have held are covered by the PREP Act, *Parker v. St. Lawrence Cty. Pub. Health Dep't*, 102 A.D.3d 140, 143-44 (N.Y. App. Div. 2012). Notably, AstraZeneca fails to cite any case involving a state *contract* claim.

---

[1] Under the PREP Act, claims that are causally related to the "administration" of covered countermeasures include, *inter alia*, claims that are causally related to the design, development, clinical testing, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, and sale of said countermeasures. *See* 42 U.S.C. § 247d-6d(a)(2)(B).

While most companies facing contract claims related to the administration of covered countermeasures have *not* asserted immunity under the PREP Act,[2] courts have rejected claims of immunity from the few companies who have. *See Fusion Diagnostic Labs., LLC v. Atila Biosystems, Inc*., No. 2:24-cv-00184, 2024 U.S. Dist. LEXIS 106927, at *5 (D.N.J. June 16, 2024) ("Defendant is not immune under the PREP Act from Plaintiff's state law breach of contract claims."); *WorkCare, Inc. v. Plymouth Med., LLC*, No. 8:21-cv-00864, 2021 U.S. Dist. LEXIS 168341, at *12 (C.D. Cal. Aug. 20, 2021) ("The PREP Act does not on its face provide immunity for state contract claims."). Similarly, a district court rejected an assertion of PREP Act immunity from a company that refused to pay its employees for time spent participating in a covered countermeasure (e.g., a COVID-19 screening process). *Haro v. Kaiser Found. Hosps*., No. CV 20-6006, 2020 U.S. Dist. LEXIS 162522, at *6-7 (C.D. Cal. Sep. 3, 2020).

In short, while courts have held that the PREP Act confers broad immunity against tort claims, courts have refused to extend this immunity to contractual violations.

### B.    Extending PREP Act Immunity to Cover Contractual Violations Would Undermine the Act's Purpose

As the *WorkCare* court noted, "[t]he PREP Act does not on its face provide immunity for state contract claims." 2021 U.S. Dist. LEXIS 168341, at *12. Given this, the Court must look to the *purpose* behind the immunity to delineate its proper scope and whether it extends to contractual violations. *See, e.g.*, *Forrester v. White*, 484 U.S. 219, 224 (1988) ("[T]he Court has been careful

---

[2] *See, e.g.*, *Quality Diagnostics Int'l, LLC v. Azure Biotech, Inc*., No. 4:23-CV-3886, 2024 U.S. Dist. LEXIS 9058 (S.D. Tex. Jan. 18, 2024); *Heaton Contract Mfg., LLC v. Noble.Com, Inc*., No. 20-CV-1875, 2023 U.S. Dist. LEXIS 162261 (E.D. Wis. Apr. 20, 2023); *Viza Elecs., LLC v. Paradigm Clinical Research. Inst., Inc*., No. 3:22-cv-49, 2022 U.S. Dist. LEXIS 172193 (W.D.N.C. Sept. 23, 2022).

not to extend the scope of [legislative immunity] further than its purposes require."); *Texas v. United States*, 292 U.S. 522, 534 (1934) ("The scope of the immunity must be measured by the purpose which Congress had in view . . . ."); *Leonard v. Ala. State Bd. of Pharmacy*, 61 F.4th 902, 914 (11th Cir. 2023) (using the purpose of the PREP Act as the "touchstone" for construing the scope of preemption); *Fusion Diagnostic*, 2024 U.S. Dist. LEXIS 106927, at *6-7 (concluding that PREP Act immunity does not extend to contract claims based, in part, on the purpose of Act).

Here, AstraZeneca correctly identifies the purpose of the PREP Act: "To encourage the expeditious development and deployment of medical countermeasures during a public health emergency." Dkt. 24 at 9 (citation omitted). But AstraZeneca fails to explain how immunizing contractual violations will advance this purpose. Under AstraZeneca's interpretation of the statute, the following conduct would be immunized:

- A covered hospital refusing to honor its contractual obligation to pay a supplier for the costs of covered goods (e.g., testing kits, masks, vaccines, antivirals, etc.);

- A covered manufacturer violating its contractual obligation to pay a research company for the cost of conducting a clinical trial, including the cost of labor and supplies;

- AstraZeneca refusing to reimburse clinical trial participants in Salt Lake County for their time, despite contractually promising to pay $125 for each completed study visit and $30 for each completed phone call. Informed Consent Form ("ICF") at 12 (Dkt. 1-1 at 13);

- AstraZeneca willfully violating its numerous contractual obligations to maintain the privacy of trial participants' medical history, medical conditions, and biodata. *Id*. at 15-20; and

- AstraZeneca *fraudulently inducing* clinical trial participants to enter the study by making contractual promises that it believed were illusory and meaningless.

Immunizing this type of conduct would not advance the PREP Act's purpose of encouraging the expeditious development and deployment of medical countermeasures. To the

contrary, such unscrupulous conduct would undermine the Act's purpose by eliminating the certainty that contracts provide—a certainty that provides the bedrock for a healthy business environment. *See generally NL Indus. v. Commercial Union Ins. Co.*, 65 F.3d 314, 327 (3d Cir. 1995) ("By enforcing the parties' expectations, courts interpreting contracts assure the consistency and predictability necessary to a healthy business environment."); *Sonic Indus. LLC v. Olympia Cascade Drive Ins LLC*, No. CIV-22-449, 2022 U.S. Dist. LEXIS 152033, at *17 (W.D. Okla. Aug. 24, 2022) ("[T]he public interest is served when contractual obligations are enforced and disserved when contractual obligations are not enforced. That is because the enforcement of contracts promotes predictability and stability in the national economy.").

AstraZeneca's "complete immunity" theory would eliminate centuries of contract law from the economy of covered countermeasures, leaving companies and persons who dare get involved to fend for themselves in an anarchic world where people can be cheated at will with no recourse to the law. Surely this absurd and unreasonable result was not what Congress intended when it enacted the PREP Act. *See State by Div. of Consumer Prot. v. GAF Corp.*, 760 P.2d 310, 313 (Utah 1988) ("It is axiomatic that a statute should be given a reasonable and sensible construction, and that the legislature did not intend an absurd or unreasonable result." (citation omitted)).[3]

---

[3] The canon of constitutional avoidance counsels in further support of this conclusion. Under this canon, "when a particular construction would raise serious constitutional problems, the court will avoid that construction unless doing so would plainly conflict with Congress's intent." *Olmos v. Holder*, 780 F.3d 1313, 1320-21 (10th Cir. 2015); *see also Warger v. Shauers*, 574 U.S. 40, 50 (2014) ("The canon 'is a tool for choosing between competing plausible interpretations' of a provision." (citation omitted)). Here, an interpretation of the PREP Act that immunizes contractual violations would raise constitutional concerns because it would permit the taking of vested contract rights, which are property rights under the Fifth Amendment's Takings Clause. *See United States Tr. Co. v. New Jersey*, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); *Lynch v. United States*, 292 U.S. 571, 579 (1934) (stating that "[v]alid contracts are property" for purposes of the

## II.    EVEN IF THE PREP ACT APPLIES TO CONTRACT CLAIMS, ASTRAZENECA CLEARLY AND UNMISTAKABLY WAIVED ITS IMMUNITY

### A.    AstraZeneca's Unequivocal, Express Promise to Pay the Costs of Research Injuries Constitutes a Waiver Under Utah Law

AstraZeneca's unequivocal and express promise to pay the costs of research injuries, including medical expenses, easily satisfies Utah's standard for waiver of a statutory right. Under Utah law, the following elements are necessary for a waiver to occur: (1) "an existing right," (2) "knowledge of its existence," and (3) "an intention to relinquish it." *Pioneer Builders Co. of Nev. v. K D A Corp.*, 2018 UT App 206, ¶ 14, 437 P.3d 539. With respect to the last element, the intention to relinquish must be unequivocal or "must be inconsistent with any other intent." *Id.* (citing *Medley v. Medley*, 2004 UT App 179, ¶ 7, 93 P.3d 847). "More succinctly," the intention to waive "must be clear and unmistakable." *Larsen Beverage v. Labor Comm'n*, 2011 UT App 69, ¶ 11, 250 P.3d 82.

Here, the first two elements of waiver are indisputably satisfied: (1) AstraZeneca had an existing right to immunity under the PREP Act; and (2) AstraZeneca had knowledge of the existence of this right, as evident by the contract's implicit reference to PREP Act immunity.[4]

The third element is also readily satisfied because the contract's plain meaning evinces an unequivocal intent to relinquish immunity with respect to the costs of research injuries. First, AstraZeneca's contract states that, "[t]he Sponsor has an insurance policy to cover the costs of

---

Takings Clause "whether the obligor be a private individual, a municipality, a state, or the United States").

[4] The contract does not reference the PREP Act by name or citation, but for *sophisticated* parties, such as AstraZeneca, the contract is "plainly" alluding to the PREP Act. Dkt. 24 at 15. The same cannot be said for *unsophisticated* parties, including Plaintiff and other trial participants, who would have little basis to know what law was being referenced, or how to learn more about it.

research injuries as long as you have followed your study doctor's instructions." Dkt. 1-1 at 14. This provision provides one, and only one, ground for relieving AstraZeneca of this obligation: i.e., if Plaintiff did not follow the instructions of the study doctor. Thus, "as long as" Plaintiff followed the study doctor's instructions, which she did, AstraZeneca was responsible for covering her costs. This promise is clear, unequivocal, and inconsistent with an intent to retain immunity.

Second, AstraZeneca's contract states that "Sponsor *will* pay the costs of medical treatment for research injuries, provided that the costs are reasonable and you did not cause the injury yourself." *Id*. (emphasis added). The word "will," like the word "shall," has "an unmistakably mandatory character" and thereby denotes a non-discretionary obligation. *Hewitt v. Helms*, 459 U.S. 460, 471 (1983). Thus, so long as Plaintiff's costs are reasonable, and Plaintiff did not cause her injury, AstraZeneca is mandated under the contract to "pay the costs of medical treatment." This promise is clear, unequivocal, and inconsistent with an intent to retain immunity.

Third, the contract repeatedly states that Plaintiff is "entitled" to the benefits listed in the contract. Dkt. 1-1 at 5, 21. For example, the contract assures Plaintiff that if she decides to withdraw from the trial, it "will not result in any penalty or loss of benefits to which you are otherwise *entitled*." *Id.* at 5 (emphasis added). Thus, the contract expressly conferred a *right* to these benefits.[5] As rights, these benefits were not subject to AstraZeneca's whim or discretion. This further evinces the unequivocal nature of AstraZeneca's intention to waive its immunity.

---

[5] *See In re Cloward*, 608 B.R. 759, 764 (Bankr. D. Utah 2019) ("In legal usage, the phrase 'is entitled to' means 'has a right to.' This is consistent with its common usage, as Webster defines 'entitle' as 'to give a title to' and defines 'entitled' as 'having a right to certain benefits or privileges.' The term 'entitlement' is defined as an 'absolute right to a . . . benefit . . . granted immediately upon meeting a legal requirement.'" (citations omitted) (ellipses in original)).

Finally, the contract's discussion of PREP Act immunity does not save AstraZeneca from its obligation to pay the costs of research injuries. First, the contract states that the PREP Act "*may* limit your right to sue,*" not that it "will" limit the right to sue. *Id*. at 14 (emphasis added). The use of the word "may" is entirely consistent with AstraZeneca waiving its immunity for *some* (i.e., contract), but not *all* (i.e., tort), claims. Second, the contract states that "[*i*]*f* the order applies, it limits your right to sue." *Id*. (emphasis added). The use of the word "if" is, again, consistent with AstraZeneca waiving immunity for *some*, but not *all*, claims. In short, the contract's discussion of PREP Act immunity is readily harmonized with AstraZeneca's binding contractual obligation to pay the costs of research injuries.

### B. AstraZeneca's Interpretation of the Contract Violates Black Letter Principles by Ignoring and Rendering Meaningless the Promise to Pay the Costs of Injuries

It is a black letter principle that *all* provisions of a contract should be given effect, and none should be ignored or rendered meaningless. *See Terry v. Hinds*, 47 F. Supp. 3d 1265, 1271-72 (D. Utah 2014) ("In interpreting a contract, the court looks to the writing itself to ascertain the parties' intentions, and [considers] each contract provision in relation to all of the others, with a view toward giving effect to all and ignoring none." (citation and internal quotation marks omitted)); *Thatcher v. Lang*, 2020 UT App 38, ¶ 31, 462 P.3d 397 ("When interpreting the plain language, we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless."). This rule applies equally to analyses of waiver, as evident by the case law that AstraZeneca relies upon. *E.g.*, *Pioneer Builders Co. of Nev. v. K D A Corp.*, 2018 UT App 206, ¶ 21, 437 P.3d 539 (interpreting the contract in a way that avoids rendering any of its provisions "superfluous").

8

Although AstraZeneca acknowledges that a contract should be "read as a whole," Dkt. 24 at 14, it violates this cardinal rule by failing to give effect to the promise-to-pay clauses in the contract. For example, AstraZeneca *does not even mention*—let alone give any effect to—the "costs of research injuries" provision. *See id.* at 13-16. AstraZeneca also omits, and fails to give any effect to, the "entitled" provisions. *Id.*

The only promise-to-pay provision that AstraZeneca acknowledges in its analysis is the provision that "[s]ponsor will pay the costs of medical treatment for research injuries." *Id.* at 13. But acknowledging a provision is not enough; the provision needs to be *given effect*. AstraZeneca makes no attempt to do so. Instead, AstraZeneca dismisses the provision because it "does not reference the PREP Act at all, let alone explicitly." *Id.* Under AstraZeneca's construction, the promise-to-pay provision is thus superfluous which is incompatible with black letter law on contract interpretation.[6]

### C.   AstraZeneca Is Incorrect that Waivers of Statutory Rights Need to Be Explicitly Stated

Another flaw with AstraZeneca's waiver analysis is that it uses a legally incorrect premise to discard the promise-to-pay clause. Contrary to AstraZeneca's motion, waivers of statutory rights do not need to be "explicitly stated." Indeed, Utah courts have long recognized that waivers "may be express or implied." *Am. Sav. & Loan Ass'n v. Blomquist*, 445 P.2d 1, 2 (Utah 1968); *Webb v. R.O.A. Gen., Inc.*, 773 P.2d 834, 839 (Utah Ct. App. 1989).

---

[6] If this is how AstraZeneca understood this term when it drafted the contract (i.e., superfluous and meaningless), then AstraZeneca also engaged in fraudulent inducement. *Daines v. Vincent*, 2008 UT 51, ¶ 38, 190 P.3d 1269 (setting forth the elements of fraudulent inducement). Plaintiff reserves the right, therefore, to amend her Complaint to add a fraudulent inducement claim.

The case that AstraZeneca cites to sidestep this rule does not actually do so. Dkt. 24 at 13 (citing *Larsen Beverage*, 250 P.3d at 85). In *Larsen Beverage*, the Utah Court of Appeals cited a U.S. Supreme Court decision for the rule that a waiver requires the "undertaking" to be "explicitly stated." *Larsen Bev*erage, 250 P.3d at 85 (quoting *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983)). As an initial point, the term "undertaking" is not clear on its face, as it can just as readily be interpreted as the conduct being promised (e.g., "we hereby promise to pay the medical expenses"), as opposed to a specific reference to the statutory right being waived (e.g., "we hereby waive our immunity under the PREP Act"). Under the former conception of undertaking, the waiver would be *implied*, whereas under the latter conception, the waiver would be *express*.

More importantly, the Supreme Court in *Metropolitan Edison* (cited to in *Larsen Beverage*) specifically endorsed the viability of implied waivers. The Court stated that "there does not have to be an express waiver of statutory rights." *Metropolitan Edison*, 460 U.S. at 708 n.12. The Court supported this with a citation to *Teamsters v. Lucas Flour Co*., 369 U.S. 95 (1962), where the Court held that a collective bargaining agreement implicitly waived the right to strike by committing to resolve disputes through arbitration. Although the collective bargaining agreement did not specifically waive the statutory right to strike, the Court held it would "*do violence to accepted principles of traditional contract law*" to not find waiver since the plain meaning of the contract was inconsistent with any other interpretation. *Lucas Flour*, 369 U.S. at 105 (emphasis added). That is precisely the situation present with AstraZeneca's contract here.

The analysis in *Larsen Beverage* accords with the rule set forth by the Supreme Court. First, the Utah Court of Appeals determined that the contract at issue was not "inconsistent" with the statutory right. *Larsen Beverage*, 250 P.3d at 85 ("[W]e do not see that Larsen's responsibility

to pay medical expenses is necessarily inconsistent with its right to seek reimbursement for those expenses thereafter."). Here, by contrast, the contract is indisputably inconsistent with the right to immunity because, absent the contract, AstraZeneca would have no responsibility to pay the "costs of research injuries." Second, while *Larsen Beverage* considered whether the contract explicitly referenced the statute that provided the right (i.e., the right to reimbursement), it did not stop there. It alternatively looked to see if there was "a reference to the general concept" of reimbursement. *Id.* Because there was no reference to the general concept the court held there was no waiver. *Id.* Here, by contrast, the contract specifically addresses the concept that is the subject of the statutory right (i.e., compensation for injuries). Thus, assuming *arguendo* that the PREP Act even applies to contract claims (it does not), the analytical framework in *Larsen Beverage*[7] supports a finding of waiver under the circumstances here.

III.     **PLAINTIFF'S CASE IS NOT TIME-BARRED UNDER THE** *RELEVANT* **STATUTE OF LIMITATIONS (UTAH CODE § 78B-2-309(1)(b))**

   A.     **Under the Relevant Statute of Limitations, Plaintiff Had Six Years to File Her Claim**

In Utah, the statute of limitations that governs breach of *written* contract actions is Utah Code § 78B-2-309(1)(b). Under this statute, "[a]n action may be brought within six years: . . . upon any contract, obligation, or liability founded upon an instrument in writing." Utah Code § 78B-2-309(1)(b) (formerly Utah Code § 78-12-23(2)). The Utah Supreme Court has "set forth the test for determining whether the six-year period of section [78B-2-309(1)(B)] applies to a particular case."

---

[7] *Accord Medley*, 93 P.3d at 848-49 (finding that a divorce stipulation did not waive the right to future alimony because the terms of the stipulation were not inconsistent with the right, and there was neither an explicit reference to the statute nor "a clear reference to the concept of future alimony").

*Brigham Young Univ. v. Paulsen Constr. Co.*, 744 P.2d 1370, 1372 (Utah 1987) (citing *Bracklein v. Realty Insurance Co.*, 80 P.2d 471, 476 (1938)). The six-year statute of limitations applies "[i]f the fact of liability arises or is assumed or imposed from the instrument itself, or its recitals." *Id.* (citation omitted) (alteration in original). As the *Brigham Young* court explained, if a defendant owes no duty to the plaintiff "[a]bsent the contractual obligations," then the six-year statute of limitations applies. *Id.* at 1372; *see also Records v. Briggs*, 887 P.2d 864, 869 (Utah Ct. App. 1994) ("[I]f the cause of action arises from a breach of *a promise set forth in* the contract, the action is *ex contractu* . . . ." (citation omitted)).

Here, the six-year statute of limitations applies to Plaintiff's claims because "absent the contractual obligations" Plaintiff would have had no cause of action. Because of the PREP Act, Plaintiff's claim against AstraZeneca could *only* arise from AstraZeneca's breaches of its contractual promises, and not from socially imposed duties of tort law. *See DCR, Inc. v. Peak Alarm Co.*, 663 P.2d 433, 435 (Utah 1983) (explaining that "[c]ontract actions are created to protect the interest in having promises performed," whereas tort actions are created to uphold duties of conduct that "are imposed by law, and are based primarily upon social policy" (citation omitted)).

Finally, even if AstraZeneca did owe Plaintiff a duty under tort law, it is a "blackletter principle" that Plaintiff can "elect" to sue under the contract. *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 267 & n.2 (Utah 1995). In other words, if Plaintiff had an untimely tort claim, she would still have the right to sue for breach of contract within the six-year statute of limitations. *Id.* ("An act and its consequences may be both a tort and a breach of contract . . . . When this is so, the injured person, although barred by a statute from maintaining an action of tort may not be

barred from enforcing his contractual . . . right or vice versa." (quoting Restatement (Second) of Torts § 899, cmt. b (1979) (ellipses in original)).

**B.    AstraZeneca Fails to Cite or Acknowledge the Controlling Statute and Case Law, and Relies on Case Law Regarding Inapposite Breach of Warranty Claims**

In its motion, AstraZeneca does not cite, or acknowledge, Utah's statute of limitations for breaches of written contracts. AstraZeneca also does not cite the binding precedent from the Utah Supreme Court regarding this statute. Instead, AstraZeneca relies exclusively on the Utah Product Liability Act's statute of limitations (Utah Code § 78B-6-706), and the case law interpreting it.[8] Critically, none of the cases that AstraZeneca cites deal with breaches of *written contracts*. Rather, the cases it cites all deal with inapposite *breach of warranty* claims.

To appreciate the irrelevance of the case law that AstraZeneca cites, it is helpful to consider the Utah Supreme Court's discussion of the "slippery" and "blurred" distinction between breach of warranty claims and *tort* claims. *Davidson Lumber Sales, Inc. v. Bonneville Inv., Inc.*, 794 P.2d 11, 14 (Utah 1990); *see also Wheeler Mach. Co*., 2008 UT 84 ¶ 27. Unlike traditional breach of contract claims, breach of warranty claims (1) were specifically developed in the product liability context, (2) inherently involve the sale of defective goods, and (3) do not require a written contract—let alone privity—between the parties. *Davidson*, 794 P.2d at 14-15; *Wheeler Mach. Co*., 2008 UT 84 ¶¶ 25-27. Thus, whether characterized as a "contract" or a "tort," a breach of warranty claim is a natural and obvious fit for the product liability statute of limitations. This is

---

[8] *Utah Local Gov't Tr. v. Wheeler Mach. Co*., 2008 UT 84, 199 P.3d 949 (Utah 2008); *Mecham v. C.R. Bard, Inc*., No. 2:19-cv-00750-JNP, 2020 U.S. Dist. LEXIS 93671 (D. Utah May 27, 2020); *Strickland v. Gen. Motors Corp*., 852 F. Supp. 956 (D. Utah 1994).

*not* the case, however, with traditional breach of contract claims (such as the one here), which is why written contracts are governed by an entirely separate statute of limitations. *See Brigham Young*, 744 P.2d at 1372.

### C.    The Types of Damages that Plaintiff Seeks Have No Bearing on Whether the Cause of Action Sounds in Contract or Tort

AstraZeneca's contention that Plaintiff's cause of action sounds in tort because of the damages she is seeking is meritless. The cause of action must be judged according to the *elements of the claim*, not the damages being sought.[9] The one case that AstraZeneca cites to support its position does not actually do so. Dkt. 24 at 18 (citing *Records*, 887 P.2d at 868). The *Records* court noted in passing that the characterization of an action should consider "the true nature of the wrong and the injury." *Records*, 887 P.2d at 868. Injury and damages are not synonymous terms: the latter flows from the former, but not vice versa. In any event, neither *Records* nor any other case that AstraZeneca cites, modifies or abrogates the Utah Supreme Court's precedential standard for determining if the six-year statute of limitations for written contracts applies to a given case. *Brigham Young*, 744 P.2d at 1372. AstraZeneca's argument that Plaintiff's case is time-barred fails accordingly.

## IV.    PLAINTIFF HAS PLEADED A PLAUSIBLE CLAIM FOR BREACHES OF THE IMPLIED DUTY OF GOOD FAITH

Plaintiff has pleaded a plausible claim for breach of the implied duty of good faith, notwithstanding AstraZeneca's arguments to the contrary. Dkt. 24 at 15-16, 23-24. AstraZeneca's three arguments contradict longstanding law and are devoid of judicial precedent.

---

[9] Doctrinally, the determination as to which damages are permissible in a given case is properly done *after* the claim is characterized, not before. Plaintiff will thus separately address AstraZeneca's factual contentions regarding damages in the section on damages below.

### A.     The Waiver Analysis Has No Bearing on the Implied Duty of Good Faith

First, AstraZeneca argues that it is implausible for an implied duty of good faith to be read into a contractual obligation which waives statutory immunity. Dkt. 24 at 15-16. AstraZeneca offers no legal support for this proposition. Nor does AstraZeneca explain how this purported rule can square with Utah's longstanding rule that "every contract is subject to an implied covenant of good faith." *Brehany v. Nordstro, Inc.*, 812 P.2d 49, 55 (Utah 1991); *accord Vander Veur v. Groove Entm't Techs.*, 2019 UT 64, ¶ 9, 452 P.3d 1173 ("[A]ll contracts contain a covenant of good faith and fair dealing . . . ."). Instead, AstraZeneca argues that a company cannot plausibly waive immunity to an implied duty since a waiver requires an express intention, whereas an implied duty is, by definition, inferred. Dkt. 24 at 15-16. But this argument puts the cart before the horse. So long as the contractual obligation waives the immunity to an existing right, the ordinary rules of contract govern, including the implied duty of good faith. To throw out this cardinal rule would "do violence to accepted principles of traditional contract law," *Lucas Flour*, 369 U.S. at 105, with the only apparent "benefit" being that companies would be allowed to operate in bad faith. The Court should reject this misguided request.

### B.     Plaintiff Has Alleged Breaches of Duties That Come Squarely Within the Implied Covenant of Good Faith and Fair Dealing

Second, AstraZeneca summarily asserts that Plaintiff is claiming "an amorphous, unbounded right to recovery." Dkt. 24 at 24. This is not so. The Utah Supreme Court has explained that, in every contract, "each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract." *Vander Veur*, 2019 UT 64 ¶ 9 (citation omitted). In the context of insurance contracts, the Utah Supreme Court has held that "the implied obligation of good faith performance contemplates, at

the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will *fairly evaluate* the claim, and will thereafter *act promptly and reasonably* in rejecting or settling the claim." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985) (emphases added). The Utah Court of Appeals has imported this implied duty of insurers into contracts that, while not called insurance contracts or regulated as such, satisfy the definition of insurance.[10] *Pugh v. N. Am. Warranty Servs.*, 2000 UT App 121, ¶ 23, 1 P.3d 570 (applying the insurer's duty of good faith to a vehicle service contract and concluding "Defendant delayed unreasonably in both investigating the loss and in authorizing and paying for covered repairs when the need was established").

Here, whether one uses the general standard, *Vander Veur*, 452 P.3d at 1177, or the insurer standard, *Beck*, 701 P.2d at 801, Plaintiff has alleged conduct that plausibly shows breaches of the implied duty. This conduct includes AstraZeneca's "unconscionable delay" in responding to Plaintiff's numerous requests for coverage, and AstraZeneca's "paltry" offer of compensation which it conditioned on Plaintiff agreeing to waive her *right* to future recovery. *See* Dkt. 1 at ¶¶ 20-22, 138-140, 145-159, 188. This conduct destroyed, or at least injured, Plaintiff's right to receive the fruits of the contract because a right to coverage means little if the insuring party has no obligation to respond in a timely manner. The right means even less if the insuring party can condition its contractual *obligation* to pay for past expenses on the covered party foregoing its contractual *right* to recover for future expenses. Plaintiff has pleaded a plausible claim.

---

[10] As discussed below, AstraZeneca's contract qualifies as an insurance contract under the standard set forth in *Pugh*.

C.      **Plaintiff's Express and Implied Breach Claims Are Not Redundant**

Lastly, AstraZeneca argues that Plaintiff's implied duty claim should be dismissed on the grounds that it is "redundant" to the express breach claim. Dkt. 24 at 24. The only grounds that AstraZeneca cites for this contention is that Plaintiff purportedly "pleads the same economic and non-economic damages" for the two claims. *Id.* This is not so. While the Complaint does not allocate specific damages to specific breaches, the Complaint does not claim that the damages are identical across the two claims. Instead, the Complaint appropriately pleads that the damages for each claim will "be determined at trial." Dkt. 1 at ¶¶ 185, 190. Moreover, as a matter of law, there are some types of damages (e.g., attorney fees) that are only available for implied breaches, not express breaches. *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 25 & n.4, 133 P.3d 428. Thus, the damages for the two claims are not identical. But, even if they were, this is not a proper basis for *dismissing* a claim. Indeed, even if Plaintiff had not alleged *any* actual damages from the implied breach claim, dismissal would not be warranted because Plaintiff would still be entitled to nominal damages. *Terry*, 47 F. Supp. 3d at 1275.

V.      **THE GENERAL AND CONSEQUENTIAL DAMAGES PLAINTIFF SEEKS ARE ALL PROPERLY RECOVERABLE IN CONTRACT UNDER THE SPECIFIC CIRCUMSTANCES OF THIS CASE**

AstraZeneca asks this Court to strike all of Plaintiff's damages except for "out-of-pocket medical" expenses. Dkt. 24 at 19-23. AstraZeneca bases this request on a selective reading of the contract, and a misapplication of the law.

A.      **Plaintiff Is Entitled to Attorney Fees if She Prevails**

AstraZeneca argues that Plaintiff cannot be entitled to attorneys' fees because "[t]his is not an insurance case," but it makes no attempt to reconcile this conclusion with the holding in *Pugh*.

Dkt. 24 at 23. In *Pugh*, the Utah Court of Appeals held that a contract need *not* be called an insurance contract, nor be regulated as such, to permit recovery for attorneys' fees. 2001 UT App 121 ¶¶ 17, 21. Instead, a contract qualifies as an "insurance contract" if it meets the definition of insurance. *Id*. The two definitions of insurance that the *Pugh* court cited are: (A) "an arrangement, contract, or plan for the transfer of a risk or risks from one or more persons to one or more other persons"; and (B) "an agreement by which one party for a consideration promises to pay money or its equivalent or to do an act valuable to other party upon destruction, loss, or injury of something in which other party has an interest." *Id.* ¶ 15 (citing Utah Code Ann. § 31A-1-301(48)(a)(i) and Black's Law Dictionary 721 (5th ed. 1979)).

Under this standard, the Utah Court of Appeals held that a *vehicle service contract* qualified as an insurance contract because it met both definitions of insurance and "served the exact same purpose as an insurance contract." *Id.* ¶ 16. The court also observed that "[t]he policy concerns that led the Utah Supreme Court to allow for recovery of attorney fees applie[d] with equal vigor" to the vehicle service contract because "Pugh's vehicle was stranded in Cedar City for an entire year due to [defendant]'s refusal to pay for the necessary repairs. [Defendant]'s actions resulted in foreseeable and provable consequential damages to Pugh, including the attorney fees he had to incur in an ultimately successful effort to recover his due." *Id.* ¶ 21.

The same result attaches here. As with the contract in *Pugh*, AstraZeneca's promise to "cover the costs of research injuries" served "the exact same purpose as an insurance contract." Indeed, AstraZeneca even used the term "insurance policy" in the contract when discussing its promise to pay, stating that "Sponsor has an insurance policy to cover the costs of research injuries." Dkt. 1 at ¶ 9. Moreover, like the *Pugh* plaintiff's car being stranded for a year due to the

defendant's refusal to pay, Plaintiff here was in limbo for *years* waiting for a response to her requests, *id.* ¶¶ 107-59, and had to refinance her home in order to make ends meet in the interim, *id.* ¶ 110. As in *Pugh*, it was entirely foreseeable to AstraZeneca that the Plaintiff would need to incur attorneys' fees in order to recover her due under the contract.

Finally, as the *Pugh* court explained, the fact that an insurance contract is not regulated by the state "might *strengthen*, rather than weaken, the case for allowing attorney fees to be awarded as consequential damages." *Pugh,* 2001 UT App 121 ¶ 19 n.6 (emphasis added). This is because "[t]he Insurance Department has at its disposal a variety of measures for promoting good behavior by regulated insurers." *Id.* Accordingly, "[a]warding attorney fees as consequential damages for breach of an unregulated insurer's duties may be one of the few ways to get its attention and promote its good behavior." *Id.* Thus, as in *Pugh*, the fact that AstraZeneca's contract is not regulated by the Insurance Department weighs in favor, not against, permitting attorneys' fees for bad faith conduct.

### B.     The Plain Meaning of "Costs of Research Injuries" Is Expansive and Not Limited to Medical Expenses

AstraZeneca dubiously contends that the contract "cannot plausibly be read to include or provide for any economic damages beyond" medical treatment costs. Dkt. 24 at 20. According to AstraZeneca, "[n]othing in the contract contemplates AstraZeneca paying study participants compensation for lost income, loss of household services, costs of transportation, or childcare expenses." *Id.* AstraZeneca reaches this conclusion by limiting its evaluation to the provision where AstraZeneca promised to pay "the costs of medical treatment for research injuries." *Id.* This, however, is not the only provision in the contract where AstraZeneca promised to pay costs.

In a separate provision of the contract, *which AstraZeneca conspicuously fails to acknowledge*, AstraZeneca promised to "cover the costs of research injuries." Dkt. 1 at ¶ 56 (citing Dkt. 1-1 at 14). The plain meaning of the words "costs of research injuries" is very broad in scope and readily encompasses lost income, loss of household services, costs of transportation, and childcare expenses. Nor is there anything in the provision on medical expenses that abrogates or limits this broader promise to pay the "costs of research injuries."[11]

At a minimum, it is reasonable (i.e., plausible) to construe the term "costs of research injuries" as covering all costs, not just medical expenses, since that is the plain meaning. Even if this clause could also be reasonably read as being limited to medical expenses, an ambiguity would exist. *Brady v. Park*, 2019 UT 16, ¶ 54 n.40, 445 P.3d 395 ("A contract provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." (citation and internal quotation marks omitted)). It is a longstanding rule in Utah that ambiguities in insurance contracts are construed against the insurer and in favor of broader coverage for the insured. *Alf v. State Farm Fire & Casualty Co.*, 850 P.2d 1272, 1274 (Utah 1993) ("If a policy is ambiguous, doubt is resolved against the insurer."); *Poulsen v. Farmers Ins. Exch.*, 2016 UT App 170, ¶ 9, 382 P.3d 1058 ("Utah has a longstanding

---

[11] *See NOAA Md., LLC v. Adm'r of the GSA*, 997 F.3d 1159, 1166 (Fed. Cir. 2021) ("[T]he second sentence contains no 'notwithstanding the foregoing,' 'provided, however, that,' or similar language indicating that it is making an exception to, operating in even partial derogation of, or narrowing the coverage expressly specified in the immediately preceding sentence."); *cf. Morrison v. Lindsey Lawn & Garden, Inc.*, No. 13-1467, 2014 U.S. Dist. LEXIS 27146, at *16 (E.D. Pa. Mar. 4, 2014) ("The fact that the sentence immediately following focuses on a narrower set of current known or threatened liabilities . . . does not narrow the scope of the broad disclaimer in the preceding sentence.").

commitment to the principle that insurance policies should be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance." (cleaned up)). Accordingly, since AstraZeneca's contract qualifies as an insurance contract under *Pugh*, Plaintiff's plain language interpretation of "costs of research injuries" prevails as a matter of law.[12]

### C. The Contract Does Not Limit Medical Expenses to "Out of Pocket" Costs

AstraZeneca summarily asserts that the promise to "pay the costs of medical treatment" was only a promise to pay "out-of-pocket costs." Dkt. 24 at 20. However, the contract—drafted by a sophisticated company—does *not* use the term "out-of-pocket costs." Nor does AstraZeneca explain why the Court must re-write the contract to add in this post-hoc limitation. *Monaco Apartment Homes v. Figueroa*, 2021 UT App 50, ¶ 10, 489 P.3d 1132 ("The court will not rewrite a contract to supply terms which the parties omitted." (cleaned up)). Other insurers have made this same request, and courts across the country have routinely rejected it, as this Court should do as well. *See, e.g., Auto Club Prop. Cas. Ins. Co. v. Moser*, 874 S.E.2d 295, 303-05 (W. Va. 2022) (collecting cases).

Like AstraZeneca does here, insurers have argued that the promise to pay for "incurred" medical expenses must necessarily be interpreted as excluding expenses that have been paid under other insurance policies. But courts have soundly rejected this argument, holding that "an insurer

---

[12] Even if this were not an insurance contract under *Pugh* and the meaning of the term "costs of research injuries" was considered ambiguous (despite its plain meaning), the ambiguity would be for the jury, not the Court, to resolve, after due consideration of extrinsic evidence. *Brady*, 2019 UT 16 ¶ 56 & n.47. If the extrinsic evidence at trial fails to clarify the intent of the parties, the ambiguity would then be construed against the drafter (AstraZeneca) as a matter of law. *Home Sav. & Loan v. Aetna Cas. & Sur. Co.*, 817 P.2d 341, 347 (Utah Ct. App. 1991) ("Generally, ambiguous provisions will be construed against the drafter of the contract only if extrinsic evidence fails to clarify the intent of the parties.").

is liable to the insured for the entire expense under the medical payments provision, regardless of whether or how the medical expense was ultimately paid."[13] *Id.* at 303.

In so holding, courts have stressed that the insurer, as the drafter of the contract, had the ability to add in this limitation. If insurers choose not to do so, courts will not do so for them. *E.g.*, *Golchin v. Liberty Mut. Ins. Co.*, 993 N.E.2d 684, 689-90 (Mass. 2013) ("What is *not* present here is an exclusion from or limitation on MedPay coverage for medical expenses that are also covered under a separate health insurance policy. We interpret the absence of such a provision to mean, by implication, that the policy does not bar MedPay benefits in such a situation."); *Samsel v. Allstate Ins. Co.*, 59 P.3d 281, 290 (Ariz. 2002) ("Allstate could have, but did not, specifically provide for reduction of medical payments benefits by a coordination of benefits or other clause limiting medical payments coverage to expenses actually paid by an insured."); *Moorman v. Nationwide Mut. Inc. Co.*, 148 S.E.2d 874, 876 (Va. 1966) ("Had [the insurer] intended to limit or reduce the amount of its liability for medical payments . . . if other medical payments were available . . . from another source, it could easily have so provided. It cannot ask us to make a contract for the parties, which they did not make themselves.").

The case of *Guerrier v. Mid-Century Ins. Co.*, 663 N.W.2d 131 (Neb. 2003) is instructive. Similar to the contract here, the insurer promised that "[w]e will pay reasonable expenses for necessary medical services." *Guerrier*, 663 N.W.2d at 133. Based on this language, the insurer argued it had no obligation to pay for the plaintiff's medical expenses since they had already been

---

[13] While this rule may result in double recovery for the insured, this does not justify re-writing the contract as written. 6 J.E. Thomas & C.J. Robinette, New Appleman on Insurance Law § 64.04[2], at 64-57 (2012) ("Where the policy does not contain a nonduplication provision or set-off provision, courts and commentators conclude that a double recovery is permissible.").

covered by workers' compensation. The Nebraska Supreme Court disagreed. The court held that the provision was *unambiguous* in showing that the insurer was "obligated to pay the reasonable expenses of Guerrier, *regardless of whether those expenses have already been paid by another*." *Id.* at 135–36 (emphasis added). The same conclusion applies here.

AstraZeneca's fleeting argument on standing does not change this result. Dkt. 24 at 20. Indeed, courts have routinely allowed plaintiffs to recover for expenses paid by third party insurers, irrespective of whether said third party was in the case. *See e.g.*, *Samsel*, 59 P.3d 281; *Guerrier*, 663 N.W.2d 131. Thus, Plaintiff's right to medical expenses does not depend on subrogation.

### D.    Plaintiff Has Pleaded Plausible Grounds for Emotional Damages

Emotional damages are recoverable in "unusual" breach of contract cases such as the one at bar. *See Beck*, 701 P.2d at 802. The Utah Supreme Court has explained that where, as here, "the primary nature of the contractual obligations involves peculiarly personal interests, as opposed to pecuniary interests, emotional distress damages stemming from a breach of that contract may be warranted." *Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, ¶ 33, 424 P.3d 897. There are two factors that must be present for emotional damages to be recoverable. First, the contract must be of a "nature" where emotional damages were foreseeable. *Cabaness v. Thomas*, 2010 UT 23, ¶ 75, 232 P.3d 486. Second, the contract must have "specific language" that contemplates the availability of emotional damages. *Gregory*, 2018 UT 36 ¶ 29.

Here, the first factor is readily satisfied because the Utah Supreme Court has recognized that the purpose of insurance is "not only to provide funds in case of loss, but to provide *peace of mind* for the insured." *Cabaness*, 232 P.3d at 507 (emphasis added); *see also Gregory*, 2018 UT 36 ¶ 35 n.42 (same) (citation omitted). Moreover, the contract here is not merely insurance for

commercial real estate, but insurance for Plaintiff's well-being, including ensuring the privacy of her medical history, and ensuring compensation, in addition to medical treatment and/or a referral, if she suffers serious harm. Dkt. 1-1 at 10-20. The contract is thus deeply personal in nature, with a focus on protecting non-monetary interests. It was foreseeable that breaches of this contract could cause emotional harm, and thus the first factor is satisfied.

The second factor is also satisfied because the contract *explicitly* contemplates *damages* for "mental" and "emotional injury." Dkt. 1 at ¶ 173 (quoting Dkt. 1-1 at 14). This express contemplation of emotional damages makes the instant contract a more obvious fit for emotional damages than was the case in *Cabaness*. *See Gregory*, 2018 UT 36 ¶ 31 n.35 (discussing the lack of explicit contemplation of emotional *damages* in the *Cabaness* contract). The contract here is also distinguishable from the one in *Gregory*, as there the contract "[was] void of *any* language related to mental or emotional harm." *Id.* ¶ 35 (emphasis added). It is also distinguishable from the contract in *Ward v. McGarry*, 2022 UT App 62, ¶¶ 3, 10, 12, 511 P.3d 1213, where the court was confronted with *no written contract at all*.

Moreover, contrary to AstraZeneca's motion, the contract does not state that damages for mental and emotional damages are barred. Instead, the contract states that such damages "may" be barred, which, by implication, means that the claims may not be barred. *See* Dkt. 1-1 at 14. Further, the contract implies that the claim will only be barred "[i]f the order applies." *Id.* Thus, under the contract, such claims are not barred if the PREP Act does not apply.[14] This language is more than

---

[14] The contract's discussion of damages for emotional injury does *not* condition this recovery on physical harm resulting from the vaccine itself. Instead, the contract states that emotional damages "*may*" not be recoverable if the injury has a causal relationship with the vaccine. *See* Dkt. 1-1 at 13.

sufficient to satisfy the second factor, which only requires that emotional damages be "contemplated," not that they be guaranteed. *Gregory*, 2018 UT 36 ¶ 30.

Alternatively, if the Court were to find that the contract is ambiguous regarding emotional damages, dismissal would still be error. This is because the ambiguity would need to be construed against AstraZeneca as the insurer, *Poulsen*, 2016 UT App 170 ¶ 9, or, at a minimum, would present a question of fact for the jury to decide,[15] *Brady*, 2019 UT 16, ¶¶ 53, 56.

## <u>CONCLUSION</u>

AstraZeneca's motion asks for a sweeping suite of new and troubling law to relieve the company of contractual obligations that it voluntarily entered into. First, AstraZeneca asks for a grant of "complete immunity" for contractual violations under the PREP Act. Second, AstraZeneca asks that its clear and unmistakable promise to pay the costs of research injuries be written out of the contract by holding that waivers must be explicitly stated, notwithstanding U.S. and Utah Supreme Court precedent to the contrary. Third, AstraZeneca asks this Court to apply the Utah Product Liability Act's statute of limitations to a breach of *written* contract, notwithstanding additional precedent from the Utah Supreme Court to the contrary. Finally, AstraZeneca asks the Court to carve out an exception to the implied duty of good faith so that companies can operate in *bad faith* where, as here, they have waived a statutory right. The Court should deny each of these misguided requests and deny AstraZeneca's motion in its entirety.

Plaintiff requests oral argument on the motion.

---

[15] The jury would be able to consider extrinsic evidence, notwithstanding AstraZeneca's argument to the contrary. Dkt. 24 at 22 (citing *Gregory*, 2018 UT 36 ¶ 32). *Gregory* held that the trial court erred by considering extrinsic evidence because the contract in that case was *unambiguous*. 2018 UT 36 ¶ 35 n.43.

Dated this 26th day of July, 2024.

SIRI & GLIMSTAD LLP

By:     _/s/ Michael Connett_
Aaron Siri
Elizabeth A. Brehm
Michael Connett

MARSHALL OLSON & HULL, PC
Jason R. Hull
Anikka T. Hoidal

_Attorneys for Plaintiff_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of July, 2024, I caused the foregoing **PLAINTIFF'S OPPOSITION TO ASTRAZENECA'S MOTION TO DISMISS** to be filed via the court's CM/ECF system, which transmitted notice of such filing to all counsel of record.

<u>        /s/ Michael Connett        </u>

KAMIE F. BROWN (8520)
AARON C. HINTON (16840)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
P. O. Box 45385
Salt Lake City, UT 84145-0385
Tel: (801) 532-1500
Fax: (801) 532-7543
kbrown@rqn.com
ahinton@rqn.com

ARTHUR E. BROWN (*pro hac vice forthcoming*)
ALEXANDER COUSINS (*pro hac vice forthcoming*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000
arthur.brown@arnoldporter.com
alexander.cousins@arnoldporter.com

SAMUEL I. FERENC (*pro hac vice forthcoming*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Tel: (202) 942-5000
sam.ferenc@arnoldporter.com

*Attorneys for AstraZeneca AB and AstraZeneca Pharmaceuticals LP*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BRIANNE DRESSEN,<br><br>        Plaintiff,<br><br>   v.<br><br>ASTRAZENECA AB; ASTRAZENECA PHARMACEUTICALS LP; and VELOCITY CLINICAL RESEARCH, INC.,<br><br>        Defendants. | **ASTRAZENECA DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Case No. 2:24-cv-00337-RJS-CMR<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

# <u>TABLE OF CONTENTS</u>

I.    THE PREP ACT BARS PLAINTIFF'S CLAIMS. ................................................ 2

      A.    AstraZeneca Is Immune From This Action. ............................................... 2

      B.    AstraZeneca Did Not Waive Its Immunity. ............................................... 6

II.   PLAINTIFF'S CLAIMS ARE TIME-BARRED.................................................. 9

III.  ANY WAIVER OF ASTRAZENECA'S IMMUNITY IS LIMITED TO
      OUT-OF-POCKET COSTS FOR MEDICAL TREATMENT. ...................................... 12

      A.    At Most, Plaintiff Can Recover Out-Of-Pocket Costs for Medical Care. .............. 12

      B.    The ICF Is Not An Insurance Contract. ................................................ 15

IV.   PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF THE
      IMPLIED DUTY OF GOOD FAITH OR ATTORNEY FEES. ...................................... 17

V.    NONECONOMIC DAMAGES ARE CATEGORICALLY UNAVAILABLE.............. 18

1680578

**AA164**                              **AA164**                              **AA164**

## TABLE OF AUTHORITIES

**Cases**

*1143 Oakwood Village LLC v. Albertsons, Inc.*, 104 P.3d 1226 (Utah 2004) ............................. 17

*Airstar Corp. v. Keystone Aviation, LLC*, 514 P.3d 568 (Utah Ct. App. 2022) ........................... 17

*AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682 (9th Cir. 2022) ....................................... 3

*Am. Sav. & Loan Ass'n v. Blomquist*, 445 P.2d 1 (Utah 1968) .................................................... 6

*Beck v. Farmers Ins. Exch.*, 701 P.2d 795 (Utah 1985) ................................................................ 18

*Bennion v. Stolrow*, 550 P.3d 474 (Utah 2024) ........................................................................... 13

*Brigham Young Univ v. Paulsen Constr. Co.*, 744 P.2d 1370 (Utah 1987) ................................. 10

*Collier v. Heinz*, 827 P.2d 982 (Utah Ct. App. 1992) .................................................................. 18

*Dyno Nobel v. Steadfast Ins. Co.*, 85 F.4th 1018 (10th Cir. 2023) ............................................. 15

*Equine Holdings LLC v. Auburn Woods LLC*, 482 P.3d 880 (Utah Ct. App. 2021) ............... 7, 14

*Failor v. MegaDyne Med. Prods., Inc.*, 213 P.3d 899 (Utah Ct. App. 2009) ....................... 10, 11

*Fusion Diagnostic Laboratories, LLC v. Atila Biosystems, Inc.*, No. 2:24-cv-00184, 2024
    WL 3024915 (D.N.J. June 17, 2024) ................................................................................... 4

*Gardiner v. York*, 153 P.3d 791 (Utah Ct. App. 2006) ................................................................ 16

*Glen v. Reese*, 225 P.3d 185 (Utah 2009) .................................................................................... 14

*Gregory & Swapp, PLLC v. Kranendonk*, 424 P.3d 897 (Utah 2018) ................................... 18, 19

*Haro v. Kaiser Foundation Hospitals*, No. CV 20-6006, 2020 WL 5291014 (C.D. Cal.
    Sept. 3, 2020) ....................................................................................................................... 4

*Harris v. Albrecht*, 86 P.3d 728 (Utah 2004) ............................................................................... 15

*Hopman v. Sunrise Villa Culver City*, No. 20STCV25558, 2021 Cal. Super. LEXIS 2107
    (Cal. Super. Ct. Jan. 5, 2021) .............................................................................................. 3

*In re W. Ins. Co.*, 521 P.3d 851 (Utah 2022) ............................................................................... 14

*JENCO LC v. SJI LLC*, 541 P.3d 321 (Utah Ct. App. 2023) .............................................. 6, 7, 8, 9

*Keyfman v. West Hills Hosp.*, No. 23VECV03136, 2023 WL 11781969 (Cal. Super. Ct. Nov. 27, 2023) ......................................................................................................... 3

*Lewiston State Bank v. Greenline Equip., L.L.C.*, 147 P.3d 951 (Utah Ct. App. 2006) ............... 16

*Maney v. Brown*, 91 F.4th 1296 (9th Cir. 2024) .......................................................................... 3, 5

*McKitrick v. Gibson*, 541 P.3d 949 (Utah 2024) ........................................................................... 18

*Metro. Edison Co. v. NLRB*, 460 U.S. 693 (1983) .......................................................................... 6

*Moore v. Berg Enterprises, Inc.*, 201 F.3d 448 (10th Cir. 1999) .................................................. 12

*NetDictation LLC v. Rice*, 455 P.3d 625 (Utah Ct. App. 2019) .................................................... 14

*Padilla v. Brookfield Healthcare Ctr.*, No. 21-cv-2062, 2021 WL 1549689 (C.D. Cal. Apr. 19, 2021) ................................................................................................................... 4

*Perry v. Pioneer Wholesale Supply Co.*, 681 P.2d 214 (Utah 1984) ............................................ 11

*Pioneer Builders Co. of Nev. Inc. v. K D A Corp.*, 437 P.3d 539 (Utah Ct. App. 2018) ........ 6, 7, 9

*Politella v. Windham S.E. Sch. Dist.*, --- A.3d ---, 2024 WL 3545717 (Vt. July 26, 2024) ........... 2

*Pugh v. North American Warranty Services, Inc.*, 1 P.3d 570 (Utah Ct. App. 2000) ...... 15, 16, 18

*Reighard v. Yates*, 285 P.3d 1168 (Utah 2012) ............................................................................. 18

*Robinson v. Colo. State Lottery Div.*, 179 P.3d 998 (Colo. 2008) ................................................ 11

*Strickland v. Gen. Motors Corp.*, 852 F. Supp. 956 (D. Utah 1994) ............................................ 10

*Teamsters v. Lucas Flour Co.*, 369 U.S. 95 (1962) ........................................................................ 6

*Thatcher v. Lang*, 462 P.3d 397 (Utah Ct. App. 2020) .............................................................. 8, 13

*U.S. Fid. & Guar. Co. v. Sandt*, 854 P.2d 519 (Utah 1993) ......................................................... 15

*Utah Funeral Directors & Embalmers Ass'n v. Mem'l Gardens of the Valley, Inc.*, 408 P.2d 190 (Utah 1965) .............................................................................................................. 15

*Utah Local Government Trust v. Wheeler Machinery Co.*, 199 P.3d 949 (Utah 2008) ................ 9

*Veysey v. Veysey*, 339 P.3d 131 (Utah App. 2014) .................................................................. 11, 12

*Vigos v. Mountainland Builders, Inc.*, 993 P.2d 207 (Utah 2000) .............................................. 12

*W. Valley City v. Bret W. Rawson, P.C.*, 489 P.3d 191 (Utah 2021) ............................................. 14

*Ward v. McGarry*, 511 P.3d 1213 (Utah Ct. App. 2022) ............................................................ 19

*Webb v. R.O.A. Gen., Inc.*, 773 P.2d 834 (Utah Ct. App. 1989) ................................................. 6

*WorkCare, Inc. v. Plymouth Med., LLC*, No. 8:21-cv-00864, 2021 WL 4816631 (C.D. Cal. Aug. 20, 2021) ................................................................................................................. 4

**Statutes**

42 U.S.C. § 247d-6d(a)(1) ...................................................................................................... 1, 2, 3

42 U.S.C. § 247d-6d(a)(2)(B) ................................................................................................. 3, 8

Utah Code Ann. § 31A-21-313(1) ............................................................................................ 12

Utah Code Ann. § 78B-2-309(1)(b) ......................................................................................... 11

Utah Code Ann. § 78B-6-703(1) ......................................................................................... 10, 11

Utah Code Ann. § 78B-6-706 ................................................................................................... 9

**Other Authorities**

11 Jordan R. Plitt et al., *Couch on Insurance* § 158:10 (3d ed. June 2024 update) ..................... 16

Donald M. Carley, 6 *New Appleman on Insurance Law Library Edition* § 64.04[2] (2024) ....... 16

Plaintiff's brief in opposition ("Opp.") to AstraZeneca's Motion to Dismiss ("Br.") is a litany of misconstrued precedent, mischaracterizations of the Informed Consent Form ("ICF"), and misapprehensions of AstraZeneca's arguments. Plaintiff characterizes her claims as arising from an ordinary breach of contract dispute, but the Complaint makes clear that this is a quintessential product liability case that was filed too late. Plaintiff does not deny that she is alleging *personal injuries* resulting from administration of AstraZeneca's COVID-19 vaccine, nor does Plaintiff dispute that the Public Readiness and Emergency Preparedness Act ("PREP Act") immunizes AstraZeneca "from suit and liability under Federal and State law with respect to *all* claims" arising from "the administration to or the use by an individual of" its COVID-19 vaccine. 42 U.S.C. § 247d-6d(a)(1) (emphasis added). Plaintiff's claims fall squarely within the scope of AstraZeneca's PREP Act immunity and should be dismissed.

In an effort to salvage her case, Plaintiff attempts to rewrite the PREP Act's immunity provision to exclude all claims styled as breach of contract, even if they arise from the administration or use of a covered countermeasure. That argument contradicts the plain language of the statute. Indeed, Plaintiff relies solely on cases involving non-immunized commercial contract claims that did *not* arise from the "administration to or the use by an individual of a covered countermeasure," and thus fell outside the PREP Act for reasons that do not apply here. To support her argument that AstraZeneca *waived* its PREP Act immunity, Plaintiff strikingly ignores the recent, controlling Utah authority cited in AstraZeneca's motion, instead relying on outdated precedent. As for her attempt to avoid dismissal for untimeliness, Plaintiff does not seriously dispute that Utah courts classify causes of action by their substance, not their labels, and

1680578

**AA168**                          **AA168**                          **AA168**

that the Utah Product Liability Act's two-year statute of limitations applies to both tort and contract claims alleging injury from a defective product.

Plaintiff makes a host of other meritless arguments, including asserting that the ICF is an insurance contract, that an ICF provision that merely describes AstraZeneca's insurance policy somehow imposes sweeping obligations to pay her household expenses in perpetuity, and that she is entitled to recover costs for medical treatment that her insurer paid on her behalf. None of these claims creates any obstacle to dismissal. This is a straightforward case alleging personal injury from a COVID-19 vaccine, and it should accordingly be dismissed under the PREP Act—precisely the outcome Congress intended when it adopted the statute. The Court should reject Plaintiff's arguments in opposition and grant AstraZeneca's motion to dismiss.

## ARGUMENT

### I.     THE PREP ACT BARS PLAINTIFF'S CLAIMS.

#### A.     AstraZeneca Is Immune From This Action.

Plaintiff's claims are barred in full by the PREP Act. *See* Br. 9-12. Plaintiff does not dispute that the PREP Act immunizes AstraZeneca from claims of injury allegedly caused by its COVID-19 vaccine, though she misconstrues the statute and AstraZeneca's position. The text of the PREP Act is clear and unambiguous: "covered persons" like AstraZeneca are immune from suit and liability "with respect to *all claims for loss* caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure." 42 U.S.C. § 247d-6d(a)(1) (emphasis added); *see, e.g.*, *Politella v. Windham S.E. Sch. Dist.*, --- A.3d ---, 2024 WL 3545717, at *1 (Vt. July 26, 2024) (finding PREP Act immunizes school district from parents' claims arising from accidental administration of COVID vaccine to student). Plaintiff's claims

indisputably allege loss caused by administration of AstraZeneca's vaccine, so this case is barred under a straightforward application of the PREP Act. *See* Br. 12.

Plaintiff attempts to invent a bright-line rule that PREP Act immunity applies only to claims that sound in tort and does not extend to contract claims. Opp. 1-3. That is not the law. Courts have recognized that the immunity "covers claims for loss ***sounding in tort or contract***, as well as claims for loss relating to compliance with local, state, or federal laws, regulations, or other legal requirements." *Keyfman v. West Hills Hosp.*, No. 23VECV03136, 2023 WL 11781969, at *1 (Cal. Super. Ct. Nov. 27, 2023) (unpublished) (emphasis added); *see Hopman v. Sunrise Villa Culver City*, No. 20STCV25558, 2021 Cal. Super. LEXIS 2107, at *5 (Cal. Super. Ct. Jan. 5, 2021) (unpublished) (same); *see also, e.g.*, *Maney v. Brown*, 91 F.4th 1296, 1302 (9th Cir. 2024) ("The PREP Act covers 'all claims for loss' related to the administration or use of covered countermeasures. 'The use of "all" indicates a sweeping statutory reach.'" (quoting *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 690-91 (9th Cir. 2022))). That interpretation correctly adheres to the statute's immunity provisions, which draw no distinctions between types of claims.

Indeed, the PREP Act applies to "*all* claims for loss" that relate to "the administration to or the use by an individual of a covered countermeasure." 42 U.S.C. § 247d-6d(a)(1) (emphasis added); *see also id.* § 247d-6d(a)(2)(B). PREP Act immunity thus turns on the *source* of the alleged loss—*i.e.*, whether it relates to the administration or use of a covered countermeasure—not the pleading label chosen by the plaintiff. In the routine commercial cases that Plaintiff relies on, *see* Opp. 3, PREP Act immunity did not apply because the contractual claims at issue did *not* arise from the administration or use of a covered countermeasure. For example, in *Fusion Diagnostic Laboratories, LLC v. Atila Biosystems, Inc.*, No. 2:24-cv-00184, 2024 WL 3024915 (D.N.J. June

17, 2024) (unpublished), a clinical laboratory offering testing services sued a supplier of COVID test kits that were faulty. *See id.* at *1. The court rejected the defendant's invocation of the PREP Act because the plaintiff "d[id] not allege loss from the 'administration to or the use by an individual' of a covered countermeasure." *Id.* at *2. Instead, the plaintiff merely "sue[d] as a buyer seeking to hold the seller liable for the sale of allegedly defective Covid tests." *Id.* The PREP Act was therefore inapplicable. Contrary to Plaintiff's description, *Fusion Diagnostic* did not purport to construe the PREP Act as excluding immunity for *all* contract claims. *Contra* Opp. 4. The court's holding was narrow, stating only that "[n]othing in the language of the PREP Act suggests that a manufacturer is immune from suit brought by the buyer in a commercial breach of contract dispute over the quality of goods sold." 2024 WL 3024915, at *2.

So too with *WorkCare, Inc. v. Plymouth Med., LLC*, No. 8:21-cv-00864, 2021 WL 4816631 (C.D. Cal. Aug. 20, 2021) (unpublished), which like *Fusion Diagnostic* was a commercial action by a buyer of unusable COVID tests. *See id.* at *1. As in *Fusion Diagnostic*, the court denied the defendant immunity because "there has been no administration or use of covered countermeasures here." *Id.* at *5. The court noted in dicta that "[t]he PREP Act does not on its face provide immunity for state contract claims," but relied on unrelated case law addressing whether assisted living facilities can use the PREP Act to remove state-court actions alleging wrongful death from COVID. *See id.* (citing *Padilla v. Brookfield Healthcare Ctr.*, No. 21-cv-2062, 2021 WL 1549689, at *4 (C.D. Cal. Apr. 19, 2021)).[1] In the dispositive part of its analysis, the court explained that

---

[1] *Haro v. Kaiser Foundation Hospitals*, No. CV 20-6006, 2020 WL 5291014 (C.D. Cal. Sept. 3, 2020) (unpublished), involves the same unrelated issue concerning the "complete preemption" doctrine of removability, and has no bearing on the scope of PREP Act immunity for personal injury claims. *Contra* Opp. 3.

"[u]nder a common-sense reading of the statute, Defendant has not engaged in the 'administration' of covered countermeasures," and so "the PREP Act does not confer immunity on Defendant." *Id.*

Plaintiff would have the Court treat this case identically to these run-of-the-mill commercial disputes that plainly do not involve administration or use of a covered countermeasure, the trigger for immunity. In contrast to those cases, Plaintiff's complaint alleges claims for personal injury arising from administration of AstraZeneca's COVID-19 vaccine, Compl. ¶ 68, which fall squarely within the scope of PREP Act immunity. Plaintiff's contrary arguments conflict with the purpose of the statute, which Plaintiff agrees is "[t]o encourage the expeditious development and deployment of medical countermeasures during a public health emergency" by limiting liability for alleged injuries. Opp. 4 (quoting Br. 9); *see, e.g.*, *Maney*, 91 F.4th at 1298 ("Congress passed the PREP Act in 2005 to encourage during times of crisis the development and deployment of medical countermeasures (such as diagnostics, treatments, and vaccines) by limiting legal liability relating to their administration."). Withholding immunity from covered persons for any claims arising from administration or use of covered countermeasures would run directly counter to Congress's intent. It would also create precisely the disruption to the business environment that Plaintiff asserts would result from a mistaken interpretation of the PREP Act. Opp. 4-5. The Court should heed Plaintiff's warning, apply the PREP Act's immunity provisions as written, and dismiss this case with prejudice. *See* Br. 12.[2]

---

[2] Because this case falls squarely within the scope of the PREP Act, the Court need not assess the outer bounds of the immunity provision or evaluate the hypothetical scenarios Plaintiff lists. Opp. 4. Nor does the Court need to address the constitutional issue Plaintiff raises. Opp. 5 n.3. Whatever interaction PREP Act immunity may have with the Fifth Amendment's Takings Clause, it assuredly is irrelevant to Plaintiff's claims of personal injury.

### B.      AstraZeneca Did Not Waive Its Immunity.

Plaintiff's argument that AstraZeneca waived its PREP Act immunity misstates Utah law and misreads the ICF. At the outset, Plaintiff simply ignores governing Utah precedent setting a high bar for waiver of statutory rights. *See* Opp. 6-8. Utah courts require that "waiver of any statutorily guaranteed right must be *explicitly stated*, so that the parties' intent is *clear and unmistakable*," *JENCO LC v. SJI LLC*, 541 P.3d 321, 333 (Utah Ct. App. 2023) (quoting *Pioneer Builders Co. of Nev. Inc. v. K D A Corp.*, 437 P.3d 539, 542 (Utah Ct. App. 2018)) (emphases added). Courts "will not infer from a general contractual provision that the parties intended to waive" statutory rights, *id.* at 333 (quoting *Pioneer Builders*, 437 P.3d at 542), and "failure to reserve a statutorily protected right is not the equivalent of a waiver of that right," *Pioneer Builders*, 437 P.3d at 543.

Plaintiff inexplicably disregards these governing standards in favor of decades-old precedents that have long since been superseded. Opp. 9-11 (citing *Am. Sav. & Loan Ass'n v. Blomquist*, 445 P.2d 1 (Utah 1968); *Webb v. R.O.A. Gen., Inc.*, 773 P.2d 834 (Utah Ct. App. 1989); *Metro. Edison Co. v. NLRB*, 460 U.S. 693 (1983); *Teamsters v. Lucas Flour Co.*, 369 U.S. 95 (1962)). Applying black-letter common law is not an exercise in deriving some original intent of a doctrine; courts look to the most recent controlling precedent, which here forecloses Plaintiff's arguments for waiver.[3] Nothing in the ICF comes close to an "explicit[] state[ment]" of "clear and

---

[3] Plaintiff's waiver argument fails even under the historical standards she points to, derived from *Teamsters v. Lucas Flour Co.*, 369 U.S. 95 (1962). *See* Opp. 10. In *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693 (1983), the Supreme Court explained that an implied waiver was recognized in *Lucas Flour* "*only because of* the unique conjunction between" two bespoke clauses in a collective bargaining agreement. 460 U.S. at 708 n.12 (citing *Lucas Flour*, 369 U.S. at 105) (emphasis added). Other than that exceptional situation, "the waiver of a protected right must be expressed clearly and unmistakably" and "*explicitly* stated." *Id.* at 708 & n.12 (emphasis added).

unmistakable" intent to waive AstraZeneca's PREP Act immunity from suit and liability. *JENCO LC*, 541 P.3d at 333 (quoting *Pioneer Builders*, 437 P.3d at 542). The operative language of the ICF—stating that "Sponsor will pay the costs of medical treatment for research injuries, provided that the costs are reasonable, and you did not cause the injury yourself"—is a "general contractual provision" that cannot plausibly communicate an unmistakable "intention" to relinquish AstraZeneca's immunity, particularly since the very same page of the ICF expressly *acknowledges* AstraZeneca's immunity. *Id.*; *see* ICF at 13.

Even less reasonable is Plaintiff's claim that AstraZeneca intended to waive the PREP Act in stating that it "has an insurance policy to cover the costs of research injuries as long as you have followed your study doctor's instructions." Opp. 6-7 (quoting ICF at 13).[4] That sentence does not pledge or commit to any action at all, let alone clearly and unmistakably; it merely identifies the source of any compensation that may be provided. It is the very next sentence of the ICF—stating that "Sponsor will pay the costs of medical treatment for research injuries" under certain conditions—that defines the scope of compensation potentially available to participants who experience a research injury. ICF at 13. By reading the first sentence in isolation and insisting that it creates contractual obligations, Plaintiff impermissibly asks the Court to insert words into the ICF. *See, e.g.*, *Equine Holdings LLC v. Auburn Woods LLC*, 482 P.3d 880, 892 (Utah Ct. App. 2021) ("[C]ourts must attempt to construe the words chosen by the parties, and may not, as part of that exercise, make alterations that materially change the meaning of the instrument's text.").

---

[4] Plaintiff puzzlingly asserts that AstraZeneca's opening brief failed to acknowledge this provision, Opp. 9, but AstraZeneca quoted it in full, *see* Br. 6. For her part, Plaintiff's opposition only once includes the actual operative language in its entirety, *i.e.*, "Sponsor will pay the costs of medical treatment for research injuries, provided that the costs are reasonable and you did not cause the injury yourself." Opp. 7.

Furthermore, Plaintiff's interpretation fails to properly "examine the *entire* contract and *all* of its parts in relation to each other [to] give a reasonable construction of the contract as a whole." *Thatcher v. Lang*, 462 P.3d 397, 405 (Utah Ct. App. 2020) (citation omitted) (emphases added). Reviewing the ICF as a whole makes clear that the PREP Act is a statutory overlay that shapes the meaning of the agreement's "general contractual provision[s]," *JENCO LC*, 541 P.3d at 333, including the statement that AstraZeneca "will pay the costs of medical treatment for research injuries" in certain cases, ICF at 13. The ICF defines "research injuries" as (1) "[i]njuries that have been caused by the vaccine;" (2) injuries that have been caused by "tests"; and (3) injuries that have been caused by "procedures." *Id.* The PREP Act immunizes AstraZeneca from suit and liability for the first category, in which Plaintiff's alleged injury falls, but not necessarily for the remaining categories, which may or may not have "a causal relationship with the administration to or use by an individual of a covered countermeasure." 42 U.S.C. § 247d-6d(a)(2)(B). The ICF accordingly provides that the PREP Act "*may* limit" trial participants' "right to sue" for research injuries sustained in the trial, depending on the circumstances. ICF at 13 (emphasis added).

This plain interpretation of the ICF properly considers the agreement as a whole and harmonizes the provisions that address compensation for research injuries. *See Thatcher*, 462 P.3d at 405. Contrary to Plaintiff's contention, no language in the agreement, properly understood, is rendered "superfluous and meaningless." Opp. 9 n.6. Further, the ICF's extensive description of the PREP Act explicitly *reserves* AstraZeneca's right to immunity for claims arising from certain research injuries. *See* ICF at 13. The Court should not "infer from [the ICF's] general contractual provision[s] that the parties intended to waive" AstraZeneca's PREP Act immunity, particularly

when the ICF contains express language to the contrary. *JENCO LC*, 541 P.3d at 333 (quoting *Pioneer Builders*, 437 P.3d at 542).

## II.   PLAINTIFF'S CLAIMS ARE TIME-BARRED.

The Utah Product Liability Act's two-year statute of limitations applies to Plaintiff's complaint—and has long since expired. *See* Utah Code Ann. § 78B-6-706. Plaintiff insists that Utah's six-year period for breach of written contracts governs, but that is incorrect. Though styled as a contract case, Plaintiff's claims sound exclusively in product liability and are accordingly out of time.

Plaintiff does not dispute that the Utah Supreme Court held in *Utah Local Government Trust v. Wheeler Machinery Co.*, 199 P.3d 949 (Utah 2008), that "[t]he Utah Product Liability Act applies to actions, *in both tort and contract*, arising from injury caused by a defective product." *Id.* at 957 (emphasis added). While Plaintiff tries to avoid that pronouncement, the court's analysis of the Product Liability Act was clear and sweeping: "product liability encompasses *all actions* seeking money damages for injury to people or property resulting from defective products." *Id.* at 951 (discussing Utah Code Ann. § 78B-6-706) (emphasis added). That describes the allegations in this case precisely. The fact that Plaintiff styled her complaint as a contract action to plead around AstraZeneca's PREP Act immunity, *see* Compl. ¶¶ 32-34, is irrelevant.

Plaintiff also does not dispute that Utah courts take a holistic approach to determining "which of … two [statutes of limitations] provisions applies" to a plaintiff's claims. *Jensen v. Sawyers*, 130 P.3d 325, 333 (Utah 2005). The Utah Supreme Court "pay[s] little heed to the labels placed on a particular claim, favoring instead an evaluation based on the essence and substance of the claim." *Id.*; *see also Failor v. MegaDyne Med. Prods., Inc.*, 213 P.3d 899, 905 (Utah Ct. App.

2009) ("Utah courts look to the nature of the action and not the pleading labels chosen").[5] Plaintiff here seeks compensation for personal injuries allegedly caused by a defective pharmaceutical product. *See, e.g.*, Compl. ¶¶ 165-69, 174-77. Under *Wheeler Machinery*, that brings her complaint squarely within the Utah Product Liability Act's two-year statute of limitations. Plaintiff counters that she can "elect" to sue under the ICF rather than bring a tort action, Opp. 12-13, but that principle applies only when a plaintiff actually has viable tort and contract claims. Here, "look[ing] to the nature of the action and not the pleading labels chosen," Plaintiff has only a product liability claim, so there is nothing to elect. *Failor*, 213 P.3d at 905.

Plaintiff alternatively steers the Court toward inapplicable case law that sets out a test for distinguishing claims based on written contracts from actions for *injuries to property*. Opp. 11-12 (citing *Brigham Young Univ v. Paulsen Constr. Co.*, 744 P.2d 1370, 1372 (Utah 1987)). Plaintiff's claims here involve a written instrument, but a judicially created test cannot override the Product Liability Act, which expressly applies to "any action for damages for personal injury, death, or property damage allegedly caused by a defect in a product." Utah Code Ann. § 78B-6-703(1). That language unquestionably encompasses Plaintiff's claims. *See Strickland v. Gen. Motors Corp.*, 852 F. Supp. 956, 959 (D. Utah 1994) (explaining the text of the Product Liability Act indicates that "the Utah legislature … intended that all claims against a manufacturer, based on a defective product, be subject to [the Act's statute of limitations], regardless of the theory alleged"). Moreover, Utah courts hold that "[w]hen two statutes of limitations conflict, the statute applying to a specific type of action"—here, the Product Liability Act—"controls over a more general

---

[5] Plaintiff again fails to discuss this on-point case law—which AstraZeneca featured prominently in its brief, Br. 3, 17-18—in favor of passages from older authority that are stripped of context.

statute." *Veysey v. Veysey*, 339 P.3d 131, 133 (Utah App. 2014) (citing *Perry v. Pioneer Wholesale Supply Co.*, 681 P.2d 214, 216 (Utah 1984)). Plaintiff tellingly avoids addressing the Product Liability Act's text, to which she has no answer.

Plaintiff also challenges the notion that the type of damages she seeks bears on whether her claims sound in tort or contract. By its terms, the Utah Product Liability Act applies to "any action for *damages for personal injury* … allegedly caused by a defect in a product." Utah Code Ann. § 78B-6-703(1) (emphasis added). Plainly, the type of damages Plaintiff is pursuing is relevant to determining the "nature of the action." *Failor*, 213 P.3d at 905; *see also, e.g.*, *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1003 (Colo. 2008) (en banc) ("Although the nature of the relief requested is not dispositive on the question of whether a claim lies in tort, the relief requested informs our understanding of the nature of the injury and the duty allegedly breached."). Here, Plaintiff seeks to recover past and future "lost income," "loss of household services," "costs of transportation," and "[p]ast child care expenses," Compl. ¶ 169, as well as non-economic damages for emotional distress, *id.* ¶¶ 171-77. These are classic product liability damages. *See* Br. 18. Plaintiff alternatively asserts that the proper focus should be the "injury" she seeks rather than "damages," Opp. 14, but that test points to product liability as well. Plaintiff received AstraZeneca's vaccine through a process that involved a written ICF, but the injury she alleges is an adverse event resulting from administration of a pharmaceutical product—quintessential product liability harm. Compl. ¶¶ 32, 62-63. In "essence and substance," *Jensen*, 130 P.3d at 333, this is unquestionably a product liability case.

Plaintiff's assertion that she qualifies for the six-year statute of limitations under Utah Code Ann. § 78B-2-309(1)(b) also directly conflicts with her unsupported argument that the ICF "qualifies as an insurance contract." Opp. 16 n.10; *id.* at 17-19. The ICF is not an insurance policy,

*see* section III.B, *infra*, but even if it were, Plaintiff's claims would be subject to Utah's *three*-year statute of limitations "for actions based upon insurance contracts." *Moore v. Berg Enterprises, Inc.*, 201 F.3d 448 (10th Cir. 1999) (unpublished opinion) (citing Utah Code Ann. § 31A-21-313(1)); *see Veysey*, 339 P.3d at 133 (directing courts weighing conflicting statutes of limitations to use "the statute applying to a specific type of action" over the "more general statute"). Plaintiff's use of two fundamentally incompatible theories underscores that she lacks a coherent solution to the untimeliness of her claims.[6]

Finally, applying the Utah Product Liability Act statute of limitations here best comports with the Utah legislature's reasoned determination of the proper period for adjudicating claims of personal injury from defective products, which can require expert evidence of causation that becomes more difficult to obtain over time. *See Vigos v. Mountainland Builders, Inc.*, 993 P.2d 207, 213 (Utah 2000) ("Statutes of limitations are intended to prevent unfair dilatory litigation against a defendant and to *require that claims be litigated while proper investigation and preservation of evidence can occur.*" (emphasis added)). Allowing Plaintiff to proceed here, nearly *four years* after her alleged injury, would undermine the legislature's clear intent with respect to personal injury claims involving allegedly defective products.

### III.   ANY WAIVER OF ASTRAZENECA'S IMMUNITY IS LIMITED TO OUT-OF-POCKET COSTS FOR MEDICAL TREATMENT.

#### A.   At Most, Plaintiff Can Recover Out-Of-Pocket Costs for Medical Care.

Even if Plaintiff's claims were timely and not barred by the PREP Act, the Court should nonetheless dismiss Plaintiff's claims for all damages except reasonable out-of-pocket costs of

---

[6] AstraZeneca reserves the right to move for dismissal of Plaintiff's claims as untimely under the three-year limitations period for insurance contracts should the Court find the ICF qualifies as one.

medical treatment. *See* Br. 19-20. No other compensation is available under the operative language of the ICF, which states that AstraZeneca will pay "the costs of medical treatment for research injuries." ICF at 13. Plaintiff insists that the preceding sentence of the ICF—explaining that AstraZeneca "has an insurance policy to cover the costs of research injuries"—somehow entitles her to a far more expansive scope of damages. Opp. 19-21. That reading of the text is untenable. As described in section I.B, *supra*, the ICF's reference to AstraZeneca's insurance merely identifies the source of any compensation that may be provided under the agreement. The following sentence then specifies what compensation may be available: "the costs of medical treatment for research injuries." ICF at 13. That language clarifies the meaning of the previous sentence, dispelling any doubt about the meaning of "costs of research injuries"; they are "the costs of medical treatment" that a trial participant expends for treating such injuries. *Id.*

Plaintiff's contrary reading would render the second sentence of the paragraph superfluous and nonsensical. Plaintiff would have the Court find that AstraZeneca took on an immense commitment to pay for a vast range of long-term personal expenses—in a sentence that does not even state AstraZeneca "will" do anything—and then in the next sentence, made a redundant statement about its intention to pay for a narrow subset of those costs. Plaintiff claims that AstraZeneca's interpretation fails to give the first sentence meaning, Opp. 9, but it is her reading that impermissibly fails to "harmonize[] the provisions and avoid[] rendering any provision meaningless." *Bennion v. Stolrow*, 550 P.3d 474, 477 (Utah 2024) (citation omitted). The contradictions in Plaintiff's approach illustrate why contract language cannot be read in isolation, but must be considered in the context of the entire agreement. *See Thatcher*, 462 P.3d at 405.

Plaintiff alternatively claims that the ICF is ambiguous on the scope of available compensation, but that argument falls flat. "[A] provision of a contract is not rendered ambiguous by the bare existence of competing interpretations of it." *W. Valley City v. Bret W. Rawson, P.C.*, 489 P.3d 191, 197 (Utah 2021) (citation omitted); *see also*, *e.g.*, *NetDictation LLC v. Rice*, 455 P.3d 625, 631 (Utah Ct. App. 2019) ("A contract is not ambiguous 'simply because one party seeks to endow [terms] with a different interpretation according to his or her own interests.'" (citation omitted)). Rather, a contract or provision is ambiguous *only* if "it is capable of more than one *reasonable* interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *NetDictation LLC*, 455 P.3d at 631 (emphasis added) (quoting *Glen v. Reese*, 225 P.3d 185, 189 (Utah 2009)). Importantly, a party's proposed interpretation "may be 'ruled out' as unreasonable based on 'the natural meaning of the words in the contract provision in context of the contract as a whole.'" *W. Valley City*, 489 P.3d at 197 (citation omitted).

Plaintiff's reading of the ICF's compensation provisions is unreasonable on its face because it impermissibly inserts words that are absent in the first sentence, *see supra*, at 7 (citing *Equine Holdings LLC*, 482 P.3d at 892), and would deprive the second sentence of any meaning, as just noted. Plaintiff's reading thus must be "ruled out." *W. Valley City*, 489 P.3d at 197. Because there is no ambiguity for the Court to resolve, the Court should find as a matter of law that if AstraZeneca waived its PREP Act immunity in any way (it did not), the waiver is limited to Plaintiff's out-of-pocket costs of medical treatment for research injuries. *See In re W. Ins. Co.*, 521 P.3d 851, 858 (Utah 2022) ("If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." (citation omitted)).

### B.     The ICF Is Not An Insurance Contract.

Plaintiff's remaining arguments largely rely on the Court accepting the false premise that the ICF is an insurance contract. That claim fails from the start. Under Utah law, certain "elements [are] essential to an insurance contract": the agreement must identify "the types of risk [the insured] wants covered, the amount of the indemnity, the duration of coverage, [and] the premium." *Harris v. Albrecht*, 86 P.3d 728, 730-31 (Utah 2004) (citation omitted). *None* of those elements is present in the ICF, ruling out any argument that it qualifies as an insurance agreement. Even if some of those elements could be discerned in the ICF, there is indisputably nothing in the agreement that resembles an insurance premium. That element is essential because the central purpose of insurance is the distribution of risk among individuals paying premiums. *See Utah Funeral Directors & Embalmers Ass'n v. Mem'l Gardens of the Valley, Inc.*, 408 P.2d 190, 194-95 (Utah 1965). No such structure existed for the trial participants who signed the ICF. Nor was the ICF a policy "intended for sale to the public," another identifying feature of insurance agreements. *Dyno Nobel v. Steadfast Ins. Co.*, 85 F.4th 1018, 1026 (10th Cir. 2023) (quoting *U.S. Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 523 (Utah 1993)).

Sidestepping controlling case law, Plaintiff relies on the Utah Court of Appeals' decision in *Pugh v. North American Warranty Services, Inc.*, 1 P.3d 570 (Utah Ct. App. 2000), for its finding that certain contracts not styled as insurance policies nonetheless qualify as such under Utah law. *See* Opp. 17-18 (citing *Pugh*, 1 P.3d at 574-76). The agreement at issue in *Pugh* was a "service contract" that provided limited warranty coverage for a used vehicle in exchange for payment from the plaintiff. 1 P.3d at 572. Importantly, the parties agreed that "the *sole purpose* of the contract was to shift the risk of financial loss due to vehicle breakdown" from the buyer to the

warranty provider. *Id.* at 574 (emphasis added); *see also id.* (explaining the provider effectively "conceded" that "the contract served the exact same purpose as an insurance contract").

For these reasons, the agreement in *Pugh* was, in effect, an insurance contract, as subsequent courts have recognized. *See Gardiner v. York*, 153 P.3d 791, 793 (Utah Ct. App. 2006) (describing *Pugh* as "a breach of insurance contract case"); *see also Lewiston State Bank v. Greenline Equip., L.L.C.*, 147 P.3d 951, 956 (Utah Ct. App. 2006) (same). In sharp contrast to the vehicle warranty policy in *Pugh*, the "sole purpose" of the ICF here was not to shift risk for expected expenses, but rather to facilitate a clinical trial of a vaccine that would help liberate the world from the disruption and devastation of a once-in-a-century pandemic. The ICF's inclusion of additional provisions addressing compensation for any injured trial participants does not remotely render the agreement analogous to the service contract in *Pugh*.

That the ICF is not an insurance contract confirms that Plaintiff cannot interpret "costs of medical treatment" to allow for recovery of expenses paid by her health insurer. Opp. 21-23. The authorities plaintiff cites for that premise involve traditional insurance, and most concern medical payments provisions in automobile policies that cover "incurred" medical expenses, a term of art that the ICF does not use. *See* 11 Jordan R. Plitt et al., *Couch on Insurance* § 158:10 (3d ed. June 2024 update). That includes the insurance treatise Plaintiff cites for the principle that she can reasonably recover expenses she did not pay, which is plainly inapplicable here. *See* Opp. 22 n.13; Donald M. Carley, 6 *New Appleman on Insurance Law Library Edition* § 64.04[2] (2024) (newer edition of Plaintiff's cited treatise addressing a specific feature of uninsured motorist coverage that allows for double recovery in certain circumstances). Looking to the principles that actually govern the ICF, the compensation provision restricts payments to "costs of medical treatment for research

injuries, provided that the costs are *reasonable*." ICF at 13 (emphasis added). By any measure, it would not be reasonable for AstraZeneca to make payments to Plaintiff for medical expenses that have already been covered by her health insurer.[7]

## IV.   PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF THE IMPLIED DUTY OF GOOD FAITH OR ATTORNEY FEES.

The Court should dismiss Plaintiff's claim for breach of the implied duty of good faith, which is both barred by the PREP Act and meritless, as well as her request for attorney fees. *See* Br. 15, 17-19, 23-24. Plaintiff does not dispute that AstraZeneca is immune from implied covenant claims if it retains PREP Act immunity from her express breach claims. Instead, Plaintiff merely states that "the ordinary rules of contract govern, including the implied duty of good faith," as long as a contractual obligation "waives the immunity to an existing right." Opp. 15. AstraZeneca has *not* waived its immunity, *see* section I.B, *supra*, so Plaintiff's implied covenant claim is barred.

The claim also fails on the merits. The implied covenant doctrine "cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante," nor "create rights and duties inconsistent with express contractual terms," and courts "will not use [the] covenant to achieve an outcome in harmony with the court's sense of justice but inconsistent with the express terms of the applicable contract." *1143 Oakwood Village LLC v. Albertsons, Inc.*, 104 P.3d 1226, 1240 (Utah 2004) (citation omitted); *accord Airstar Corp. v. Keystone Aviation, LLC*, 514 P.3d 568, 581 (Utah Ct. App. 2022). In response, Plaintiff resorts to case law involving insurance bad faith. *See* Opp. 15-16 (citing *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah

---

[7] Plaintiff appears to have abandoned the Complaint's meritless subrogation-based request for double recovery. *Compare* Opp. 23 ("Plaintiff's right to medical expenses does not depend on subrogation") *with* Complaint ¶ 168 (stating Plaintiff is entitled to double recovery because her "insurer has a contractual right to subrogation for both past and future expenditures"); *see* Br. 18.

1985)). Because the ICF is not an insurance contract, *see* section III.B, *supra*, that authority is irrelevant and Plaintiff fails to state a plausible claim.

The same reasoning and authorities dispose of Plaintiff's request for attorney fees. As with her implied covenant claim, Plaintiff demands attorney fees based on case law involving insurance agreements. Opp. 17-19. Plaintiff offers no other basis for awarding fees, nor does any exist. "Attorney fees are generally recoverable in Utah only when authorized by statute or contract." *McKitrick v. Gibson*, 541 P.3d 949, 954 (Utah 2024) (quoting *Reighard v. Yates*, 285 P.3d 1168, 1182 (Utah 2012)). Utah courts emphasize that awarding of attorney fees is an "exception" with "narrow application to insurance contracts." *Pugh*, 1 P.3d at 576 n.7. "[A]n expansive view of the exception 'is not reasonable because it would eviscerate the general rule; attorney fees would be awarded virtually every time a party is found in breach of its contract.'" *Id.* (quoting *Collier v. Heinz*, 827 P.2d 982, 984 (Utah Ct. App. 1992)). This case offers no basis to depart from the general rule. The Court should hold that the ICF is not an insurance agreement and dismiss Plaintiff's implied covenant claim and demand for fees.

## V.     NONECONOMIC DAMAGES ARE CATEGORICALLY UNAVAILABLE.

Plaintiff is not entitled to noneconomic damages of any kind, and her contrary arguments again misconstrue governing law. Setting aside PREP Act immunity, damages for mental anguish are presumptively unrecoverable in breach of contract claims. *See Gregory & Swapp, PLLC v. Kranendonk*, 424 P.3d 897, 904 (Utah 2018). For such damages to be available, "[s]omething in the contract … must show that the parties contemplated granting relief for more than the typical mental anguish and discouragement that results from a breach of contract." *Id.* at 905. Specifically, a plaintiff must show that "at the time the parties formed the contract, they contemplated that

emotional distress damages *might flow from a breach of the contract*." *Ward v. McGarry*, 511 P.3d

1213, 1216 (Utah Ct. App. 2022) (emphasis added) (citing *Gregory & Swapp*, 424 P.3d at 897).

Plaintiff has not and cannot make that showing. Nothing in the ICF indicates that the parties

explicitly contemplated noneconomic damages for breach of the ICF. *See* Br. 22. Plaintiff resists

that clear conclusion by obscuring the controlling precedent and cherry-picking quotations to

develop a more favorable test that is not the law. Opp. 23-25. Plaintiff alternatively suggests that

the ICF is ambiguous with respect to noneconomic damages, but offers no reasonable alternative

interpretation of the agreement. *See* section III.A, *supra*. The Court should reject these arguments.

Plaintiff cannot state a claim for noneconomic damages, which in any event are barred by the

PREP Act.

<u>**CONCLUSION**</u>

For the reasons set forth above and in AstraZeneca's Motion, AstraZeneca respectfully

requests that this Court grant its Motion to Dismiss and dismiss Plaintiff's Complaint with

prejudice.

DATED this 16th day of August 2024.

RAY QUINNEY & NEBEKER P.C.

  /s/ Kamie F. Brown
Kamie F. Brown
Aaron C. Hinton

ARTHUR E. BROWN (*pro hac vice pending*)
ALEXANDER COUSINS (*pro hac vice pending*)
SAMUEL I. FERENC (*pro hac vice pending*)
**ARNOLD & PORTER KAYE SCHOLER LLP**

*Attorneys for AstraZeneca AB and AstraZeneca
    Pharmaceuticals LP*

Jason R. Hull [11202]
jhull@mohtrial.com
Anikka T. Hoidal [16489]
ahoidal@mohtrial.com
**MARSHALL OLSON & HULL, PC**
Newhouse Building
Ten Exchange Place, Suite 350
Salt Lake City, Utah 84111
Tel: (801) 456-7655

*Attorneys for Plaintiff*

*Admitted Pro Hac Vice*

Aaron Siri*
aaron@sirillp.com
Elizabeth A. Brehm*
ebrehm@sirillp.com
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Ste 500
New York, NY 10151
Tel: (888) 747-4529

Michael Connett*
mconnett@sirillp.com
**SIRI & GLIMSTAD LLP**
700 S. Flower St., Suite 1000
Los Angeles, CA 90017
Tel: (888) 747-4529

## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| BRIANNE DRESSEN,<br><br>      Plaintiff,<br><br>v.<br><br>ASTRAZENECA AB; ASTRAZENECA PHARMACEUTICALS LP; and VELOCITY CLINICAL RESEARCH, INC.,<br><br>      Defendants. | **PLAINTIFF'S SUR-REPLY TO ASTRAZENECA'S MOTION TO DISMISS**<br><br>Case No: 2-24-cv-00337-RJS-CMR<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

Pursuant to the parties' stipulation (ECF No. 43) and the Court's order (ECF No. 44),

Plaintiff hereby submits the following sur-reply to AstraZeneca's Motion to Dismiss.

## <u>TABLE OF CONTENTS</u>

I.    THE PREP ACT'S SCOPE OF IMMUNITY ...................................................... 1

  A.  AstraZeneca Fails to Explain How Lying Advances the Purpose of the PREP Act..... 1

  B.  AstraZeneca Fails to Provide a Valid Statutory Distinction Between
      "Run-of-the-Mill Commercial Disputes" and Its Own Breach Here........................... 1

II.   ASTRAZENECA WAIVED ANY IMMUNITY IT HAD ................................... 2

  A.  Utah Courts Do Not Require an Express Statement of Waiver .................................. 2

  B.  A Talismanic Waiver Rule Would Invite Rank Abuse and Gamesmanship ............... 4

  C.  AstraZeneca Continues to Give No Effect to Its Promise to Pay ................................. 5

III.  PLAINTIFF'S CLAIMS ARE NOT TIME-BARRED ....................................... 5

  A.  AstraZeneca Fails to Justify an Abrogation of Utah Code § 78-12-23(2) and the
      Utah Supreme Court's Interpretation Thereof ............................................................. 5

  B.  AstraZeneca Concedes that a Person with Viable Contract and Tort Claims Can
      Elect to File Either Cause of Action ............................................................................ 6

  C.  The Case Is Timely Under the Statute of Limitations for Insurance Contracts........... 7

IV.   PLAINTIFF HAS A VIABLE CLAIM FOR BREACH OF GOOD FAITH.................... 7

V.    ASTRAZENECA'S ATTEMPTS TO ESCAPE DAMAGES ARE UNAVAILING ........ 8

  A.  The Contract's Promise to Pay Provisions Are Not Limited to Medical Costs........... 8

  B.  AstraZeneca Misstates the Law on Attorney Fees ....................................................... 9

  C.  Medical Costs Are Not Limited to Out-of-Pocket Expenses..................................... 10

  D.  The Contract Expressly Contemplates Damages for Emotional Injury ..................... 10

AA188                             AA188                             AA188

## I.   THE PREP ACT'S SCOPE OF IMMUNITY

### A.  AstraZeneca Fails to Explain How Lying Advances the Purpose of the PREP Act

In its reply, AstraZeneca makes no attempt to explain how immunizing the act of lying advances the purposes of the PREP Act. How is it that allowing sophisticated pharmaceutical companies to make false promises to vulnerable and trusting clinical trial participants advances the purposes the PREP Act? AstraZeneca never answers this question because the answer is obvious, and fatal, to its position. *See Texas v. United States*, 292 U.S. 522, 534 (1934) ("The scope of the immunity must be measured by the purpose which Congress had in view . . . .").

### B.  AstraZeneca Fails to Provide a Valid Statutory Distinction Between "Run-of-the-Mill Commercial Disputes" and Its Own Breach Here

AstraZeneca tacitly concedes in its reply that the scope of immunity under the PREP Act has limits that are not expressly identified in the statute. Specifically, AstraZeneca concedes that the PREP Act does not immunize "run-of-the-mill commercial disputes," Reply at 5, despite the absence of said limitation on the scope of immunity in the statutory text, *see* 42 U.S.C. § 247d-6d(a)(2)(B) (defining the scope of immunity). The problem with AstraZeneca's argument is that, under the terms of the statute, there is no valid basis for distinguishing "run-of-the-mill commercial disputes" from the breach of contract at issue here.

AstraZeneca argues that its own breach is immunized because Plaintiff's claim of loss arises from "the administration" and/or "use" of a covered countermeasure, whereas commercial disputes do not. Reply at 3 (citing 42 U.S.C. § 247d-6d(a)(1)). However, immunity under the PREP Act is *not* limited to claims of loss arising from the "administration" or "use" of a covered countermeasure. As section 247d-6d(a)(2)(B) makes clear, immunity under the Act extends to all claims of loss causally related to, *inter alia*, the "clinical testing or investigation," "distribution,"

"marketing," "promotion," "purchase," and "sale" of covered countermeasures. AstraZeneca fails to apply its theory of immunity to the full reach of section 247d-6d(a)(2)(B). By failing to do so, AstraZeneca avoids grappling with the far-reaching implications that result from construing the PREP Act as immunizing contractual violations, including any contract for the "purchase" or "sale" of a Covid-19 vaccine.

If section 247d-6d(a)(2)(B) is interpreted as encompassing contract claims, the "run-of-the-mill commercial disputes" that AstraZeneca concedes are not immunized under the PREP Act will be immunized. Indeed, it is hard to conceive of a contract breach regarding Covid-19 vaccines that is not causally related to the "use," "distribution," "marketing," "promotion," "purchase," and/or "sale" of these products. AstraZeneca seeks to sidestep this serious problem by assuring the Court that it "need not assess the outer bounds of the immunity provision or evaluate the hypothetical scenarios Plaintiff lists." Reply at 5 n.2. But that would require ignoring reality, the plain text of the statute, and the implications of holding that terms of contracts cannot be enforced by the contracting parties. This would certainly unravel the PREP Act's purpose of encouraging the use, distribution, marketing, promotion, purchase and sale of these products during a public health emergency. Nobody, not in this case or in any other, should be able to use the PREP Act as a shield to lie to a contacting party about what they will do per the terms of a contract.

## II.    ASTRAZENECA WAIVED ANY IMMUNITY IT HAD

### A.  Utah Courts Do Not Require an Express Statement of Waiver

In its reply, AstraZeneca doubles down on its erroneous contention that a waiver requires an explicit assertion of waiver. Reply at 6. If AstraZeneca was correct, the waiver analysis would be a simple mechanical exercise of screening the contract to find language of express waiver (e.g., "we hereby waive X statutory right"). But neither of the cases that AstraZeneca cites in its reply

resort to such a simplistic, talismanic approach. *Id.* (citing *JENCO LC v. SJI LLC*, 541 P.3d 321, 333 (Utah Ct. App. 2023); *Pioneer Builders Co. of Nev. v. K D A Corp.*, 2018 UT App 206, 437 P.3d 539, 542 (Utah Ct. App. 2018)).

First, in *Pioneer Builders*, the court did not stop its analysis after finding no express assertion of waiver. 2018 UT App 206, ¶¶ 12–23. Instead, the court engaged in a detailed analysis of the contract to determine whether the contractual provisions were inconsistent with the statutory right. *Id.* ¶ 20 ("[N]ot only does the Agreement fail to explicitly state the parties' intent to waive the right of redemption, but its language is consistent with a contrary interpretation."). This is the same approach that the Utah Court of Appeals used in *Larsen Beverage*. *See* 2011 UT App 69, ¶ 10, 250 P.3d 82 ("[W]e do not see that Larsen's responsibility to pay medical expenses is necessarily inconsistent with its right to seek reimbursement for those expenses thereafter."). *Pioneer Builders* demonstrates that the waiver inquiry is *not* limited to a simple scan of the contract for language of express waiver. *Pioneer Builders* shows that the court will look to see if the contract can be harmonized with the statutory right – if it can be, no waiver will be found. If the contract *cannot* be harmonized with the statutory right, the court will find waiver because to hold otherwise would "do violence to accepted principles of traditional contract law." *See Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 105 (1962).

AstraZeneca fares no better with *JENCO*. As with the court in *Pioneer Builders*, the *JENCO* court did not limit its analysis to a simple mechanical search for an express assertion of waiver. Instead, the *JENCO* court also looked for whether a waiver could be "implied." 2023 UT App 151, ¶ 40 ("And no such waiver can be implied on the facts of this case."). The *JENCO* court's analysis is thus consistent with the rule that a waiver can be express *or* implied. *See Metropolitan*

*Edison Co. v. N.L.R.B.*, 460 U.S. 693, 708 n.12 (1983) ("[T]here does not have to be an express waiver of statutory rights."); *Am. Sav. & Loan Ass'n v. Blomquist*, 445 P.2d 1, 2 (Utah 1968) (stating that waivers "may be express or implied" (citation omitted)).

### B.  A Talismanic Waiver Rule Would Invite Rank Abuse and Gamesmanship

The talismanic approach that AstraZeneca asks this Court to adopt would invite rank gamesmanship and abuse, which may help explain why no court has adopted it. The rule would permit sophisticated parties to make promises to unsophisticated parties that the former knows are inconsistent with a statutory right, and thereby shield the sophisticated party from ever having to honor the illusory promise. The following hypothetical illustrates the point:

> An amusement park company promises attendees, in return for the price of admission, that it will pay the costs of any injuries that attendees suffer from riding on the park's roller coaster. Unbeknownst to most attendees, a statute exists that immunizes amusement parks from paying for any injuries caused by roller coasters. The contract does not reference nor explicitly waive the company's right under this statute. When one of the attendees is injured by the roller coaster, the company disavows responsibility for paying the costs because the contract's promise to pay did not specifically waive the company's right under the statute.

Under AstraZeneca's interpretation of waiver, the amusement park company would have no responsibility to pay the costs because the contract did not expressly waive the statutory right. But, thankfully, this is not Utah law. Instead, as the *Pioneer Builders*, *Larsen Beverage*, and *JENCO* cases demonstrate, Utah courts look to whether the promise is inconsistent with the statutory right. If the promise is inconsistent with the right, and the company has knowledge of said right, the company will be deemed to have waived it. *See* ECF No. 26 at 6. This is precisely what AstraZeneca has done here.

4

### C.  AstraZeneca Continues to Give No Effect to Its Promise to Pay

AstraZeneca's reply violates black letter law of contract interpretation by failing to give effect to the ICF's unequivocal promise to pay the costs of research injuries. Reply at 8; *see Thatcher v. Lang*, 2020 UT App 38, ¶ 31. According to AstraZeneca, its promise to pay for vaccine-induced injuries was simply an illusion—the company never actually meant it; just like the hypothetical amusement park company never meant to honor its promise. But however much AstraZeneca would prefer that the promise disappear, black letter law requires it be given effect.

AstraZeneca does not cure this problem by suggesting that its promise to pay for research injuries *might* be valid for injuries caused by "tests" and "procedures." Reply at 8 (stating that injuries from tests and procedures are "not necessarily" immunized under the PREP Act). First, there is no valid statutory basis under the PREP Act to distinguish research injuries caused by "tests" and "procedures" from those caused by vaccines, since all such injuries are causally related to "clinical testing or investigation" and thereby immunized. *See* 42 U.S.C. § 247d-6d(a)(2)(B). Second, even if there was a valid statutory distinction between these injuries (there is not), there is nothing in the plain language of the contract that would remotely justify this post-hoc differential treatment—particularly to the lay eyes of an unsophisticated clinical trial participant.

## III.   PLAINTIFF'S CLAIMS ARE NOT TIME-BARRED

### A.  AstraZeneca Fails to Justify an Abrogation of Utah Code § 78-12-23(2) and the Utah Supreme Court's Interpretation Thereof

AstraZeneca's reply fails to remedy the fatal flaws of its motion. First, AstraZeneca does not even attempt to justify its reliance on inapposite *breach of warranty* cases (i.e., claims that do not involve *written* contracts). Reply at 9–12. Second, AstraZeneca once again fails to cite a single case where the Product Liability Act was applied to a case where, as here, the liability arises from

a *written* contract. *Id.* Third, AstraZeneca offers an invalid basis for distinguishing Utah's six-year statute of limitations for *written* contracts (Utah Code § 78-12-23(2)) and the governing precedent regarding it. *Id.* at 10 (citing *Brigham Young Univ. v. Paulsen Constr. Co.*, 744 P.2d 1370, 1372 (Utah 1987)). AstraZeneca summarily asserts that the test set forth in *Brigham Young* is limited to distinguishing written contract claims "from actions for *injuries to property*." *Id.* There is nothing, however, in the *Brigham Young* test, nor in Utah Code § 78-12-23(2), that cabins the six-year statute of limitations to only those claims involving damage to property. The six-year statute of limitations applies, without limitation, "[i]f the fact of liability arises or is assumed or imposed from the instrument itself, or its recitals." *Brigham Young*, 744 P.2d at 1372 (citation omitted).

## B. AstraZeneca Concedes that a Person with Viable Contract and Tort Claims Can Elect to File Either Cause of Action

AstraZeneca concedes, as it must, that a person with "viable" contract and tort claims can elect to sue under the contract, with the statute of limitations for the contract claim thereby governing the case. Reply at 10; *see also Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 267 & n.2 (Utah 1995). While AstraZeneca summarily asserts that Plaintiff does not have a "viable" contract claim, it offers no valid basis for this assertion. Reply at 10. Importantly, AstraZeneca does not challenge any element of Plaintiff's contract claim (i.e., offer, acceptance, breach, and damages). *Id.* Instead, AstraZeneca resorts to a conclusory tautological assertion that Plaintiff's claim is really a product liability action.[1] *Id.* But even if Plaintiff could have filed this

---

[1] AstraZeneca makes this argument despite the fact that Plaintiff's complaint is devoid of any allegation that the vaccine was defective, a prerequisite element of a product liability claim. *See* Reply at 10 (quoting Utah Code § 78B-6-703(1) for the proposition that product liability claims involve injuries "allegedly caused by a defect in the product").

case as a product liability action, she was entitled to exercise her right to file it as a contract action

instead and AstraZeneca fails to offer any authority to the contrary.

The specificity test does not change this result. The specificity test applies when multiple

statutes of limitations apply to the same cause of action. *See, e.g.*, *Veysey v. Veysey*, 2014 UT App.

264, ¶¶ 8–15 (two statutes of limitation applied to same child support claim); *Perry v. Pioneer*

*Wholesale Supply Co*., 681 P.2d 214, 216 (Utah 1984) (two statutes of limitations potentially

applied to the same breach of warranty claim). Where, as here, the plaintiff elects a contract cause

of action instead of a product liability/tort cause of action, the specificity test no longer applies—

otherwise, the rule articulated in *Ward* would be a nullity. 907 P.2d at 267 & n.2.

### C.  The Case Is Timely Under the Statute of Limitations for Insurance Contracts

AstraZeneca suggests that Plaintiff's claims would be time-barred if the Court used the

statute of limitations for insurance contracts. Reply at 12 n.6 (citing Utah Code § 31A-21-313(1)).

This is not so. As the Utah Supreme Court has explained, the statute of limitations for breaches of

insurance contracts does not begin to run until the insurer refuses to reimburse the expenses. *Tucker*

*v. State Farm Mut. Auto. Ins. Co*., 2002 UT 54, ¶¶ 15–16. Here, AstraZeneca did not convey its

refusal to reimburse all of the expenses until, at the earliest, December 17, 2021. Complaint ¶¶

137–40. Plaintiff filed her Complaint less than three years from this date and, thus, her claim is

timely under Utah Code § 31A-21-313(1).

## IV.    PLAINTIFF HAS A VIABLE CLAIM FOR BREACH OF GOOD FAITH

AstraZeneca continues to dispute that it should have to operate in good faith when carrying

out its contractual obligation to pay the costs of research injuries under the ICF. Reply at 17.

Translated, AstraZeneca asks for a judicial blessing to carry out its contractual obligation in *bad*

*faith*. AstraZeneca does not explain how this unsavory rule coheres with the law of contracts, or any reasonable conception of sound public policy. The Court should reject it in kind.

Nor is there merit to AstraZeneca's argument that Plaintiff has not plausibly pled a violation of the implied duty of good faith. AstraZeneca bases this argument on the premise that Plaintiff relies solely on the duty of good faith that adheres to insurance contracts. Reply at 17–18. But Plaintiff cites and relies on *both* the *general* duty of good faith, as articulated in *Vander Veur v. Groove Entm't Techs.*, 2019 UT 64, ¶ 9, 452 P.3d 1173, as well as the duty that is specific to insurance contracts, as articulated in *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985). *See* ECF No. 26 at 15–16. As Plaintiff explained, "whether one uses the general standard . . ., or the insurer standard . . ., Plaintiff has alleged conduct that plausibly shows breaches of the implied duty." *Id.* at 16. AstraZeneca fails to offer any explanation as to why this is not so.

## V.   ASTRAZENECA'S ATTEMPTS TO ESCAPE DAMAGES ARE UNAVAILING

### A.  The Contract's Promise to Pay Provisions Are Not Limited to Medical Costs

The ICF has two promise-to-pay provisions: the first is a promise to pay the "costs of research injuries," the second is a promise to pay the "costs of medical treatment." ECF No. 1-1 at 14. In its reply, AstraZeneca contends that if the term "costs of research injuries" is construed as being broader than the term "costs of medical treatment," it will necessarily render the latter "superfluous and nonsensical." Reply at 13–14. This argument fails for multiple reasons.

First, the plain meaning of the term "costs of research injuries" *is* different, and *is* broader, than the term "costs of medical treatment." Had AstraZeneca, the (sophisticated) drafter of the ICF, intended for these terms to have the *same* meaning, it would not have used terms that have such obviously *different* meanings.

Second, the two promises identify different requirements for when AstraZeneca will cover the respective costs. Whereas costs of research injuries will be covered "as long as you have followed your study doctor's instructions," the costs of medical treatment will be covered if participants satisfy additional requirements, including that the costs be "reasonable."

Third, the two promises can be given effect without rendering either redundant. Specifically, the provision on medical costs can be plausibly read as an identification of a subcategory of costs for which AstraZeneca wished to impose additional conditions. This would be consistent with a reasonable apprehension that medical costs would likely be the main driver of costs, particularly if the company did not think study participants would be seriously injured. The fact that the Plaintiff *was* seriously injured and *has* incurred significant non-medical costs does not provide a basis for relieving AstraZeneca of the bargain it not only willingly entered but also drafted. *C.f. Oakwood Vill. Ltd. Liab. Co. v. Albertsons, Inc*., 2004 UT 101, ¶ 53, 104 P.3d 1226 (declining to intervene to protect a party from the losses of a bad bargain after "unpredictable market forces . . . render[ed] the contractual terms unfavorable to themselves").

**B.  AstraZeneca Misstates the Law on Attorney Fees**

AstraZeneca seeks to evade *Pugh v. North American Warranty Services*, *Inc.*, 2000 UT App 121, 1 P.3d 570, by adding requirements that are nowhere to be found in the holding of that case. The *Pugh* court set forth a standard for what qualifies as a "contract of insurance *for purposes of awarding attorney fees*." *Id.* ¶ 21 (emphasis added). This standard did not include the elements of insurance contracts that AstraZeneca claims are "essential." Reply at 15. Nor did *Pugh* hold that the contract must have insurance as its "sole purpose." While the vehicle service contract at issue in *Pugh* did have this feature, the definition of insurance that the court used did not identify this as a necessary element. Instead, the court focused on whether the contract transfers the risk of future

expenses from one party to the other. *Id.* That is plainly the case here, with the ICF even calling it an "insurance policy." AstraZeneca's arguments to the contrary are meritless.

### C.  Medical Costs Are Not Limited to Out-of-Pocket Expenses

AstraZeneca is incorrect that the interpretation of contractual promises to pay medical expenses turns on the word "incurred." Reply at 16. Indeed, one of the main cases that Plaintiff cited deals with a contract that does not use the word "incurred," yet the court reached the same conclusion: i.e., a promise to pay medical costs extends, unless otherwise stated, to both insured and uninsured costs. *See Guerrier v. Mid-Century Ins. Co.*, 266 Neb. 150, 152 (2003). This plain meaning interpretation extends to any contract, not just insurance contracts. Further, contrary to AstraZeneca's contention (Reply at 17 n.7), Plaintiff has not "abandoned" her allegation that subrogation provides a separate basis for recovering insured expenses (i.e., recovery for "out-of-pocket" exposes would be purely illusory if insured expenses are not also covered).

### D.  The Contract Expressly Contemplates Damages for Emotional Injury

AstraZeneca summarily asserts that "[n]othing in the ICF indicates that the parties explicitly contemplated noneconomic damages for breaches of the ICF." Reply at 19. But that is belied by the words of the contract, which specifically references the potential for "emotional injury." ECF No. 1-1 at 14. Importantly, the contract does *not* limit this potential for emotional injury to adverse reactions from the vaccine. Given the highly personal nature of this contract (i.e., study participants were putting their health on the line in exchange for AstraZeneca promising to insure them against the risk of financial loss if the experimental treatment injured them), the contract's express reference to damages for emotional injury is sufficient to satisfy the "contemplation" standard. *See Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, ¶ 30, 424 P.3d 897, 906.

Dated this 6th day of September, 2024.

**SIRI & GLIMSTAD LLP**

By:   *Michael Connett*
Aaron Siri*
Elizabeth A. Brehm*
Michael Connett*

*\*Admitted Pro Hac Vice*

**MARSHALL OLSON & HULL, PC**

Jason R. Hull
Anikka T. Hoidal

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of September, 2024, I caused the foregoing

**PLAINTIFF'S SUR-REPLY TO ASTRAZENECA'S MOTION TO DISMISS** to be filed via

the court's CM/ECF system, which transmitted notice of such filing to all counsel of record.

*/s/ Michael Connett*

KAMIE F. BROWN (8520)
AARON C. HINTON (16840)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
P. O. Box 45385
Salt Lake City, UT 84145-0385
Tel: (801) 532-1500
Fax: (801) 532-7543
kbrown@rqn.com
ahinton@rqn.com

ARTHUR E. BROWN (*pro hac vice*)
ALEXANDER COUSINS (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000
arthur.brown@arnoldporter.com
alexander.cousins@arnoldporter.com

SAMUEL I. FERENC (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Tel: (202) 942-5000
sam.ferenc@arnoldporter.com

*Attorneys for AstraZeneca AB and AstraZeneca Pharmaceuticals LP*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BRIANNE DRESSEN,<br><br>       Plaintiff,<br><br>   v.<br><br>ASTRAZENECA AB; ASTRAZENECA PHARMACEUTICALS LP; and VELOCITY CLINICAL RESEARCH, INC.,<br><br>       Defendants. | **ASTRAZENECA DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**<br><br>Case No. 2:24-cv-00337-RJS-CMR<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

Pursuant to DUCivR 7-1(c), Defendants AstraZeneca AB and AstraZeneca LP (collectively, "AstraZeneca") submit this Notice of Supplemental Authority to notify the Court of a significant authority pertinent to AstraZeneca's pending Motion to Dismiss (Dkt. No. 24). The supplemental authority, *Redd v. Amazon.com, Inc.*, No. 20 C 6485, 2024 WL 2831463 (N.D. Ill. June 4, 2024), attached as Exhibit A, is pertinent to substantive issues raised at pages 9-12 of AstraZeneca's Motion (Dkt. No. 24), pages 2-5 of Plaintiff's Opposition (Dkt. No. 26), pages 2-5 of AstraZeneca's Reply (Dkt. No. 38), and pages 1-2 of Plaintiff's Sur-Reply (Dkt. No. 45).

In *Redd*, the U.S. District Court for the Northern District of Illinois held that the plaintiff's claims under the Illinois Biometric Information Privacy Act were barred by the Public Readiness and Emergency Preparedness Act (the "PREP Act"). *Redd*, 2024 WL 2831463, at *6. In opposing summary judgment, the plaintiff argued that PREP Act "immunity applies only to 'certain tort claims.'" *Id.* at *2. The court rejected that argument, reasoning that "[t]he starting and ending point" for interpreting the PREP Act is its "plain language," and concluding that "[n]othing in the Act limits the scope of its immunity to 'certain tort claims' or excludes claims for 'statutory violations.'" *Id.* at *3. The court also concluded that the "broader statutory context" – the PREP Act's "sole exception" for willful misconduct claims – confirmed the court's interpretation that the PREP Act "provided [the defendants] immunity from suit and liability for [plaintiff's] statutory claims." *Id.*

The discussion of the scope of PREP Act immunity in the *Redd* decision is highly relevant to AstraZeneca's pending Motion to Dismiss because: (1) AstraZeneca has moved to dismiss Plaintiff's claims under the PREP Act; and (2) the parties dispute the scope of the PREP Act's immunity and its applicability to Plaintiff's claims.

DATED this 10th day of October 2024.

RAY QUINNEY & NEBEKER P.C.


/s/ Kamie F. Brown
Kamie F. Brown
Aaron C. Hinton

Arthur E. Brown (*pro hac vice*)
Alexander Cousins (*pro hac vice*)
Samuel I. Ferenc (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**

*Attorneys for AstraZeneca AB and*
*AstraZeneca Pharmaceuticals LP*

# EXHIBIT A

Redd v. Amazon.com, Inc., Slip Copy (2024)

Med & Med GD (CCH) P 308,105

2024 WL 2831463

United States District Court, N.D. Illinois, Eastern Division.

Cynthia REDD, individually and on behalf
of all others similarly situated, Plaintiff,

v.

AMAZON.COM, INC. and
Amazon.com LLC, Defendants.

Case No. 20 C 6485
|
Signed June 4, 2024

**Attorneys and Law Firms**

Ryan F. Stephan, Stephan Zouras, LLP, Chicago, IL, for Plaintiff.

Ryan Spear, Perkins Coie LLP, Seattle, IL, Susan Donnelly Fahringer, Erin Kathleen Earl, Perkins Coie LLP, Seattle, WA, Debra Rae Bernard, Kathleen A. Stetsko, Perkins Coie LLP, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

Sunil R. Harjani, United States District Judge

 *1 Cynthia Redd, an Illinois resident, works for Amazon.com Services LLC. Redd claims that Amazon.com, Inc. and Amazon.com Services LLC (formerly known as "Amazon.com LLC") (collectively, "Amazon")[1] violated various requirements of the Illinois' Biometric Information Privacy Act (the "BIPA"), 740 ILCS 14/1 *et seq.*, when it collected her biometric identifiers and biometric information (collectively, "biometric data") while using thermal cameras to conduct temperature checks during the COVID-19 pandemic. Redd has sued on behalf of herself and a putative class of similarly situated individuals who allegedly had their biometric data collected by Amazon without first complying with the requirements of Sections 15(a), 15(b), and 15(d) of the BIPA. Now before the Court is Amazon's motion for summary judgment with respect to all claims asserted by Redd in her individual capacity. Amazon seeks summary judgment, based on, among other things, statutory immunity under the Public Readiness and Emergency Preparedness Act (the "PREP Act" or "the Act"), a statute which protects persons who administer pandemic countermeasures from liability. Under the PREP Act, Amazon contends, Redd's

claims for violations of the BIPA are "claims for loss" and are causally related to Amazon's use of the thermal cameras. The plain text of the PREP Act definitely resolves these issues in Amazon's favor. Accordingly, Amazon's motion [84] is granted.

## BACKGROUND[2]

"Congress enacted the PREP Act in 2005 to encourage the expeditious development and deployment of medical countermeasures during a public health emergency by allowing the HHS Secretary to limit legal liability for losses relating to the administration of medical countermeasures such as diagnostics, treatments, and vaccines." *Cannon v. Watermark Retirement Communities, Inc.*, 45 F.4th 137, 139 (D.C. Cir. 2022) (internal quotes and citation omitted). The PREP Act grants immunity "from suit and liability under Federal and State law" for "all claims for loss" stemming from the administration or use of a "covered countermeasure." 42 U.S.C. § 247d-6d(a)(1). "The immunity is triggered by a declaration from the Secretary identifying the threat to public health, the period during which immunity is in effect, and other particulars." *Cannon*, 45 F.4th at 139; 42 U.S.C. § 247d-6d(b)(1).

On March 17, 2020, the Secretary of Health and Human Services ("Secretary") declared that "COVID-19 constitutes a public health emergency" under the PREP Act. 85 Fed. Reg. 15,19801, 2020 WL 1245193 (Mar. 17, 2020).[3] PRDSOF ¶ 19.[4] Following the Secretary's declaration, Amazon used thermal cameras to screen employees' temperatures who worked in some of its warehouse facilities, including in Illinois. *Id.* at ¶ 24. Using thermal cameras in high-traffic warehouses allowed Amazon to check employees' temperatures and thereby reduce the risk of COVID-19 transmission.[5] *Id.* at ¶¶ 25, 27. One of the warehouses at which Amazon used thermal cameras to screen employees' temperatures was its MDW7 facility in Monee, Illinois. *Id.* at ¶ 29. Amazon used thermal cameras to screen employees' temperatures at MDW7 from about April or May of 2020 to about August 2021. *Id.* at ¶ 30. Amazon purchased the cameras used at MDW7 from non-party Infrared Cameras, Inc. ("ICI"). *Id.* at ¶ 35. The ICI camera systems were positioned near the entrance of MDW7 so that Amazon could check employees' temperatures as they arrived for work each day. *Id.* at ¶ 43.

Case 2:24-cv-00337-RJS-CMR  Document 46-1  Filed 10/10/24  PageID.319  Page 3 of 8

**\*2**  Redd is an employee who had her temperature checked by those cameras. Redd worked at Amazon's MDW7 facility from about October 2020 to about March 2022. PRDSOF ¶ 31. Redd transferred to Amazon's MDW2 facility in March 2022, where she currently works. *Id.* at ¶ 33. Amazon has not used thermal cameras to screen employees' temperatures at MDW2 during the time Redd has worked at MDW2. *Id.* at ¶ 34. Moreover, Amazon no longer uses any thermal cameras, including the ICI camera systems, to screen employees' temperatures at any Amazon facilities, including MDW7 and MDW2. *Id.* at ¶ 67.

Redd claims that Amazon used the thermal camera to check her temperature and collect her biometric identifiers (*i.e.*, scans of facial geometry) and biometric information multiple times while she worked at MDW7 without her knowledge or consent. PRDSOF ¶ 32. She alleges Amazon not only collected and stored her biometric data, but it also subsequently disclosed that data "to other Amazon entities, to the third-party biometric device and software vendor(s), and to other, currently unknown, third parties, which, inter alia, host and/or analyze the biometric data." Doc. 55, Second Am. Compl. ("SAC") ¶ 34. Based on those allegations, Redd asserts three BIPA claims. First, she alleges that Amazon violated Section 15(b) of BIPA by collecting her biometric data without first providing the notice and obtaining the consent required by Section 15(b). *See* 740 ILCS § 14/15(b); *see also* SAC ¶¶ 78-86. Second, she alleges that Amazon violated Section 15(a) by possessing her biometric data without adopting a "written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying" that data. *See* 740 ILCS § 14/15(a); *see also* SAC ¶¶ 70-77. Third, she alleges that Amazon violated Section 15(d) by disclosing her biometric data without her consent. *See* 740 ILCS § 14/15(d); *see also* SAC ¶¶ 87-94.

## ANALYSIS

Amazon contends that summary judgment in its favor is warranted on three independent grounds: (1) the PREP Act immunizes Amazon against Redd's claims, or, alternatively, the PREP Act preempts BIPA in this context; (2) Redd has presented no evidence that would allow a reasonable jury to find that Amazon violated BIPA; and (3) Redd is not entitled to any of the forms of relief authorized by BIPA. Because the Court concludes that the PREP Act applies and shields

Amazon from suit and liability, it declines to reach Amazon's other arguments.

The PREP Act's immunity provision states:

> Subject to the other provisions of this section, a covered person *shall* be immune from suit and liability under Federal and *State law* with respect to *all* claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure ....

42 U.S.C. § 247d-6d(a)(1) (emphasis added). *Loss* means "any type of loss." *Id.* § 247d-6d(a)(2)(A) (emphasis added). The "scope" of immunity "applies to *any* claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the ... administration ... or use of such countermeasure. *Id.* § 247d-6d(a)(2)(B) (emphasis added).

A suit for damages and injunctive and declaratory relief brought under the BIPA is a suit under state law. Moreover, there is no dispute that Amazon is a "[c]overed person" under the PREP Act, 42 U.S.C. § 247d-6d(i)(2) or that the administration of the temperature screenings to Redd is a "[c]overed countermeasure" under the PREP Act, *id.* at § 247d-6d(i)(1). *See* Doc. 85 at 7-9; Doc. 96 at 6-10. All that Redd contests is whether her BIPA claims assert "claims for loss" under the PREP Act and her loss was causally related to that covered countermeasure. More specifically, as to the first issue, Redd argues that her BIPA claims fall outside the scope of PREP Act immunity because the immunity applies only to "certain tort claims," not claims under the BIPA for statutory violations, and only if those claims result in one of the specific types of loss listed in Section 247d-6d(a)(2)(A) of the Act. The Court disagrees.

**\*3**  The starting and ending point of the Court's analysis is the plain language of the PREP Act. *In re Algozine Masonry Restoration, Inc.*, 5 F.4th 827, 828 (7th Cir. 2021) ("When interpreting a statute, we look first to the statutory language. When the language is plain[,] we enforce it without further

ado."); *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 674, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end."). The PREP Act's text makes clear that Redd's suit is a "claim[ ] for loss" within the plain language of the Act. The Court reaches this conclusion after examining the plain language of 42 U.S.C. § 247d-6d(a)(1) and § 247d-6d(a)(2)(B). First, the PREP Act "covers 'all claims for loss' related to the administration or use of covered countermeasures. The use of 'all' indicates a sweeping statutory reach." *Maney v. Brown*, 91 F.4th 1296, 1302 (9th Cir. 2024) (certain internal quotes and citation omitted); 42 U.S.C. § 247d-6d(a)(1). Second, the scope of the immunity is broad as it expressly "applies to *any* claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the ... administration ... or use of such countermeasure." 42 U.S.C. § 247d-6d(a)(2)(B) (emphasis added). Nothing in the Act limits the scope of its immunity to "certain tort claims" or excludes claims for "statutory violations."

The broader statutory context confirms the Court's interpretation that the Act provides Amazon immunity from suit and liability for Redd's BIPA claims. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. ——, 139 S. Ct. 1743, 1748, 204 L.Ed.2d 34 (2019) (quoting *Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891, (1989)); *see also Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455, 142 S.Ct. 1783, 213 L.Ed.2d 27 (2022) (words must be "interpreted in their context, not in isolation") (internal quotes and citation omitted). The PREP Act includes one exception to its grant of immunity for covered countermeasures administered by covered persons. The "sole exception" to the immunity granted under the PREP Act is a federal action for "death or serious physical injury proximately caused by willful misconduct." [6] 42 U.S.C. § 247d-6d(d)(1). That exception does not exempt BIPA statutory violations from the Act's immunity protections. Because Redd does not allege death or serious physical injury, the only exception to the Act's immunity does not include Redd's BIPA claims.

Moreover, the Act bars all claims "under Federal and State law" that assert "any type of loss" related to administration or use of covered countermeasures. 42 U.S.C. §§ 247d-6d(a)(1), 247d-6d(a)(2)(A). Redd's BIPA claims plainly assert a type of privacy loss. *See* SAC ¶ 9 (alleged "[a]s a result

of Defendants' conduct, Plaintiff and the putative Class lost the right to control the collection, use, and storage of their biometric identifiers and information and were exposed to ongoing, serious, and irreversible privacy risks."); *McDonald*, 456 Ill.Dec. 845, 193 N.E.3d at 1267 (BIPA claim asserted the "*loss* of the ability to maintain [ ] privacy rights.") (emphasis added); *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 620 (7th Cir. 2020) (Defendant's "failure to comply with the [BIPA] resulted, both for [plaintiff] and others similarly situated, in the *loss of the right* to control their biometric identifiers and information.") (emphasis added).

Redd's interpretation of what constitutes a covered "loss" under the PREP Act contravenes the Act's express language. Again, Section 247d-6d(a)(1) states PREP Act immunity applies to "*all claims for loss* caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure[.]" (emphasis added). In turn, Section 247d-6d(a)(2)(A) defines "loss" in sweeping terms to mean "*any* type of loss, *including*"—not limited to—the enumerated examples. [7] (Emphasis added). In other words, the list of covered losses in Section 247d-6d(a)(2)(A) is illustrative, rather than exhaustive. See *Campbell v. Acuff-Rose, Music, Inc.*, 510 U.S. 569, 577–78, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (statutory use of the term "including" indicates an " 'illustrative and not limitative' function of the examples given") (citation omitted); *Simon v. Cooperative Educational Service Agency #5*, 46 F.4th 602, 608 (7th Cir. 2022) (explaining that the word "including" suggests "an illustrative—rather than exhaustive—list."). Therefore, the four examples in the Act are not the exclusive examples of the types of loss covered under the PREP Act.

**\*4** To support her argument, Redd relies upon an advisory opinion of the General Counsel of the Department of the Department of Health and Human Services, which states that "PREP Act immunity ... is limited to claims for death, physical, mental or emotional injury, illness, disability or condition, fear of such harm or need for medical monitoring, and damage to property, including business interruption loss." U.S. Dep't of Health & Human Servs., Off. of Gen. Couns., Advisory Op. 20-04 at 3 (Oct. 23, 2020). But Advisory Opinion 20-04 does not help Redd because the opinion itself states that it does not "bind the Department of Health and Human Services or the federal courts" and it "does not have the force or effect of law." Moreover, Advisory Opinion 20-04 provides no analysis for its conclusion. The opinion cites only to 42 U.S.C. § 247d-6d generally and a May 19, 2020 Advisory Opinion of the General Counsel, which

itself cites no authority for the proposition that PREP Act immunity is limited to personal injury or damage to property. *Id.* at 3 n.13 (citing https://www.hhs.gov/sites/default/files/prep-act-advisory-opinion-hhs-ogc.pdf). As explained above, the General Counsel's opinion is contrary to the plain text of the Act. Accordingly, it is not persuasive and is entitled to no deference on the question of whether the PREP Act immunity is limited to personal injury or damage to property clams. *See Martin*, 37 F.4th at 1214 (rejecting General Counsel of the Department of Health and Human Services' interpretation of the PREP Act where the "reasoning [was] thin" and "apply[ing] the statute without an administrative overlay.").

The other authorities Redd relies on to support her assertion that the PREP Act immunity applies only to certain tort claims are equally unavailing. *McDonald v. Symphony Bronzeville Park, LLC*, 456 Ill.Dec. 845, 193 N.E.3d 1253 (Ill. S. Ct. 2022), concerned whether the exclusivity provisions of the Illinois Workers' Compensation Act barred an employee's claims for liquidated damages under the BIPA. The Illinois Supreme Court held that IWCA's exclusivity provision applies only to claims alleging "harmful change[s] in the human organism" and does not preempt BIPA claims for violation of a privacy right in the employment context. *Id.* at 1267-68. *McDonald's* analysis has no application here on the scope of the PREP Act, which broadly defines the "claims for loss" as "*any* type of loss, *including*" physical, mental, or emotional injury. 42 U.S.C. § 247d-6d(a)(2)(A). Redd also cites two district court decisions from this district finding that the violation of a privacy right under BIPA is not a physical or psychological injury subject to Illinois's two-year statute of limitations for personal injury actions. *Vaughan v. Biomat USA, Inc.*, 2022 WL 4329094, at *11 (N.D. Ill. Sept. 19, 2022); *Quarles v. Pret A Manger (USA) Ltd.*, 2021 WL 1614518, at *4 (N.D. Ill. Apr. 26, 2021). However, neither decision involves, let alone analyzed, the question of whether a BIPA claim is a covered loss under the PREP Act. Accordingly, these cases also have no bearing on the scope of the PREP Act. Thus, the Court concludes that Redd's BIPA claims assert a loss within the scope of PREP Act immunity.

The PREP Act also requires a causal nexus with the administration or use of a countermeasure. Redd argues that her claims are not causally related to Amazon's use of ICI camera systems. Specifically, she contends that her claims "stem" not from Amazon's use of the ICI camera systems "in and of itself," but, rather, "from Amazon's failure to follow BIPA's informed consent requirements." Doc. 96 at 13. Further, Amazon argues that Redd's claims meet the § 247d-6d(a)(1) standard because her alleged losses "aris[e] out of" and "relate[e] to" Amazon's deployment of the ICI camera systems. Amazon similarly contends that Redd's alleged losses have a causal relationship to Amazon's use of the ICI cameras. [8]

Section 247d-6d(a)(1) provides immunity to "all claims for loss *caused by, arising out of, relating to, or resulting from* the administration to or the use by an individual of a covered countermeasure." (emphasis added). The Seventh Circuit has not considered the meaning of the phrases "arising out of" or "relating to" in § 247d-6d(a)(1) of the PREP Act. In other contexts, the Seventh Circuit has found that the ordinary meaning of "arising out of" or "relating to" is broad. *United States v. Liestman*, 97 F.4th 1054, 1061 (7th Cir. 2024) ("relating to" is ordinarily "the broadest of connecting language."); *IAC/InterActive Corp v. Roston*, 44 F.4th 635, 641 (7th Cir. 2022) (wording "arising out of or related to ... is quite broad"); *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002) (characterizing an arbitration clause covering all claims either "arising out of" or "relating to" the contract as "a very broad, standard arbitration clause"); *Gregory v. Home Ins. Co.*, 876 F.2d 602, 606 (7th Cir. 1989) (" 'related to' covers a very broad range of connections.").

**\*5** In a recent opinion by the Ninth Circuit, the Court examined whether the plaintiff's claims were for loss "relating to" the use of a covered countermeasure within § 247d-6d(a)(1). *Hampton v. California*, 83 F.4th 754, 763-65 (9th Cir. 2023). The Ninth Circuit explained that the surrounding verbal phrases of "caused by," "arising out of," and "resulting from" in § 247d-6d(a)(1) "all connote some type of causal relationship." *Id.* at 764. The Court held that "[a]t the very least, then, for PREP Act immunity to apply, the underlying use or administration of a covered countermeasure must have played some role in bringing about or contributing to the plaintiff's injury. It is not enough that some countermeasure's use could be described as relating to the events underpinning the claim in some broad sense." *Id.* at 764.

Amazon's administration of the ICI camera systems without informed consent clearly "played some role in bringing about or contributing to [Redd's] injury." *Hampton*, 83 F.4th at 764. Redd claims that her loss of the ability to maintain her privacy was caused by Amazon's failure to comply with BIPA's requirements prior to use of the ICI camera systems. Redd's claims thus flow directly from the administration and use of the ICI camera systems. In other words, the fact that Amazon administered and used the ICI camera systems, in

and of itself, dictated whether it needed to follow BIPA's informed consent requirements. If Amazon had not used the cameras, the issue of consent would be moot. Thus, the use of the cameras is *a* key nexus to Redd's claim, and ultimately contributed to the injury and the alleged privacy violation that she claims she suffered. Under the broad language of "arising out" of or "relating to," the use of the cameras need not be the sole cause of the injury, but simply one that played some role in that situation, which, as demonstrated above, it plainly did.

Moreover, several courts have persuasively held that PREP ACT immunity applies to similar claims based on lack of informed consent regarding countermeasures. *Deborah Fust v. Gilead Sciences, Inc.*, 2024 WL 732965, at *5–7 (E.D. Cal. Feb. 21, 2024) (the PREP Act immunity applied to plaintiffs' claims for physical injuries and death based on lack of informed consent about the dangers of taking an antiviral medication for COVID-19 treatment), reconsideration denied, *Fust v. Gilead Sciences, Inc.*, 2024 WL 1367353 (E.D. Cal. Apr. 1, 2024); *Baghikian v. Providence Health & Services*, 2024 WL 487769, at *4 (C.D. Cal. Feb. 6, 2024) ("the PREP Act applies to claims based on failure to obtain consent."); *Bird v. State*, 537 P.3d 332 (S. Ct. Wyo. 2023) (the PREP Act barred prisoners' claims that they did not give consent to receive Janssen COVID-19 vaccine because their claims were causally related to the administration of a covered countermeasure and did not involve death or serious physical injury caused by willful conduct); *M.T. v. Walmart Stores, Inc.*, 63 Kan.App.2d 401, 528 P.3d 1067, 1084 (Kan. App. 2023) (the PREP Act applies to "claims based on the failure to obtain consent" and "a claim based on the administration of a covered countermeasure without parental consent is causally related to the administration of a covered countermeasure."); *Cowen v. Walgreen Co.*, 2022 WL 17640208, at * 3 (N.D. Okla. Dec. 13, 2022) (plaintiff's injuries from receiving COVID-19 vaccination without her knowledge or consent "actually resulted from administration of the COVID-19 vaccine"); *Happel v. Guilford Cty. Bod. of Ed.*, 899 S.E.2d 387, 394 (N.C. App. 2024) (the "broad scope of immunity provided by the PREP Act applies" to "[p]laintiffs' claims relating to the administration of the COVID-19 vaccine" without parental consent); *Parker v. St. Lawrence County Pub. Health Dept.*, 102 A.D.3d 140, 143-44, 954 N.Y.S.2d 259 (N.Y. App. Div. 2012) (preemption clause and "sweeping" immunity language of BIPA barred all state law tort claims based on defendant's "failure to obtain [parental] consent" to use of countermeasure). [9]

**\*6** In contrast, Redd relies only on a single district court case, *Haro v. Kaiser Found. Hosps.*, 2020 WL 5291014 (C.D. Cal. Sept. 3, 2020). In *Haro*, the plaintiff claimed that the defendant had required its hourly employees to arrive at least 15 minutes before the start of their work shift so that they could undergo screening for COVID-19 but did not compensate the plaintiff for that time. *Id.* at *1. The plaintiff sought compensation under the state minimum wage laws. *Id.* The defendant contended that the PREP Act completely preempted plaintiff's claims. *Id.* The *Haro* court held it could not find that the PREP Act completely preempted the plaintiff's claims. *Id.* at *3. However, the court concluded that the plaintiff's minimum wage claim was "not causally connected to the screening procedures themselves, but rather the requirement that employees *show up 15 minutes before their shifts start.*" *Id.* (emphasis in original). Put another way, the employer's administration and use of the covered countermeasures did not contribute to that financial injury— whether the early arrival was for a COVID-19 screening or another work-related requirement was irrelevant because the cause of the injury was the unpaid time.

Unlike *Haro*, Redd's alleged injuries have nothing to do with Amazon's compensation policies related to its temperature checks. Rather, Redd claims that her privacy loss is exclusively attributable to Amazon's administration or use of the ICI camera systems without informed consent. The alleged harm inflicted was not independent of the administration and use of the ICI camera systems. The Court therefore concludes that Redd's BIPA claims and injuries are based on Amazon's administration and use of the ICI camera systems for temperature checks to prevent the spread of COVID-19. Since the administration and use of the ICI camera systems played a role in bringing about or contributing to Redd's injury, the PREP Act applies.

## CONCLUSION

For the foregoing reasons, Amazon is entitled to statutory immunity based on the PREP Act. Judgment shall enter in favor of Amazon and against Redd. Because the Court is granting Amazon's motion for summary judgment on Redd's individual claims and no class has been certified, this case is terminated. *Phillips v. Ford Motor Co.*, 435 F.3d 785, 787 (7th Cir. 2006) ("[I]f no motion to certify has been filed (perhaps if it has been filed but not acted on), the case is not yet a class action and so a dismissal of the named plaintiff[']s claims should end the case.").

**SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 2831463, Med & Med GD (CCH) P 308,105

---

### Footnotes

1   Redd brought this lawsuit against Amazon.com, Inc. and Amazon.com LLC. Amazon states that Amazon.com LLC no longer exists and therefore is not a proper defendant. Amazon assumes, and Redd does not dispute, that she intended to sue the entity that currently employs her—namely, Amazon.com Services LLC.

2   The facts are largely taken from Redd's response to Amazon's Local Rule 56.1 statement of facts ("PRDSOF"). Doc. 97. They are undisputed unless otherwise noted.

3   The Court takes judicial notice of the Secretary's Declaration, which is publicly available on the U.S. Department of Health and Human Services website. "District courts can take judicial notice of information on government websites." *Bartnett v. Abbott Laboratories*, 492 F.Supp.3d 787,798 n.2 (N.D. Ill. 2020) (citing *Denius v. Dunlop*, 330 F.3d 919, 926-27 (7th Cir. 2003)); *see also Pickett v. Sheridan Health Care Center*, 664 F.3d 632, 648 (7th Cir. 2011) ("We have recognized the authority of a court to take judicial notice of government websites.").

4   In response to Amazon's Local Rule 56.1 statement of facts, Redd objected that several paragraphs contain improper opinions of counsel and legal arguments, do not address material facts, and contain multiple assertions per paragraph. *See* Doc. 97 at 1-2. To the extent the Court agreed with Redd, the Court disregarded any opinions, legal arguments and immaterial facts set forth in Amazon's Local Rule 56.1 statement of facts. Redd also objected to many of Amazon's statements of fact "on grounds that the statement is vague, conclusory, misleading, unsupported, lacks foundation, assumes facts not in evidence and calls for speculation." *See, e.g.* ¶¶ 19, 21, 24, 25, 27, 29, 30, 35, 43. However, Redd does not explain how this boilerplate objection applied to the particular statements of fact, and the Court will not speculate as to the specific alleged error in the statements of fact. For this reason, Redd's undeveloped and conclusory objections are inadequate and overruled. *Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1063 (7th Cir. 2020) ("Arguments that are underdeveloped, cursory, and lack supporting authority are waived."). Nevertheless, to the extent the Court understood the basis for the objection, it was considered. Moreover, in other instances, Redd made conclusory objections on the ground that a statement of fact "mischaracterizes the cited document" or "mischaracterizes witness testimony." *See, e.g.*, ¶¶ 19, 21, 25, 27. Again, Redd has not demonstrated why she believes the particular statements of fact mischaracterize the evidence and her conclusory objections carry no weight. In any event, having reviewed Redd's conclusory boilerplate objections, the Court considered only relevant, admissible, and supported facts. Finally, Redd challenges certain statements of fact because Amazon relies on a "self-serving declaration from a current Amazon employee, Dave Nichols, who was never previously disclosed by [Amazon] and was only identified at a very late stage of the litigation as someone with personal knowledge as to the location or positioning" of Amazon's ICI camera systems. *See, e.g.*, ¶ 43. Redd claims Amazon identified Nichols "for the very first time" on May 4, 2022 as a person with information about the cameras and software at MDW7. Doc. 96 at 8. As a threshold matter, this objection is meritless because the record discloses that Amazon produced internal communications involving Nichols and the thermal camera setup as early as November 2021, before the original fact discovery deadline of February 28, 2022. Doc. 45; Doc. 104-1 at ¶ 3; Doc. 104-2 at 7. Moreover, Redd does not demonstrate why identifying Nichols "before the amended discovery deadline" of

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.          6

June 30, 2022 was improper. Doc. 77. If Redd believed Amazon engaged in improper discovery tactics by failing to disclose Nichols as part of its Rule 26(a)(1) disclosures, she could have filed a Rule 37(c)(1) motion seeking relief. Lastly, "[s]elf-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment." *McKinney v. Office of Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017) (internal quotes and citation omitted); *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("As we have repeatedly emphasized over the past decade, the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment.") (citations omitted).

5    Fever is a common symptom of COVID-19. *See* U.S. Food and Drug Admin. ("FDA"), Enforcement Policy for Clinical Electronic Thermometers at 2 n.2 (Nov. 3, 2023). The Court considers the Enforcement Policy because it is publicly available on the U.S. Food and Drug Administration website. https://www.fda.gov/media/136698/download.

6    Such claims for willful misconduct must be filed in the United States District Court for the District of Columbia. *See id.* § 247d-6d(e)(1); *Martin v. Petersen Health Operations, LLC*, 37 F.4th 1210, 1213 (7th Cir. 202 19842) (§ 247d-6d(d)(1) "create[s] a federal claim (payable from a federal fund)" and "covers only a subset of potential wrongs, those involving willful misconduct in using covered countermeasures.").

7    Section 247d-6d(a)(2)(A) defines "loss" as "any type of loss, including—(i) death; (ii) physical, mental or emotional injury, illness, disability, or condition; (iii) fear of physical, mental or emotional injury, illness, disability, or condition, including any need for medical monitoring; and (iv) loss of or damage to property, including business interruption loss. 42 U.S.C. § 247d-6d(a)(2)(A).

8    *See also* 42 U.S.C. § 247b-6d(a)(2)(B) ("The immunity under paragraph (1) applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the ... administration ... or use of such countermeasure.").

9    *See also Storment v. Walgreen Co.*, 2022 WL 2966607, at *3 (D. N.M. July 27, 2022) (PREP Act barred negligence claims arising out of injuries sustained from falling in parking lot after receiving COVID-19 vaccine where store failed to provide "chairs to sit on for monitoring" after vaccination, which could not be "divorced from the administration of a covered countermeasure.")

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Jason R. Hull [11202]
jhull@mohtrial.com
Anikka T. Hoidal [16489]
ahoidal@mohtrial.com
**MARSHALL OLSON & HULL, PC**
Newhouse Building
Ten Exchange Place, Suite 350
Salt Lake City, Utah 84111
Tel: (801) 456-7655

*Attorneys for Plaintiff*

*Admitted Pro Hac Vice*

Aaron Siri*
aaron@sirillp.com
Elizabeth A. Brehm*
ebrehm@sirillp.com
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Ste 500
New York, NY 10151
Tel: (888) 747-4529

Michael Connett*
mconnett@sirillp.com
**SIRI & GLIMSTAD LLP**
700 S. Flower St., Suite 1000
Los Angeles, CA 90017
Tel: (888) 747-4529

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| BRIANNE DRESSEN,<br><br>      Plaintiff,<br><br>v.<br><br>ASTRAZENECA AB; ASTRAZENECA PHARMACEUTICALS LP; and VELOCITY CLINICAL RESEARCH, INC.,<br><br>      Defendants. | **PLAINTIFF'S RESPONSE TO ASTRAZENECA DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**<br><br>Case No: 2:24-cv-00337-RJS-CMR<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

      The district court decision that AstraZeneca has identified in its Notice of Supplemental Authority is one of many cases that has held that the PREP Act immunizes *tortious* conduct (i.e., invasion of privacy). ECF No. 46 (citing *Redd v. Amazon.com, Inc.*, No. 20 C 6485, 2024 WL 2831463 (N.D. Ill. June 4, 2024)). The *Redd* decision—published three weeks *before* AstraZeneca

filed its Motion to Dismiss—does *not* address a breach of contract. AstraZeneca once again, therefore, has failed to identify any case involving a state *contract* claim, thus further highlighting that no court in this country has ever applied the PREP Act to immunize a willful breach of a contractual obligation.

Dated this 17th day of October, 2024.

SIRI & GLIMSTAD LLP

By:      *Michael Connett*
         AARON SIRI*
         ELIZABETH A. BREHM*
         MICHAEL CONNETT*

*Admitted Pro Hac Vice*

MARSHALL OLSON & HULL, PC

JASON R. HULL
ANIKKA T. HOIDAL

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of October, 2024, I caused the foregoing **PLAINTIFF'S RESPONSE TO ASTRAZENECA DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY** to be filed via the court's CM/ECF system, which transmitted notice of such filing to all counsel of record.

*/s/ Michael Connett*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 4, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users.

Dated: April 4, 2025                    */s/ R. Reeves Anderson*
                                        R. Reeves Anderson